*AUDILETT LAW PC*
335 NORTH WILMOT RD SUITE 500
TUCSON, ARIZONA 85711-2636
(520) 748-2440
Email: daa@audilettlaw.com
Daryl A. Audilett, Esq.
State Bar No. 009007; PCC No. 2036
Attorney for Defendants Nanos, Caudillo, Moseley and Pima County

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Anna Christine Lewis, et al.,<br><br>Plaintiffs,<br>vs.<br><br>Chris Nanos, et al.,<br><br>Defendants. | NO. CV 21-00557-TUC-RM<br><br>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>(ORAL ARGUMENT REQUESTED)<br><br>(The Honorable Rosemary Marquez) |

Defendants Christopher Nanos, Gilberto Caudillo, Michael Moseley and Pima County move for summary judgment pursuant to Rule 56(a), F.R.Civ.P. on all of Plaintiffs' claims.

**SUMMARY JUDGMENT PRINCIPLES**

Summary judgment is proper when: (1) the movant shows that there is no genuine dispute as to any material fact; and (2) that after viewing the evidence most favorably to the non-moving party, the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

**INTRODUCTION**

On January 20, 2021, at approximately 6:44 a.m., Deputy Gilbert Caudillo fatally shot Bradley Alexander Lewis (Lewis). There was a Probable Cause Alert for the arrest of Lewis,

arising from a December 4, 2020 assault with a deadly weapon (AWDW). Lewis pointed a black handgun at two young men, saying, "I've dropped ten bodies you're just a number to me. I'll do it again." On January 20, 2021 in the early morning hours, Lewis became a suspect in car burglaries. Lewis's blue truck was located. Deputies arrived and conducted a high risk stop. Lewis fled in his truck and drove into his grandparents Stricklens' driveway. (DSSOF 407, photo of locations, DSSOF 187, 369, photo of vehicles in driveway.) Lewis stopped his truck, exiting quickly. Instead of running away from the deputies, Lewis advanced rapidly directly toward Deputy Caudillo. Deputy Caudillo exited his vehicle and drew his firearm, pointing it at Lewis. Lewis's right hand came up with a black object that Deputy Caudillo perceived to be a gun. Deputy Caudillo fired three shots rapidly. From Lewis exiting his truck, to the shooting, 2 to 4 seconds elapsed. Lewis landed only 6 to 8 feet from Deputy Caudillo. The object was a black key fob and lanyard. (DSSOF 408, photos.)

## FACTUAL BACKGROUND
## THE LEWIS DECEMBER 4, 2020 ASSAULT WITH DEADLY WEAPON

On December 4, 2020, Lewis stopped his blue Toyota Tacoma truck on a residential street, got out, and pointed a black handgun at two young men, one of them a previous co-worker. Lewis was identified by name. Lewis told them, "I've dropped ten bodies before, you're just a number to me. I'll do it again." (DSSOF 17.) Deputy Pool responded, interviewed the two victims, and wrote a report. (DSSOF 4-39.)

## PCSD DETECTIVE CHAMONIX VALDEZ GOES LOOKING FOR LEWIS

Twelve days later, on December 16, 2020, Detective Valdez and Detective Houston followed up and went to 6671 N. Paseo De Angel looking for Lewis. (DSSOF 61-67.)

Lewis's grandfather, Ralph Stricklen, denied having information on Lewis's whereabouts. (DSSOF 68, 69, 73, 76.) Detective Valdez left her contact information with Mr. Stricklen to pass along to Lewis. Valdez told Stricklen to tell Lewis it was a serious matter that would not go away. Valdez was not thereafter contacted by Lewis. (DSSOF 72, 74, 75, 85.)

Two days later, on December 18, 2020, Detective Valdez initiated a Probable Cause Alert on Lewis for the December 4, 2020, AWDW, assault with a deadly weapon. A Probable Cause Alert notifies deputies that there is probable cause to arrest the suspect for the crime described. The Probable Cause Alert contained Lewis's identification and the crime. It included the fact that Lewis was driving a blue Toyota Tacoma, and had threatened two young men with a black handgun, saying, "I've dropped ten bodies, you're just a number to me. I'll do it again." (DSSOF 77-84.)

**<u>PCSD DEPUTY DAVID BAIRD INVESTIGATES CAR BURGLARIES</u>**

On January 20, 2021, Lewis became a suspect for car burglaries. At approximately 3:22 a.m., a resident called 911 to report a man trying to open unlocked car doors. Deputy Baird responded. (DSSOF 88-90.) Two residents showed him surveillance video of the suspect, one resident's video showed the suspect driving a blue pickup truck. (DSSOF 92, 96-99, 104-109, 110-111.)

Deputy Baird requested Communications to broadcast an "Attempt To Locate" the blue truck. (DSSOF 113.) A Marana PD Officer advised Deputy Baird that they also were looking for that truck, and the suspect Bradley Lewis. (DSSOF 114-115.) Deputy Baird located Lewis in his computer. A photo of Lewis, that he was 19 years old, six-foot tall, thin

build, weighing 150 pounds, matched the male in the two residents' surveillance videos. Baird saw there was a PC Alert for AWDW for Lewis. (DSSOF 116-119.)

**PCSD SGT. MICHAEL MOSELEY AND DEPUTY CAUDILLO**

On December 16, 2021, Sgt. Moseley first learned from Detective Valdez about Lewis and his December 4, 2020 Assault With Deadly Weapon charge. (DSSOF 141.) Sgt. Moseley gathered additional information on Lewis. (DSSOF 141-144, 146, 148.)

1. On 12-04-2020, Lewis pulled a black handgun on an individual and said "I've dropped 10 bodies. You're just a number to me. I'll do it again." (DSSOF 145a, b.)

2. Lewis was arrested on April 6, 2020, involving guns and drugs. "Shots heard" was reported to PCSD. A traffic stop on Lewis revealed spent handgun shell casings on the floor of Lewis's driver's seat and the console. Guns and illegal drugs were present. (DSSOF 145c.)

3. In November 2020 a road rage victim told Sgt. Moseley that the shooter came from Positano. Positano is a side street to Shannon Road. Positano is intersected by N. Paseo de Angel. Lewis's known address was 6671 N. Paseo De Angel. (DSSOF 145d.)

4. On January 3, 2021, gunshots were fired at the house next door to Lewis's address at 6671 N. Paseo De Angel. (DSSOF 145e.)

The events that occurred on January 20, 2021 were pre-dawn, still dark out. (SSOF 46, 162.) On January 20, 2021, at 0530 a.m., Sgt. Moseley became aware that Lewis was a suspect in car burglaries that day. (DSSOF 149-152.) Sgt. Moseley drove to N. Paseo De Angel, looking for Lewis. (DSSOF 67.) There, he saw Lewis's blue Toyota Tacoma parked beside the road, and requested additional units. (DSSOF 155-57.)

Deputy Pool set up road spikes at Positano and N. Paseo De Angel. (DSSOF 45, 160.) After a briefing, Pool remembered Lewis from the 12/04/20 AWDW call. (DSSOF 43.) Sgt. Moseley requested air support and ballistic shields. (DSSOF 164, 168.) Deputies Berry and Gilbert arrived and with Sgt. Moseley conducted a "high risk stop" on the Lewis truck, loudly commanding Lewis (by name) to get out with his hands up. (DSSOF 165, 166.)

Deputy Caudillo knew about the Probable Cause Alert and about other incidents in which Lewis was suspected. (DSSOF 218-226.) When Sgt. Moseley radioed about being on Paseo De Angel with a blue Toyota Tacoma truck, Deputy Caudillo knew it involved Lewis, that Lewis was dangerous, and Caudillo wanted ballistic shields. (DSSOF 227-28.) Deputy Caudillo arrived, he and Sgt. Moseley planned to clear the blue truck first, then to check the surrounding neighborhood. (DSSOF 241-243.) Caudillo drove past the Lewis truck, with Deputy Robles and a ballistic shield in his back seat, U-turned, drove to the blue truck, and stopped at a 45-degree angle to the right front of the Lewis truck, within inches, to pin it. (DSSOF 243-249, 258.) Deputy Caudillo saw Lewis in the driver's seat, squeezed down, trying to hide. (DSSOF 250-251.) Deputy Caudillo radioed, "He's inside. He's in the car." (DSSOF 174, 254.) Lewis started the truck. (DSSOF 252.) Deputy Caudillo recognized Lewis from his mugshot. (DSSOF 251-53.)

Lewis reversed the truck, full throttle. (DSSOF 255.) Lewis shifted into drive, wheels spinning, dust flying. Lewis drove around the front of Deputy Caudillo's vehicle through tall, thick desert vegetation, bouncing up and down violently. (DSSOF 256.) Sgt. Moseley and Deputy Caudillo pursued. (DSSOF 176, 177, 259-60.) Lewis turned into the driveway

at 6671 N. Paseo de Angel and stopped. Then Lewis backed his truck. Sgt. Moseley drove forward and contacted the rear of Lewis's truck to block him from leaving. (DSSOF 178.)

Lewis drove forward again halfway up the driveway. Sgt. Moseley followed. (DSSOF 179.) Lewis stopped. Sgt. Moseley was getting out of his vehicle, when Lewis backed into the front of Sgt. Moseley's vehicle, jarring him pretty good. These events made Moseley fear for his life, if Lewis was going to get out and shoot. (DSSOF 180-184.) Lewis drove forward again. (DSSOF 184.) Deputy Caudillo drove past Sgt. Moseley on the right. (DSSOF 185.) Sgt. Moseley exited his vehicle and went up the driver's side of the Stricklens' nearby Ford F150 truck for cover. (DSSOF 186.) Sgt. Moseley saw Lewis's driver's side door fly open. (DSSOF 188.) Lewis got out lightning fast. (DSSOF 194-95.) Lewis looked directly to the rear of his truck and bolted rearward with a black object in his right hand. (DSSOF 194-96.) Sgt. Moseley's view of Lewis was very brief, "Boom, gone." (DSSOF 189.) Sgt. Moseley heard gunfire, pop, pop, pop, in quick succession. (DSSOF 196.)

As Deputy Caudillo approached the driveway behind Moseley he heard metal crunching, and then metal scraping and scratching. (DSSOF 263-264.) When the Lewis truck stopped, Deputy Caudillo thought that Lewis would flee on foot into the desert behind the house. (DSSOF 271.) Deputy Caudillo heard Sgt. Moseley shout in a frantic tone: "WATCH OUT, WATCH OUT." (DSSOF 276.) Deputy Caudillo was still in his driver's seat when he saw Lewis flying at him, moving so fast. (DSSOF 277.) Training shows that sitting in the driver's seat is a dangerous place for an officer to be, there is no mobility, he is a sitting duck, a stationary target. (DSSOF 278.) Lewis was coming right at him. (DSSOF

277.) In his 20 years as a patrol deputy, he had never had a suspect flee in such a dangerous and desperate manner, then stop the vehicle, get out and race back at him. (DSSOF 216.)

Deputy Caudillo took one step out of his vehicle, drew his handgun, came up with both hands, pointed at Lewis. (DSSOF 279.) Just before and at the time Deputy Caudillo fired, he saw Lewis moving his arms with a black object in his right hand that Deputy Caudillo believed was a gun. (DSSOF 280, 284.) Lewis was the distance from Deputy Caudillo's vehicle door to the front of his hood and just in front of that. (DSSOF 282.)

On September 11, 2023, Deputy Caudillo was shown photographs of defense police expert Steve Ijames holding the evidence key fob in a manner that could be perceived as a gun. Deputy Caudillo stated out loud, "That's what I saw", meaning that's the way that Lewis was holding the black object that he perceived to be a gun. (DSSOF 295.) At deposition, Deputy Caudillo described: "I see a gun. A black mass. A black square that looks just like a Glock. *** (H)is hand is in a position, as, like, if you were to hold a coffee cup. And above his index finger, on top of his -- there is a black mass that – it looks square. I think it's a Glock. I think it's a gun. And he's within *** six to eight feet from me, coming at me. I am -- I fear for my life." (DSSOF 280.) Deputy Caudillo thought that it was going to be a chest-to-chest firefight and that if he did not stop the threat, he was going to be killed, shot. (DSSOF 213, 287, 297.)

Lewis collapsed to the ground. (DSSOF 288.) After commands to show his hands, Lewis brought his right hand from underneath him and let go of what was in his right hand, a black key fob with a black lanyard. (DSSOF 290, 291, 408.) Moseley immediately radioed

"998" (officer involved shooting), and for medical assistance "10-18" (as soon as possible) Sgt. Moseley also requested that meds not hold off, but immediately come into the scene. (DSSOF 200-201, 204, 205, 293, 406.) Deputy M. Gilbert heard the gunshots from the location of the initial traffic stop area and immediately radioed "Shots fired." (DSSOF 348.)

**PLAINTIFFS' BIOMECHANICS EXPERT DR. JOSEPH PELES**

Dr. Peles opined that it would take 2.7 to 4.0 seconds for Lewis to travel from feet on the ground outside his driver's door to where Lewis was shot. (DSSOF 390.)

**DEFENDANTS' BIOMECHANICS EXPERT MICHAEL KUZEL**

Defense biomechanics and human factors expert Kuzel does not generally dispute that time frame, but adds the opinion that Deputy Caudillo had 2-4 seconds of time, and his decision had to be made before that, in one or less than 1 second of time; he has to make a decision that is predictive in nature, not reactive. (DSSOF 391, 392.) An officer has to predict what the person is going to do next. Research shows that actions beat reaction. An officer who waits to react is potentially at greatest risk. (DSSOF 393.)

**DEFENSE BALLISTICS AND SCENE EXPERT MATTHEW NOEDEL**

Matthew Noedel is a forensic scientist and an expert in ballistics and shooting scene reconstruction. (DSSOF 394.) Noedel conducted a live fire reenactment of Deputy Caudillo exiting his patrol car, standing, and delivering three shots from between his open door and the A pillar. Noedel concluded: (1) the timing for Deputy Caudillo to exit his vehicle and deliver three gunshots was likely in the range of 3 to 4 seconds; (2) the fired cartridge cases mostly landed on the passenger side windshield, consistent with where two of the three fired

cartridge cases landed on 01/20/21; (3) Lewis fell with his head/shoulders 2.5 feet behind his Toyota truck and 6.5 feet in front of Deputy Caudillo's shooting position. (DSSOF 395.)

**PCSD DEPUTY JUSTIN BERRY ARRIVED BEHIND DEPUTY CAUDILLO**

Deputy Berry drove behind Deputy Caudillo from the traffic stop area to the Stricklen driveway, about 100 yards. (DSSOF 325-26.) Deputy Berry encountered Ralph Stricklen standing in the driveway, and commanded him to show his hands. (DSSOF 327, 329.) Deputy Berry heard someone else giving commands, then three gunshots. (DSSOF 330.)

**BYSTANDERS WHO HEARD COMMANDS GIVEN**

Neighbor Jeffrey Garrett heard someone yell very loudly: "Show me your hands!" then three or four seconds later he heard three gunshots in rapid succession. (DSSOF 374-379) Ralph Stricklen heard a deputy say, "Stop. Put it down." (DSSOF 384.) Helen Stricklen heard officers call out: "Hands in the air" before she heard a gunshot. (DSSOF 383.)

**PCSD DEPUTY MATTHEW GILBERT**

Deputy Gilbert heard the gunshots when he was still at the traffic stop scene, from where the blue truck had fled. (DSSOF 348.) The traffic stop area is located about 100 yards from the Stricklen driveway. (DSSOF 326.) Deputy Gilbert immediately radioed "shots fired". (DSSOF 207, 348, 331, 407.)

**PCSD DEPUTY MICHAEL JOSEPH**

Deputy Joseph arrived after the shooting. He assisted in pulling Lewis into an open space for medical aid. He saw Lewis losing consciousness. He provided CPR until NW Fire District paramedics arrived. (DSSOF 358-365.)

**NORTHWEST FIRE DISTRICT (NWFD) NOTIFICATION AND RESPONSE**

The shooting occurred at 06:44:19 a.m. (DSSOF 372, 406) NWFD calltaker was notified at 06:44:38. NWFD paramedics arrived at 06:50:57 and were at the patient (Lewis) at 06:52:16. (DSSOF 397.) Deputies were performing CPR and had applied a QuickClot bandage with pressure to the wound. (DSSOF 364, 365, 401.) Lewis was unconscious, unresponsive, pulseless, and not breathing. Generally speaking, that condition is not survivable. (DSSOF 402-405.)

**SHERIFF CHRISTOPHER NANOS**

Defendant Sheriff Nanos did not personally participate in any events that led to the shooting. Sheriff Nanos did not personally train any deputies, command staff, or supervisors involved in the Lewis shooting. (DSSOF 410-425.) Sheriff Nanos, in his individual capacity, is entitled to summary judgment on the merits and is entitled to qualified immunity.

**LEGAL DISCUSSION**

Pursuant to Court's Order (Doc. 22), the following claims remain. The Estate of Bradley Lewis: COUNT I - Fourth Amendment claim. Anna and Bradley Lewis: COUNT II - Fourteenth Amendment claim. Anna and Bradley Lewis: COUNT III – State Law Wrongful Death claim. Anna and Bradley Lewis: COUNT IV – Loss of Consortium claim. Helen and Ralph Stricklen: COUNT V – Property Damage claim.

**COUNT I: USE OF EXCESSIVE FORCE, 4TH AMENDMENT**

Deadly force is reasonable if "the officer has probable cause to believe that the suspect poses a significant threat of death or serious injury to the officer or others." *Tennessee v.*

*Garner*, 471 U.S. 1, 3 (1985). In *Graham v. Connor*, 490 U.S. 386 (1989), the U.S. Supreme Court held: “The ‘reasonableness’ of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.” Id. at 396. (Citations omitted.) “The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.” *Id*. at 396-97.

Deputy Caudillo had mere seconds to evaluate the threat presented by Lewis, who had previously threatened others with a black handgun, and was now carrying a black object in his right hand that Deputy Caudillo believed was a gun. Lewis was advancing at full speed towards Deputy Caudillo, having just moments before made desperate and dangerous efforts to flee in his truck. Lewis had ignored many commands to surrender at the initial high risk stop area.

Whether a particular use of force is objectively reasonable depends on several factors, including (1) the severity of the crime that prompted the use of force, (2) the threat posed by a suspect to the officer or others, and (3) whether the suspect is resisting arrest. *Id*. at 396. The most important *Graham* factor is whether the suspect poses an immediate threat to the safety of the officer or others. *Cutler v. Nanos*, 546 F.Supp.3d 856, 868-69 (2021), citing *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011).

Regarding (1) severity of the crime; deputies were trying to arrest Lewis for the December 4, 2020, Assault With Deadly Weapon, a dangerous felony. Regarding (2) the

threat posed to the officer or others; Lewis previously threatened others with a gun, he fled in his truck, stopped, exited and then advanced toward Deputy Caudillo in a threatening manner holding a black object that Deputy Caudillo perceived to be a gun. Regarding (3) whether Lewis was resisting arrest; Lewis ignored many commands and opportunities to surrender, then fled, driving recklessly.

Summary judgment is proper where an officer reasonably perceived a deadly threat and used deadly force, even though the suspect was not armed. *Waid v. County of Lyon*, 87 F.4th 383, 386, 390-93 (9th Cir., 2023), (officers shot unarmed man who ran at them in a residential hallway); *Lemmon v. City of Akron, Ohio*, 768 Fed.Appx. 410, 412-14 (6th Cir., April 17, 2020), (officer ordered suspect to show his hands, suspect placed hand in his front waistband, made quick movement towards officer who shot four times, suspect was unarmed); *Pollard v. City of Columbus, Ohio*, 780 F.3d 395, 398-400 (6th Cir., 2015) (suspect reached toward the vehicle floorboard, suspect ordered to show his hands, suspect extended his arms and clasped his hands into a shooting posture, officers called out “Don’t do it” and “Drop it,” suspect again reached down into the floorboard before making the same shooting posture, suspect was unarmed, 80 shots fired, 23 bullets struck suspect, killing him.)

In many cases, whether an officer’s actions were objectively reasonable is a pure question of law. *Cutler v. Nanos*, 546 F.Supp. 3d 856, 869 (D. Ariz. 2021); *Sinaloa Lake Owners Ass’n v. City of Simi Valley*, 70 F.3d 1095, 1099 (9th Cir. 1995); *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

Arizona District Court Judge James Soto recently (March 15, 2023) granted summary

judgment in a very similar case to the case at bar. PCSD Sgt. Navarro fatally shot Marvin O'Reilly, who was unarmed but holding a black object (medical device) that Sgt. Navarro perceived to be a gun. *O'Reilly v. Navarro*, et al., No. CV-21-00168-TUC-JAS, (Doc 35). Judge Soto held that "it was objectively reasonable for Officer Navarro to perceive the object in Marvin's hand as a gun, fear for his life, and use deadly force to defend himself by firing his gun at Marvin." *Id*., p. 6; (see additional "objectively reasonable" comments at pp. 5, 8.) Photos showing how the medical device could be held to look like a gun were submitted with the O'Reilly MSJ and SSOF. Those photos are very similar to the photos submitted in this Lewis case that show how the key fob and lanyard could be held to look like a gun. (*See* and compare DSSOF 409 [O'Reilly case materials] to DSSOF 295 [Lewis case].)

Plaintiffs here claim that there were other available options like physical restraint, pepper spray, batons, or tasers. (Second Amended Complaint, Doc 14, ¶ 99.) Less intrusive alternatives to deadly force are not required. *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1992) (the appropriate inquiry is whether the officers acted reasonably, not whether they had less intrusive alternatives available to them); *Wilkinson v. Torres*, 610 F.3d 546, 551 (9th Cir. 2010) (a reasonable use of deadly force encompasses a range of conduct, and the availability of a less-intrusive alternative will not render conduct unreasonable.) Plaintiffs claim that the officers had the option to retreat and arrest Lewis later. (Second Amended Complaint, Doc. 14, ¶ 99.) Officers have no duty to retreat. *Reed v. Hoy*, 909 F2d 324, 331 (9th Cir. 1989) (concluding duty to retreat would "be inconsistent with police officers' duty to the public"), overruled on other grounds by *Virginia v. Moore*, 553 U.S. 164, 175 (2008).) The 4th

Amendment claim fails.

**COUNT II: SUBSTANTIVE DUE PROCESS; 14TH AMENDMENT**

Plaintiffs Anna and Bradley Lewis's 14th Amendment claim requires proof that shooting Lewis "shocks the conscience". *Ochoa v. City of Mesa*, 26 F.4th 1050, 1056 (2022). There are two tests used to decide whether an officer's conduct "shocks the conscience"; (1) the "deliberate indifference" test and (2) the "purpose to harm" test. *Id.*

The (1) "deliberate indifference" test does not apply here. "Deliberation is not possible if the officers 'encounter[ed] fast paced circumstances presenting competing public safety obligations'." *Id.* The (2) "purpose to harm" test applies if the situation escalated so quickly that the officer had to make a snap judgment. *Id.* Lewis, known to threaten others with a black handgun, advanced threateningly at Deputy Caudillo, while holding a black object that Deputy Caudillo perceived to be a gun. Deputy Caudillo made a split-second judgment. The "purpose to harm" test requires proof that the officer acted with a purpose to harm for reasons unrelated to legitimate law enforcement objectives. *Id.* Legitimate objectives include arrest, self-protection, and protection of the public. *Id.* After being shot, Lewis collapsed only 6.5 feet from Deputy Caudillo. The 14th Amendment claim fails.

**COUNT III: WRONGFUL DEATH**

Plaintiffs Anna and Bradley Lewis's state law wrongful death claims (A.R.S. § 12-611 et seq.) fail because Deputy Caudillo's use of deadly force was objectively reasonable.

**COUNT IV: LOSS OF CONSORTIUM**

Plaintiffs Anna and Bradley Lewis's Loss of Consortium claims fail because Deputy

Caudillo's use of deadly force was objectively reasonable.

**COUNT V: DAMAGE TO PROPERTY**

Plaintiffs Stricklen never disclosed any economic loss, cost of repair or loss of use associated with the bullet damage to their Ford F150 truck. Deputy Caudillo firing the three bullets was objectively reasonable, justified, and necessary. The property damage claim fails.

**QUALIFIED IMMUNITY**

Qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

Qualified immunity protects officers unless (1) they violated a constitutional right, and (2) their alleged misconduct was clearly established at the time. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Reference Prong (1), neither Deputy Caudillo nor Sgt. Moseley violated a constitutional right. Prong (2) requires "existing precedent" to "place[] the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). A clearly established right usually requires "controlling authority or a robust consensus of cases of persuasive authority." *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018) (quoting *Ashcroft v. al Kidd*, 563 U.S. 731, 741-42 (2011).

Prong (2) was recently addressed by the 9th Circuit in a case factually similar to the case at bar. In *Waid v. County of Lyon*, 87 F.4th 383 (9th Cir. 2023), officers responded to a domestic violence call and were positioned in a hallway when the ***unarmed*** suspect ran at them. The officers fatally shot the suspect. *Waid* at 386.

The *Waid* Court found an absence of specific-case authority that: "[A] right [was] clearly established [and] 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right'." *Waid* at 387. The Court noted that: "[I]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Waid* at 387. The *Waid* Court then turned to "the obviousness principle, an exception to the specific-case requirement…". *Id.* The Court stated "that conduct [that] obviously violates the Fourth Amendment 'is particularly hard to make when officers encounter suspects every day in never-before-seen ways,' including 'countless confrontations … that yield endless permutations of outcomes and responses'." *Id*. (Citations omitted.)

In granting qualified immunity, the *Waid* Court reasoned that "[b]ecause this case does not present an obvious constitutional violation, plaintiffs must show controlling authorities (or a consensus of persuasive ones) that would have put every reasonable officer on notice that Wright's and Willey's conduct violated the Fourth Amendment. They have not done so." *Id*., at 389. Sheriff Nanos, Deputy Caudillo and Sgt. Moseley are entitled to qualified immunity.

**<u>PLAINTIFFS' CLAIMS AGAINST PIMA COUNTY AND SHERIFF NANOS</u>**

Plaintiffs allege that Pima County and Sheriff Nanos established policies, customs, practices, decisions, usages, etc., that unconstitutionally deprived citizens of their rights. (Second Amended Complaint, Doc. 14, ¶¶ 88-93.) Plaintiffs allege that Pima County and Sheriff Nanos failed to properly train, manage, control and equip Deputy Caudillo and Sgt.

Moseley, ratified, and covered up their alleged wrongful conduct. (Id., ¶¶ 102-103.) There is no evidence. Plaintiffs must identify a deficiency that demonstrates deliberate indifference and must establish sufficient facts to prove the deficiency is closely related to the constitutional injury. *Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989). Mere negligence is not enough. *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011.) No evidence, expert or otherwise, exists to support those claims. To prevail, Plaintiffs must prove that (1) the officer's actions were an unconstitutional use of excessive force, and (2) a Sheriff Nanos/Pima County policy caused the constitutional wrong. *Monell v. Dept. of Soc. Svs of New York*, 436 U.S. 658, 690-94 (1978). No evidence exists to support a *Monell* claim.

Sheriff Nanos did not personally train or supervise Sgt. Moseley or Deputy Caudillo. Nor did he direct or supervise any of the pre-shooting events. Plaintiffs' criticism of not having body worn cameras (BWC) has no legal significance. (DSSOF 389, Opinion Eight.) There is no national standard requiring BWC, nor evidence that lack of BWC encourages excessive force. (*Id.*)

**PLAINTIFFS' CLAIM OF FAILURE TO PROVIDE MEDICAL AID**

Plaintiffs' failure to render medical aid claim fails. (Second Amended Complaint, Doc. 14, ¶¶ 56-58.) Sgt. Moseley immediately requested medical and advised to have them come directly into the scene, which they did. Deputy Caudillo searched for wounds. Deputy Joseph gave CPR until medical arrived. (DSSOF 292, 363-365.) The shooting occurred at 06:44:19. (DSSOF 372, 406.) The NW Fire call taker was notified at 06:44:38. The NW Fire

dispatcher was notified at 06:45:08. Units were dispatched at 06:45:18, enroute at 06:47:10, at the scene at 06:50:57, at the patient at 06:52:16. (DSSOF 396, 397, 406.)

A police officer who promptly summons the necessary medical assistance has acted reasonably for purposes of the Fourth Amendment. *Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1099 (2006).

**CONCLUSION**

Caudillo had 2 to 4 seconds to evaluate Lewis advancing while holding a black object that Caudillo believed was a gun. His use of deadly force was objectively reasonable. There is no evidence of conduct that "shocks the conscience," was "deliberately indifferent," or done with "purpose to harm." There is no evidence to support a *Monell* claim against Pima County or Sheriff Nanos. There is no evidence to support a claim against Sheriff Nanos in his individual capacity. Nanos, Moseley and Caudillo are entitled to qualified immunity. Caudillo's use of force was justified under ARS § 13-410. Stricklen's property damage claim lacks evidence of valuation. It is barred because the shooting was objectively reasonable.

DATED this 19th day of January, 2024.

*AUDILETT LAW PC*

/s/ Daryl Audilett

Daryl A. Audilett
Attorney for Defendants Nanos, Caudillo, Moseley and Pima County

CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Eduardo H. Coronado, Esq.
CORONADO LAW FIRM, P.L.L.C.
4700 W. White Mountain Boulevard, Suite A
Lakeside, AZ 85929
**Attorney for Plaintiffs**

By /s/ Karen Audilett