*AUDILETT LAW PC*
335 NORTH WILMOT RD SUITE 500
TUCSON, ARIZONA 85711-2636
(520) 748-2440
Email: daa@audilettlaw.com
Daryl A. Audilett, Esq.
State Bar No. 009007; PCC No. 2036
Attorney for Defendants Nanos, Caudillo, Moseley and Pima County

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Anna Christine Lewis, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>Chris Nanos, et al.,<br><br>Defendants. | NO. CV 21-00557-TUC-RM<br><br>DEFENDANTS' SEPARATE STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT<br><br>(ORAL ARGUMENT REQUESTED)<br><br>(The Honorable Rosemary Marquez) |

The following Separate Statement of Facts and attached exhibits are submitted in support of Defendants Sheriff Chris Nanos, Sergeant Gilberto Caudillo, Lieutenant Michael Moseley, and Pima County's Motion for Summary Judgment on all of Plaintiffs' claims.

**<u>PCSD DEPUTY ANTHONY POOL</u>**

1. Anthony Pool is a deputy with the Pima County Sheriff's Department (PCSD). He began his law enforcement career in January 2020 after completing the PCSD law enforcement academy and becoming certified by Arizona Peace Officers Standards and Training (AZPOST). (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 1.)

2. Deputy Pool's primary positions held with PCSD to date have been patrol and DUI

Traffic Enforcement. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 2.)

3. On 12/04/2020 Deputy Pool was working as a PCSD patrol deputy in the Foothills District. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 3.)

4. On 12/04/2020 at 1225 hours, Deputy Pool responded to the intersection of North Thornwood Road and West Meadow Briar Drive in reference to a report of an incident of armed with a deadly weapon. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 4.)

5. Deputy Pool was the responsible officer on the call on 12/04/2020, and a true and accurate copy of the report on that incident is attached to his Declaration as Exhibit A. Deputy Pool's supplements are at pages 8-10 and page 13. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 5.)

6. The contents of Exhibit A accurately describe the activities Deputy Pool engaged in regarding that incident, and the information that Deputy Pool collected during his investigation of that incident on 12/04/2020. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 6.)

7. At the scene on 12/04/2020 Deputy Pool took recorded statements of Chip Frank and Jeremy Perry. Deputy Pool has reviewed the transcripts attached to his Declaration with the audio recordings of the statements. The transcripts attached to the Declaration are true and accurate transcripts of the statements Deputy Pool took of Chip Frank (Exhibit B) and Jeremy Perry (Exhibit C). (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 7.)

8. PCSD Deputy D. J. Obral #1463 took a recorded statement from witness off-duty Tucson Police Department Officer Darren Williams. Deputy Obral's supplement is contained

in Exhibit A to Pool's Declaration, pp. 11 and 12. Deputy Pool reviewed the audio recording of the statement of Darren Williams with the transcript attached to Pool's Declaration as Exhibit D, and that transcript is a true and accurate transcription of the recorded statement of witness off-duty Tucson Police Department Officer Darren Williams. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 8.)

9. The information that Deputy Pool was provided by communications prior to his arrival indicated that the incident involved a white male in a blue Toyota Tacoma, last seen heading northbound. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 9.)

10. The Toyota Tacoma had a temporary paper license plate, with an unknown plate number. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 10.)

11. The white male had stepped out of the vehicle and pointed a gun at another person. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 11.)

12. The suspect was identified as Bradley, unknown last name. Bradley used to work with the victim. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 12.)

13. Deputy Pool was told by Communications that witnesses will be standing by waiting for deputies to respond. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 13.)

14. Upon his arrival, Deputy Pool made contact with one of the witnesses, Darren Williams, who informed Deputy Pool that he was an off-duty Tucson Police Department (TPD) officer and he was a witness to the events that had just occurred. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 14.)

15. Darren Williams described that a white male, last seen wearing a camouflage hat

and a white tank top, stepped out of a blue Toyota Tacoma and pointed a gun at one of the individuals that Williams was now standing by with, Chip Frank. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 15.)

16. Deputy Pool then asked Chip Frank what had gone on. Chip Frank informed Deputy Pool that while he and his friend Jeremy were walking along the sidewalk at the intersection of Thornwood Road and Meadow Briar Drive, that an individual who he identified as an ex-coworker, Bradley, had "pulled up and started talking shit." (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 16.)

17. Chip Frank said that as the argument escalated, Bradley stepped out of the blue Toyota Tacoma and then reached in his front waistband and pulled out what looked like a black handgun and pointed it at Chip Frank, stating, "I've dropped ten bodies before and you're just a number to me. I'll do it again." (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 17.)

18. Chip Frank told Deputy Pool that he and Bradley were ex-coworkers at the McDonald's on Ina Road. Chip Frank said that Bradley was always having negative interactions with other coworkers and was always looking to pick fights. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 18.)

19. Deputy Pool then asked if Mr. Frank knew Bradley's last name so Pool could look him up on his department-issued Mobile Data Computer (MDC). Chip Frank contacted his work and informed Deputy Pool that Bradley's name is Bradley Lewis. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 19.)

20. Chip Frank told Deputy Pool that he recognized Bradley Lewis from work and he could easily identify Bradley Lewis. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 20.)

21. Deputy Pool then contacted Deputy D.J. Obral who had arrived on the scene as a backup unit. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 21.)

22. Deputy Pool then contacted Sgt. D.A. Welch and advised him of the situation. Sgt. Welch informed Pool that Bradley Lewis was a person of interest in a burglary incident, case #201120073. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 22.)

23. Sgt. Welch directed Deputy Pool to contact the Robbery/Assault Unit, specifically Sgt. M.A. Rosalik, to advise him of the situation, and to determine the next steps for the investigation involving this Assault With a Deadly Weapon (AWDW) incident involving Bradley Lewis and Chip Frank. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 23.)

24. Bradley Lewis's name and last known address of 6671 N. Paseo De Angel was already in the PCSD Spillman database, which Deputy Pool accessed through the Mobile Data Computer in his patrol unit. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 24.)

25. Deputy Pool contacted Sgt. Rosalik in the Robbery/Assault Unit. Deputy Pool informed Sgt. Rosalik of the circumstances involving his case. Sgt. Rosalik informed Pool not to do follow-up at that last known residence of Bradley Lewis. Pool was instructed to acquire taped statements from all parties (the victim and the witnesses) on scene, and then detectives would do follow-up at the address at a later date. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 25.)

26. Deputy Pool then obtained a recorded statement of the events from both Chip Frank and his companion Jeremy Perry. (*See* ¶ 7 above, Transcripts are Exhibits B and C attached to Pool Declaration.) (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 26.)

27. Deputy Pool directed Deputy Obral to obtain an audio recorded statement from the other witness, TPD off-duty officer Darren Williams. (*See* ¶ 8 above, Transcript is Exhibit D attached to Pool Declaration.) (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 27.)

28. Deputy Pool stood by while Deputy Obral provided a Victim's Rights Pamphlet to Chip Frank, informing him of his rights as a victim. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 28.)

29. Given that both Chip Frank and Jeremy Perry were under the age of 18, Deputy Pool contacted their parents to advise them of what had happened. Both families informed Deputy Pool that they were fine with Chip Frank and Jeremy Perry proceeding on their own walking to work or coming back home at their own leisure. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 29.)

30. Deputy Pool then cleared the scene and continued with his patrol duties. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 30.)

31. All audio recordings were uploaded to the DIMS records system at the Foothills District Office. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 31.)

32. Later that day, on 12/04/2020, at 1515 hours, Deputy Pool responded to the residence of 7340 North Thornwood Road to speak with Robert Zucker. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 32.)

33. Robert Zucker informed Deputy Pool that he had video surveillance footage in his front yard that captured contact between the suspect vehicle and Chip Frank, as well as Jeremy Perry. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 33.)

34. Upon Deputy Pool's arrival to his residence, Robert Zucker showed Pool video surveillance footage on his phone. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 34.)

35. The time stamp on the video surveillance was 1219 hours. The footage depicted Chip Frank and Jeremy Perry, walking southbound on Thornwood Road. Deputy Pool also observed a blue Toyota Tacoma driving southbound. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 35.)

36. Also at 1219 hours, the video footage showed the blue Toyota Tacoma truck make a U-turn and stop adjacent to Chip Frank and Jeremy Perry. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 36.)

37. An individual wearing a white shirt stepped out of the blue truck. The truck and the individual matched the descriptions provided to Deputy Pool by Chip Frank and Jeremy Perry, and that the suspect was wearing a white tank top. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 37.)

38. Deputy Pool collected the surveillance video by taking video with his department issued camera of Robert Zucker's video phone display. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 38.)

39. Deputy Pool later entered into DIMS his phone video collected from Robert Zucker's surveillance video. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 39.)

40. On January 20, 2021, at 0618 hours, Deputy Pool responded to the intersection of Paseo De Angel and Positano Way to assist Sergeant Moseley. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 40.)

41. Upon Pool's arrival, Sgt. Moseley advised Pool that there was a blue Toyota Tacoma pickup truck in the vicinity that was a suspicious vehicle related to a previous call. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 41.)

42. Sgt. Moseley advised Deputy Pool that the suspect with the blue Toyota Tacoma pickup truck was going to be Bradley Lewis, Name/Number 19987051. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 42.)

43. After a tactical briefing from Sgt. Moseley, Deputy Pool recalled Bradley Lewis and the blue Toyota Tacoma being involved in the December 4, 2020 Assault With Deadly Weapon (AWDW) incident involving Chip Frank. Deputy Pool was made aware on January 20, 2021, that as a result of the December 4, 2020 AWDW incident, a Probable Cause Alert on Bradley Lewis had issued and was in effect. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 43.)

44. Sgt. Moseley advised Deputy Pool that Bradley Lewis was last seen wearing a gray short-sleeved shirt, shorts and black shoes. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 44.)

45. Sgt. Moseley directed Deputy Pool to set up road spikes (used to puncture vehicle tires) to deploy across the roadway in case the blue Toyota Tacoma truck fled, since that intersection was the only exit-and-entrance for the cul-de-sac neighborhood. (Ex 1,

Declaration of PCSD Deputy Anthony Pool, ¶ 45.)

46. During this time frame it was still early morning darkness. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 46.)

47. While Deputy Pool was posted at the intersection, he observed Deputy Berry, Deputy Caudillo, and Deputy Robles with patrol vehicles stopped near the blue truck, addressing the blue truck, and utilizing lighting equipment, overhead lighting equipment. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 47.)

48. Deputy Pool overheard Deputy Berry giving loud verbal commands to the truck. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 48.)

49. While standing behind his patrol vehicle for cover, and still set up to deploy spikes, Deputy Pool heard a deputy call out, “He’s in the car!” (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 49.)

50. Then Deputy Pool observed the blue Toyota Tacoma turn on, and take off southwest-bound on Paseo De Angel, and it looked like it had scraped up against a patrol deputy vehicle. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 50.)

51. Deputy Pool saw a deputy patrol vehicle pursue the blue truck, while Pool stayed at the intersection. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 51.)

52. Deputy Pool heard several shots from a handgun go off in the direction that the blue truck had fled. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 52.)

53. Deputy Pool immediately heard Deputy Matthew Gilbert call out over the radio that there were shots fired. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 53.)

54. Deputy Pool then collected his road spike equipment and made his way to the incident location, where Sgt. Moseley was standing by. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 54.)

55. Sgt. Goritz directed Deputy Pool to stand by and to preserve the crime scene along Paseo De Angel and to do the crime scene log. Pool was subsequently relieved from his position and he left the area. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 55.)

56. A true and accurate copy of Deputy Pool's supplement regarding the events of 01-20-2021 is attached to his Declaration as Exhibit E. (Ex 1, Declaration of PCSD Deputy Anthony Pool, ¶ 56.)

**PCSD DETECTIVE CHAMONIX VALDEZ**

57. Chamonix Valdez is currently a sergeant with the Pima County Sheriff's Department (PCSD). (Ex 2, Declaration of PCSD Detective Chamonix Valdez, ¶ 1.)

58. Detective Valdez began her career in law enforcement when she was hired by the Pima County Sheriff's Department in March of 2011. She attended and completed the PCSD law enforcement training academy. She was certified as a law enforcement officer by Arizona Peace Officers Standards and Training (AZPOST). (Ex 2, Declaration of PCSD Detective Chamonix Valdez, ¶ 2.)

59. Detective Valdez has held various positions with PCSD including patrol, directed patrol, SWAT negotiator, Robbery/Assault Unit detective, and Homicide Unit detective. (Ex 2, Declaration of PCSD Detective Chamonix Valdez, ¶ 3.)

60. Detective Valdez's involvement in matters pertaining to Bradley Alexander Lewis

began in December 2020. At that time, Detective Valdez was a PCSD Robbery/Assault Unit detective. (Ex 2, Declaration of PCSD Detective Chamonix Valdez, ¶ 4.)

61. Detective Valdez was assigned to do a follow-up investigation concerning PCSD Incident Report #201204090. That incident happened on December 4, 2020. It involved an allegation that Bradley Alexander Lewis stopped his blue Toyota Tacoma truck, with temporary license plates, in a residential street, got out of his truck, and initiated an argument with two young men, Chip Frank and Jeremy Perry. (Ex 2, Declaration of PCSD Detective Chamonix Valdez, ¶ 5.)

62. During that argument, Mr. Lewis pulled a black handgun from his waistband and pointed it at victim Chip Frank. Mr. Lewis threatened to shoot Mr. Frank. Mr. Lewis then got back into his truck and drove away. (Ex 2, Declaration of PCSD Detective Chamonix Valdez, ¶ 6.)

63. According to the PCSD Incident Report Supplemental Narratives, PCSD Deputy Pool and Deputy Obral responded to the incident. They took audio recorded statements of witnesses Chip Frank and Jeremy Perry, and of off-duty Tucson Police Department Officer Darren Williams. (Ex 2, Declaration of PCSD Detective Chamonix Valdez, ¶ 7.)

64. The suspect Bradley Alexander Lewis was specifically identified by victim Chip Frank, who knew Mr. Lewis and had previously worked with Mr. Lewis at a local McDonald's restaurant. (Ex 2, Declaration of PCSD Detective Chamonix Valdez, ¶ 8.)

65. Mr. Lewis's alleged conduct fit the crime of Assault With Deadly Weapon (AWDW) pursuant to Arizona Revised Statute § 13-1204(A)(2):

13-1204. Aggravated assault: classification; definitions

A. A person commits aggravated assault if the person commits assault as prescribed by section 13-1203 under any of the following circumstances:

2. If the person uses a deadly weapon or dangerous instrument.

(Ex 2, Declaration of PCSD Detective Chamonix Valdez, ¶ 9.)

66. Mr. Lewis's reported address of 6671 N. Paseo De Angel was already in the PCSD Spillman data system from a prior contact or contacts with PCSD. (Ex 2, Declaration of PCSD Detective Chamonix Valdez, ¶ 10.)

67. On December 16, 2020, Detective G. Houston and Detective Valdez went to the residence of 6671 N. Paseo De Angel looking for Mr. Lewis or for information that could lead them to contacting Mr. Lewis. (Ex 2, Declaration of PCSD Detective Chamonix Valdez, ¶ 11.)

68. At the 6671 N. Paseo De Angel residence, Detectives Valdez and Houston made contact with Ralph Stricklen. Mr. Stricklen said that Bradley Lewis was his grandson and that he had moved out of the house approximately two months ago. (Ex 2, Declaration of PCSD Detective Chamonix Valdez, ¶ 12.)

69. Mr. Stricklen said that he did not know where his grandson was living and he did not have a phone number for his grandson. (Ex 2, Declaration of PCSD Detective Chamonix Valdez, ¶ 13.)

70. Detective Valdez asked Mr. Stricklen if Mr. Lewis had a vehicle. Mr. Stricklen advised that Mr. Lewis was driving a blue truck. (Ex 2, Declaration of PCSD Detective

Chamonix Valdez, ¶ 14.)

71. Mr. Stricklen's statement that Mr. Lewis was driving a blue truck fit with the truck description given by the witnesses from the December 4, 2020, Assault With Deadly Weapon (AWDW) incident, wherein victim Chip Frank specifically identified Bradley Alexander Lewis as the person who pulled out a black handgun and threatened Chip Frank with it. (Ex 2, Declaration of PCSD Detective Chamonix Valdez, ¶ 15.)

72. Detective Valdez informed Mr. Stricklen that his grandson Bradley Lewis's name came up in an investigation and that Detective Valdez really needed to find him. (Ex 2, Declaration of PCSD Detective Chamonix Valdez, ¶ 16.)

73. Detective Valdez asked Mr. Stricklen if he knew where he (Bradley Lewis) can be located. Mr. Stricklen responded "No, I do not. He's so very secretive." (Ex 2, Declaration of PCSD Detective Chamonix Valdez, ¶ 17.)

74. Detective Valdez left her business card with Mr. Stricklen and requested that if he had any contact with Mr. Lewis, that he have Mr. Lewis contact her. Detective Valdez emphasized to Mr. Stricklen that this matter is not going to go away, that it is definitely a serious matter, and that Detective Valdez would like to speak to him (Bradley Lewis) to get his side of the story. (Ex 2, Declaration of PCSD Detective Chamonix Valdez, ¶ 18.)

75. Detective Valdez was not thereafter contacted by Bradley Lewis. (Ex 2, Declaration of PCSD Detective Chamonix Valdez, ¶ 19.)

76. Detective Valdez audio recorded her December 16, 2020, conversation with Ralph Stricklen at 6671 N. Paseo De Angel. A transcript of the audio recording was created.

Detective Valdez has listened to the audio recording while reviewing the transcript and Detective Valdez finds the transcript to be accurate. A copy of the transcript is attached to Detective Valdez's Declaration as Exhibit A. (Ex 2, Declaration of PCSD Detective Chamonix Valdez, ¶ 20.)

77. On December 18, 2020, two days after being assigned the follow-up investigation of the December 4, 2020 Assault With Deadly Weapon incident involving suspect Bradley Alexander Lewis, Detective Valdez initiated and caused to issue a Probable Cause Alert (PC Alert) on Bradley Alexander Lewis. (Ex 2, Declaration of PCSD Detective Chamonix Valdez, ¶ 21.)

78. A Probable Cause Alert informs PCSD law enforcement personnel that there is probable cause to arrest a suspect associated with a particular incident/case, and that there is probable cause to detain a specific person for questioning, because there is probable cause for arrest. (Ex 2, Declaration of PCSD Detective Chamonix Valdez, ¶ 22.)

79. The Probable Cause Alert that Detective Valdez initiated for Bradley Alexander Lewis on December 18, 2020 is attached as Exhibit B to her Declaration. (Ex 2, Declaration of PCSD Detective Chamonix Valdez, ¶ 23.)

80. The Probable Cause Alert identified the suspect or "Wanted Person" as Bradley Alexander Lewis. It provided a general race (Caucasian) and gender (male) description, and a known address, 6671 N. Paseo De Angel, Tucson. (Ex 2, Declaration of PCSD Detective Chamonix Valdez, ¶ 24.)

81. The Probable Cause Alert also identified the specific Arizona criminal statute that

has been violated, in this case, ARS 13-1204(A)(2), the crime being AWDW (Assault With Deadly Weapon). (Ex 2, Declaration of PCSD Detective Chamonix Valdez, ¶ 25.)

82. The Probable Cause Alert further provided:

> "REASON: Aggravated Assault w/ Deadly Weapon 13-1204A2 (F2):
>
> "ON 12/4/2020, MR. FRANK WAS WALKING IN THE NEIGHBORHOOD OF N THORNWOOD RD & MEADOW BRAIR (sic) DR. WITH HIS FRIEND MR. WILLIAMS, WHEN A BLUE TOYOTA TACOMA PULLED UP NEXT TO THEM. THE MALE IN THE TRUCK WAS BRADLEY LEWIS. MR. LEWIS STARTED ARGUING WITH MR. FRANK. AT ONE POINT THE VERBAL ARGUMENT ESCALATED AND MR. LEWIS GOT OUT OF THE TRUCK AND PULLED A BLACK HANDGUN AND POINTED IT AT MR. FRANK. MR. LEWIS TOLD MR. FRANK, 'I'VE DROPPED TEN BODIES BEFORE YOU'RE JUST A NUMBER TO ME. I'LL DO IT AGAIN.' THEN MR. LEWIS DROVE AWAY. THERE WAS AN OFFDUTY TPD OFFICER IN THE AREA WHO WITNESSED THE INCIDENT AND WAS ABLE TO PROVIDED (sic) A STATEMENT WHICH WAS SIMILAR TO BOTH MR. FRANK AND MR. WILLIAMS STATEMENT. THE FIRE ARM (sic) HAS NOT BEEN RECOVERED AND NO CONTACT HAS BEEN MADE WITH MR. LEWIS. IT IS ALSO UNKNOWN WHERE IS HIS (sic) LIVING OR EMPLOYED."
>
> (Ex 2, Declaration of PCSD Detective Chamonix Valdez, ¶ 26.)

83. There is a dated entry at the end of the second page of the Probable Cause Alert The dated entry reads, "01/15/21 PER EMAIL FROM TIFFANY SMETAK/CID-KEEP THIS PC ALERT ACTIVE." (Ex 2, Declaration of PCSD Detective Chamonix Valdez, ¶ 27, and Exhibit B to Declaration.)

84. The last entry of the Probable Cause Alert is dated January 21, 2021 (012121) and reads, "012121 SUBJECT DECEASED PER PCSD CASE #210120022, EMAILED DET

VALDEZ, SGT ROSALIK, LT CARPENTER & TPD TWX. MN 7300”. (Ex 2, Declaration of PCSD Detective Chamonix Valdez, ¶ 28, and Exhibit B to Declaration.)

85. A true and accurate copy of Detective Valdez’s supplement in Case No. PCSD 201204090 is attached to her Declaration as Exhibit C. (Ex 2, Declaration of PCSD Detective Chamonix Valdez, ¶ 29.)

**PCSD DEPUTY DAVID BAIRD**

86. David Baird is a deputy with the Pima County Sheriff’s Department. On January 20, 2021, he was a patrol deputy in the Foothills District. (Ex 3, Declaration of Deputy David Baird, ¶ 1.)

87. Deputy Baird completed the Pima County Sheriff’s Department Academy and became a deputy sheriff in May 2007. Most of Baird’s time as a deputy sheriff has involved patrol duties and included the Foothills District for several years before January 20, 2021. (Ex 3, Declaration of Deputy David Baird, ¶ 2.)

88. Exhibit A Deputy Baird’s Declaration is Baird’s Supplemental Narrative Incident Report describing the call for service to W. Morning Jewel Place in the early morning hours of January 20, 2021, in which Bradley Lewis was determined to be a suspect attempting to burglarize vehicles in the W. Morning Jewel Place neighborhood. The contents of Baird’s Supplemental Narrative Incident Report are true and accurate, and they are described in his sworn Declaration, along with additional information relevant to this particular call for service. (Ex 3, Declaration of Deputy David Baird, ¶ 3.)

89. On January 20, 2021, at approximately 0322 hours, Deputy Baird responded to

2143 W. Morning Jewel Place in reference to a report of a suspicious person. Morning Jewel Place is located near the intersection of La Cholla Boulevard and Overton, north of Magee and on the west side of La Cholla Boulevard. (Ex 3, Declaration of Deputy David Baird, ¶ 4.)

90. Communications advised that the reportee/caller, later identified as Michelle Stewart, said that there was a Caucasian male in a black truck going down the street checking for open (unlocked) car doors. (Ex 3, Declaration of Deputy David Baird, ¶ 5.)

91. Michelle Stewart said that the truck was currently located in a cul-de-sac at the end of Morning Jewel Place. (Ex 3, Declaration of Deputy David Baird, ¶ 6.)

92. Deputy Baird was also advised that Ms. Stewart had video of the suspect. She described the driver of the truck as a Caucasian male, wearing a short-sleeved gray shirt, shorts, and black shoes. (Ex 3, Declaration of Deputy David Baird, ¶ 7.)

93. As Deputy Baird was proceeding towards the incident location on W. Morning Jewel Place, he traveled northbound through the intersection of Ina Road and La Cholla Boulevard. While driving northbound, he observed a blue Toyota Tacoma Crew Cab pickup truck traveling southbound on La Cholla and then westbound onto Ina Road. (Ex 3, Declaration of Deputy David Baird, ¶ 8.)

94. The blue truck caught Baird's attention. It was the only vehicle at that intersection when he drove through that intersection. However, at this point he was on the look-out for a black pickup truck. (Ex 3, Declaration of Deputy David Baird, ¶ 9.)

95. When Deputy Baird arrived at the area of 2133 W. Morning Jewel Place (Ms.

Stewart's address), he checked the neighborhood and did not see any black pickup trucks. (Ex 3, Declaration of Deputy David Baird, ¶ 10.)

96. Deputy Baird then went to Ms. Stewart's house and spoke with her in person. She showed him video surveillance footage on her phone. Exhibit B to Deputy Baird's Declaration is the video surveillance footage that h obtained from Ms. Stewart. It showed a dark colored pickup truck which pulled up in front of her house and a male, who appeared to be tall and thin, immediately exited the truck and ran to the neighbor's house at 2143 W. Morning Jewel Place. (Ex 3, Declaration of Deputy David Baird, ¶ 11.)

97. The male attempted to open the driver's side door of a vehicle parked there. The male appeared to run around the front of the vehicle off camera apparently to check the other doors. (Ex 3, Declaration of Deputy David Baird, ¶ 12.)

98. There was a second vehicle in the driveway and the male subject then ran back to his truck and drove away. (Ex 3, Declaration of Deputy David Baird, ¶ 13.)

99. Deputy Baird observed the suspect truck on the video that appeared to be a smaller pickup truck, possibly a 4x4 (four-wheel drive). The truck appeared to be a darker color, possibly a gray or possibly a black. However, it did appear that the night vision video footage was distorting the color of the truck. (Ex 3, Declaration of Deputy David Baird, ¶ 14.)

100. The truck then left going westbound on W. Morning Jewel Place, which itself dead-ended into a cul-de-sac. (Ex 3, Declaration of Deputy David Baird, ¶ 15.)

101. Deputy Baird then approached the residence of 2143 W. Morning Jewel Place and spoke to the homeowner, Joshua Stine. Mr. Stine told me that no one should be trying

to get into his vehicles and that he did not know anyone with a pickup truck. He checked his cars and advised that both of them had been locked and there did not appear to be any damage or anything missing from his property. (Ex 3, Declaration of Deputy David Baird, ¶ 16.)

102. Other deputies and Deputy Baird continued to check the area. As Baird was leaving the area and proceeding to the end of Morning Jewel Place to turn around, I was in front of 2202 W. Morning Jewel Place, where a female subject waved me down. (Ex 3, Declaration of Deputy David Baird, ¶ 17.)

103. Deputy Baird identified that female subject via her Arizona ID as Emelinda De Senney. Ms. De Senney told Baird that she was getting ready to go to work. Baird observed her loading equipment into her vehicle. (Ex 3, Declaration of Deputy David Baird, ¶ 18.)

104. Ms. De Senney advised Deputy Baird that at approximately 0330 hours, her video cameras picked up a male subject trying to get into her pickup truck. (Ex 3, Declaration of Deputy David Baird, ¶ 19.)

105. Ms. De Senney showed Deputy Baird the video. Exhibit C is the surveillance video footage that Baird obtained from Ms. De Senney. On that video, Deputy Baird observed the same pickup truck that he had observed in the first video from 2133 W. Morning Jewel Place, Ms. Stewart's address. (Ex 3, Declaration of Deputy David Baird, ¶ 20.)

106. In Ms. De Senney's video from 2202 W. Morning Jewel, Deputy Baird observed the same male driver exit the pickup truck and run up to the driveway and try to open the driver's side door of Ms. De Senney's pickup truck. (Ex 3, Declaration of Deputy David Baird, ¶ 21.)

107. In Ms. De Senney's video, the male subject ran back out into the street out of camera view and then ran back to the truck, got back in it and left eastbound on Morning Jewel Place. (Ex 3, Declaration of Deputy David Baird, ¶ 22.)

108. In Ms. De Senney video, as the pickup truck was pulling away, Deputy Baird was able to get a better color image of it and it was obvious to him that the pickup truck was blue in color. (Ex 3, Declaration of Deputy David Baird, ¶ 23.)

109. The blue pickup truck appeared to be a newer truck with off-road type tires on it. (Ex 3, Declaration of Deputy David Baird, ¶ 24.)

110. Deputy Baird video recorded the Ms. Stewart and Ms. De Senney videos onto my department issued field camera and placed those videos into the Digital Imaging Management System (DIMS) at the PCSD Foothills District Office. (Ex 3, Declaration of Deputy David Baird, ¶ 25.)

111. Deputy Baird has reviewed both those videos prior to executing his Declaration. Exhibits B and C to the Declaration are copies of the two videos referenced above. (Ex 3, Declaration of Deputy David Baird, ¶ 26.)

112. Based on the video from Ms. De Senney that showed a blue pickup truck, Deputy Baird drove southbound on La Cholla to Ina Rd. and went west on Ina Rd., checking the area for the blue pickup truck that I had seen earlier at the intersection of Ina Road and La Cholla, which closely matched the pickup truck he had observed in Ms. De Senney's video. (Ex 3, Declaration of Deputy David Baird, ¶ 27.)

113. Deputy Baird also contacted PCSD Communications and requested an Attempt

to Locate (ATL) be put out on the blue truck. (Ex 3, Declaration of Deputy David Baird, ¶ 28.)

114. Deputy Baird stated in his Supplemental Narrative Incident Report that a short time later, he was contacted by the Marana Police Department (MPD) and advised that the MPD had been attempting to locate that vehicle earlier in reference to an unrelated incident. The MPD officer that contacted Baird was MPD Officer Bronson Tagalog. Deputy Baird was familiar with Officer Tagalog because Tagalog was a former PCSD deputy sheriff. (Ex 3, Declaration of Deputy David Baird, ¶ 29.)

115. It was at this time that Deputy Baird was provided by Marana PD Officer Tagalog with a name for the suspect of Bradley Lewis. (Ex 3, Declaration of Deputy David Baird, ¶ 30.)

116. Deputy Baird ran that name on his Mobile Data Computer (MDC) through the PCSD Spillman system. On his MDC, Baird observed a photo of Lewis and read that Lewis was 19 years old, six feet tall, thin build, and weighed 150 pounds. (Ex 3, Declaration of Deputy David Baird, ¶ 1.) (Ex 3, Declaration of Deputy David Baird, ¶ 31.)

117. The photo and description of Lewis closely matched the male subject Baird observed in the two videos provided by Ms. De Senney and Ms. Stewart. Deputy Baird did not see a clear image of his face in the videos, but the subject in the videos was a tall, thin, Caucasian male. (Ex 3, Declaration of Deputy David Baird, ¶ 32.)

118. Deputy Baird also noted that there was a Probable Cause Alert in reference to Aggravated Assault with a Deadly Weapon in reference to an unrelated incident in regard to

Mr. Lewis. (Ex 3, Declaration of Deputy David Baird, ¶ 33.)

119. The listed address for Lewis was 6671 N. Paseo De Angel. Deputies went to that address to locate the vehicle, and Deputy Baird was advised that it was not there. (Ex 3, Declaration of Deputy David Baird, ¶ 34.)

120. Deputy Baird continued to circulate in the area but was not able to locate the blue vehicle. (Ex 3, Declaration of Deputy David Baird, ¶ 35.)

121. When Sergeant Moseley came on duty around 0600 hours, Deputy Baird received a phone call from Sergeant Moseley seeking more information about the vehicle break-in call on Morning Jewel that Baird was investigating. Baird told Sergeant Moseley that Baird believed Bradley Lewis to be the suspect. Deputy Baird told Sergeant Moseley about the blue truck. Deputy Baird told Sergeant Moseley about the neighbors' surveillance video footage. (Ex 3, Declaration of Deputy David Baird, ¶ 36.)

**PCSD LIEUTENANT (THEN SERGEANT) MICHAEL MOSELEY**

Introductory note by defense counsel Daryl Audilett about Lt. Moseley Declaration statements: The Declaration statements by Lt. Moseley below will cite to the specific numbered paragraphs of his Declaration. Where appropriate, said statements will also be separately cited to the transcripts (page/lines) of the two interviews that Lt. Moseley gave to PCSD detectives on the morning of the shooting, January 20, 2021. This will be done where the subject matter of said statements are raised, referenced, or discussed in the detective interview transcripts. The detective interview transcripts are Exhibit A and Exhibit C attached to Lt. Moseley's Declaration. The detective interview transcript location cite will be

designated: "Declaration Exhibit A Transcript, p. ___, lines ___" (first detective interview at 0757 a.m.) or "Declaration Exhibit C Transcript, p. ___, lines ___" (second detective interview at 1111 hours a.m.).

122. Michael Moseley (Moseley) is a lieutenant with the Pima County Sheriff's Department. On January 20, 2021 when the shooting of Bradley A. Lewis occurred, he was a sergeant. The contents of Moseley's Declaration include statements and descriptions he made during his interview by detectives. The Declaration also includes other recollections of Moseley concerning Bradley Alexander Lewis and the events leading up to and including the shooting event, and other matters involving his training and experience. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 1.)

**Training and Experience**

123. Sgt. Moseley had been a commissioned law enforcement officer with the Pima County Sheriff's Department since 1998, approximately 22 years on the date of the January 20, 2021 shooting. He was promoted to Sergeant in July 2020. He was promoted to Lieutenant in May 2022. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 2.)

124. Moseley attended the Pima County Sheriff's Department Basic Corrections Academy and the Corrections Training Officer Program in 1997, and worked as a corrections officer at the Pima County Adult Detention Center. Moseley attended the 16-week basic law enforcement academy at SALETC, Southern Arizona Law Enforcement Training Center in Tucson in August of 1998, the class of 98-3. After the basic SALETC academy Moseley completed a four-week advanced basic training at the Pima County Sheriff's Department

Training Center, and after that he completed the PCSD 12-week field training program. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 3.)

125. In his now 24-year career as a deputy Moseley has worked primarily in patrol. He worked twice at the training center as a class counselor and a class officer, the first time in 2006 to 2008 and the second time in August of 2019 to July of 2020. Moseley spent three years in the K-9 Unit, from 2010 to 2013. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 4.)

126. In his early years in patrol, during approximately 2000 to 2005, Moseley worked in the Foothills Directed Patrol Unit and learned how to conduct directed patrol. Directed patrol is a proactive form of patrol which involves gathering information and using it to prevent crimes that are affecting the community, and to locate suspects and persons of interest that may be involved in crimes. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 5.)

127. The concept of directed patrol extends beyond other routine patrol duties like randomly patrolling a specific geographical area and taking calls for service to assist the public. Officers engaging in directed patrol proactively investigate and develop information about crimes, suspects, persons of interest, and people for whom there is probable cause to arrest. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 6.)

128. Directed patrol enables officers to literally "put two and two together" and to "connect the dots" that enable law enforcement to proactively make arrests, keep the peace, and protect the public. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 7.)

129. Moseley is trained and qualified on the department-issued Glock 17, which is a

9mm handgun. He is trained and qualified on the department-issued patrol rifle. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 8.)

130. AZPOST (Arizona Peace Officer Standards and Training Board) is the Arizona law enforcement agency that sets the training requirements necessary to become certified as a law enforcement officer in the State of Arizona. Being certified by AZPOST as a law enforcement officer is required in order to enforce Arizona laws, and to use police powers and authority to engage in law enforcement activities. AZPOST requires that officers attend AOT, Advanced Officer Training, every year. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 9.)

131. The deputies at the Pima County Sheriff's Department attend at least 24 - 32 hours of AOT per year, including 8 hours of firearms training, legal updates and tactics. Attached to Moseley's Declaration as Exhibit K is a Training History listing Moseley's training. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 10.)

132. Moseley has attended annually a training on target identification, which is an AZPOST requirement. He has attended annual Advanced Officer Training which includes firearm training and qualifications. He has trained multiple times on the electronic Multiple Interactive Learning Objectives system (MILO). That training includes large video screen projection of "shoot – don't shoot" scenarios. All that experience and training existed on January 20, 2021. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 11.)

133. Moseley has been trained as a defensive tactics instructor, which includes use of force, and he has performed that instructor function. He is a physical fitness instructor for

Arizona Peace Officers Standards and Training (AZPOST), and he can certify others as physical fitness instructors. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 12.)

**Sgt Moseley Interview Transcripts and Hand-Drawn Scene Diagram Authenticated**

134. The shooting of Bradley Alexander Lewis occurred at approximately 0644 hours on January 20, 2021. About an hour later, beginning at about 0757 hours, Moseley was interviewed by Pima County Sheriff's Detectives Jonathan Siress Badge #7341 and Jesus Rodriguez, Badge #7579. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 13.)

135. Attached as Exhibit A to Moseley's Declaration is a transcript of that interview which started at about 0757 hours. Moseley has reviewed the transcript and attests that it is an accurate transcript of that interview. The information that Moseley provided during that interview was truthful and accurate. While listening to the audio recording with the transcript I did note that on p. 9, line 2, "felt the fear of my life" should be "felt in fear of my life." (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 14.)

136. Attached as Exhibit B to Moseley's Declaration is a hand-drawn diagram of the shooting scene. Moseley drew this diagram during the first interview. He has reviewed the diagram. It is not to scale but it fairly represents the approximate locations of vehicles and persons present when the shooting occurred. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 15.)

137. The labeling on the Exhibit B diagram represents the following:

a. 188 – Michael Moseley. The #1 188, #2 188, and #3 188 represent Moseley's three locations discussed during the interview. His radio designator

was 188 and his badge number is 1227. He wrote 188 on his car.

b. 408 – Gilbert Caudillo's radio designator was 408, and Moseley used that to represent his car, and his approximate location.

c. GF – Location of the gentleman Moseley later learned was Lewis's grandfather.

d. Bradley – Bradley Lewis

e. Lines on the diagram indicate path of foot travel.

(Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 16.)

138. Attached as Exhibit C to Moseley's Declaration is a transcript of a second interview with Detectives Siress and Rodriguez. The Exhibit C transcript of the second interview began at approximately 1111 hours on January 20, 2021. That detective interview was conducted while doing a walk-through of the area where Moseley first encountered the Lewis Toyota Tacoma pickup truck on N. Paseo De Angel, and a walk-through a short distance away of the area of the scene of the shooting in the driveway of the residence at 6671 N. Paseo De Angel. The information that Moseley provided during that interview and walk-through was truthful and accurate. While listening to the audio recording with the transcript Moseley did note there were the following errors: (1) Page 5, line 3, the first word is "bent" and should be "came"; (2) page 11, line 13, the word "standing" should be "scanning." (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 17.)

139. Attached as Exhibit D to Moseley's Declaration is a photo taken of Moseley after the shooting that depicts my uniform and appearance at the time of the shooting of Bradley

Alexander Lewis. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 18.)

**<u>Moseley's Prior Knowledge of Bradley Alexander Lewis's Criminal Activities</u>**

140. On January 20, 2021, Moseley was one of two day shift sergeants in charge of the Foothills District in Tucson. He was a supervisor of the deputies on duty in that district. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 19.)

141. Bradley A. Lewis first came to then Sgt. Moseley's attention when Moseley became aware of detectives checking out at an address which he then responded to when he learned the detectives were there looking for an aggravated assault with a deadly weapon suspect. The address was that of Ralph Stricklen, Bradley A. Lewis's grandfather. Detectives Valdez and Patino (now Houston) provided Moseley with Lewis's name, and the fact he had blue in color Toyota Tacoma with paper (temporary) plates. With that knowledge Moseley began using his directed patrol experience to gather information on Lewis in an attempt to locate him, as he had not been located, and there was probable cause for his arrest. (Ex 5, Deposition of Michael Moseley, pp. 168:15 – 169:18.)

142. For approximately three to five weeks before the shooting on January 20, 2021, Sgt. Moseley had been attempting to locate Bradley Lewis. There was a rash of calls about Lewis starting in about the middle of 2020, up until November or December of 2020, and then Lewis went off the radar. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 20; Declaration Exhibit A Transcript, p. 3, lines 4-7.)

143. Before the shooting on January 20, 2021, Sgt. Moseley was aware of various alleged criminal activities engaged in by Lewis. Some of these activities involved guns and

drugs. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 21; Declaration Exhibit A Transcript, p. 3, lines 7-38.)

144. At the time of the January 20, 2021 shooting there was a probable cause alert out on Lewis. Attached as Moseley Declaration Exhibit E is a printout of the probable cause alert. This document was accessible through the Mobile Data Computer (MDC) that is present in the Department patrol vehicles. Sgt. Moseley was aware of the existence of the probable cause alert before January 20, 2021. On January 20, 2021, Moseley looked up the probable cause alert when he was searching for Lewis and before he encountered Lewis in his Toyota Tacoma pickup truck parked on the roadside of Paseo De Angel. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 22; Declaration Exhibit A Transcript, p. 5, lines 15-19.)

145. Some of the information Sgt. Moseley had about Lewis before January 20, 2021, included:

a. On 12-04-2020 there was an allegation of assault with a deadly weapon (AWDW). That incident generated the probable cause alert. (Ex. 4, Declaration Exhibit A transcript, p. 3, lines 7-26.) Moseley read the case report on that incident. It involved a male believed to be Bradley Lewis, who drove a blue Toyota Tacoma truck. The incident occurred in the area of N. Thornwood Rd and W. Meadow Briar Dr. The male drove up to two young males, got out of his truck, pointed a black handgun at them, and stated “I’ve dropped 10 bodies. You’re just a number to me. I’ll do it again”. The male identified as Bradley

Alexander Lewis pointed a black handgun at the two young males and there was an off-duty Tucson Police Department officer who witnessed the event and reported it to Pima County Sheriff's Department. One of the individuals threatened was an ex-coworker of Bradley Lewis, and that individual identified Lewis as being the person threatening with the gun. (*See* report, Ex. 4, Declaration Exhibit F, PCSD 201204090; Ex. 4, Declaration Exhibit A Transcript, p. 3, lines 7-26.)

b. The Probable Cause Alert, Exhibit E, is a printout of what appears on the Mobile Data Computer (MDC) which deputies have in their patrol vehicles. It contains information that deputies can access and do access during their patrol shifts. On the first page, the category "INVOLVEMENTS" provides the case number of the incident giving rise to the Probable Cause Alert. That case number is "201204090" indicating the event occurred on December 4, 2020. The "Description" of the event indicates "AWDW". AWDW is a designator/acronym for "Assault With a Deadly Weapon." At the bottom of the first page it states that "SUBJECT MAY BE DETAINED FOR QUESTIONING BECAUSE THERE IS PROBABLE CAUSE FOR ARREST REFERENCE THE ABOVE CASE." On the second page of the Probable Cause Alert is found the following:

"REASON: Aggravated Assault w/ Deadly Weapon 13-1204A2 (f2)".

"ON 12/4/2020, MR. FRANK WAS WALKING IN THE

NEIGHBORHOOD OF N THORNWOOD RD & W MEADOW BRAIR (sic) DR. WITH HIS FRIEND MR. WILLIAMS, WHEN A BLUE TOYOTA TACOMA PULLED UP NEXT TO THEM. THE MALE IN THE TRUCK WAS BRADLEY LEWIS. MR. LEWIS STARTED ARGUING WITH MR. FRANK. **AT ONE POINT THE VERBAL ARGUMENT ESCALATED AND MR. LEWIS GOT OUT OF THE TRUCK AND PULLED OUT A BLACK HANDGUN AND POINTED IT AT MR. FRANK. MR. LEWIS TOLD MR. FRANK, 'I'VE DROPPED TEN BODIES BEFORE YOU'RE JUST A NUMBER TO ME. I'LL DO IT AGAIN.' THEN MR. LEWIS DROVE AWAY**. THERE WAS AN OFFDUTY TPD OFFICER IN THE AREA WHO WITNESSED THE INCIDENT AND WAS ABLE TO PROVIDED (sic) A STATEMENT WHICH WAS SIMILAR TO BOTH MR. FRANK AND MR WILLIAMS STATEMENT. THE FIRE ARM HAS NOT BEEN RECOVERED AND NO CONTACT HAS BEEN MADE WITH MR. LEWIS. IT IS ALSO UNKNOWN WHERE IS HIS (sic) LIVING OR EMPLOYED." (Emphasis added.)

c. Another incident involved a report of shots heard, shots fired in the Catalina town area. PCSD deputies conducted a traffic stop on a car being driven by Lewis. He denied involvement, but fired handgun shell casings were found on the floorboard of the driver's seat, where Lewis was seated. Guns and drugs were found in the car. Lewis was arrested. (Ex 4, Declaration Exhibit

G, PCSD Report 200406304, excerpted; Declaration Exhibit A Transcript, p. 3, lines 28-33)

d. Another incident involved a road rage, shots fired call in November, 2020. (Ex 4, Declaration Exhibit A Transcript, p. 3, line 37 to p. 4, line 11.) Moseley spoke to the victim who said that the suspected shooter came from Positano (W. Positano Way) which is a side street of Shannon Road that is intersected by N. Paseo De Angel, the street on which Lewis's grandparents lived, with an address associated with Lewis, 6671 N. Paseo De Angel. The January 20, 2021 shooting occurred at the grandparents' house at 6671 N. Paseo De Angel. This was an address that Moseley routinely drove past looking for Lewis. (Ex 4, Declaration Exhibit H, PCSD Report 201102154, excerpted.)

e. Another incident involved shots fired at the house next door to Lewis's grandparents' house at 6671 N. Paseo De Angel on 1-3-2021. This occurred a couple of weeks before January 20, 2021. As part of Moseley's morning routine, he would do a Code 9 (periodic check) while also checking that address for Lewis's vehicle. (Ex 4, Declaration Exhibit I, PCSD Report 210103235, excerpted.) (Ex 4, Declaration Exhibit A Transcript, p. 4 lines 30-37.)

(Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 23.)

146. This was a guy that was driving around, firing a gun, pointing a gun. He had threatened deadly force on two people walking on the street. Based on interviews from the

shots fired call in November 2020, he may have been the suspect in that as well. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 24; Declaration Exhibit A Transcript, p. 3, line 28, to p. 4, line 6, and p. 15, line 24, to p. 16, line 5.)

147. As a result of the information Sgt. Moseley had about Lewis, Moseley had been driving by the grandparents Ralph and Helen Stricklen's house at 6671 N. Paseo De Angel on a very regular basis during the previous weeks in an attempt to locate Lewis and, pursuant to the Probable Cause Alert, to take Lewis into custody. Based on names and addresses Moseley associated with Bradley Lewis, he also had been driving by addresses on Ethan Allen Place, Duskfire Drive, and on Pyracantha Drive, attempting to locate Lewis and to take him into custody. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 25; Declaration Exhibit A Transcript, p. 4, lines 18-33.)

148. These are names and addresses Sgt. Moseley had associated with Bradley Lewis, that also provided details of weapons, threats, and drugs:

**William Silva,** Home address: 7501 N Ethan Allan Pl

Silva contacted with Lewis reference Marana Police Department (MPD) 2008-0795 8/17/20

Occurred at Motel 6 7277 N Camino De Oeste

The caller reported a male carrying what looked like a rifle into room #315, which Bradley Lewis rented. The caller also stated they saw multiple females 15-18 years of age exiting the room.

Another witness informed MPD officers that he was concerned the females were involved in prostitution.

Bradley Lewis told officers he was leaving for New York the following day.

**Carmen Garza – Ex-Girlfriend, called in a harassment call to MPD**

2008-0980 08/11/20

Carmen Garza reported harassing text messages from Lewis. These included that he had "police on the payroll," "cops in his pocket," and that he was going to put her new boyfriend in the hospital. Carmen reported that she had seen Bradley with guns.

**Oro Valley PD Threats case V20080216 8/06/20**

The foster mother of KP (16 years of age), Ester Delgado, reported that a boy named "Alex," later identified by them as Bradley Alexander Lewis (18 years of age), was at their residence. Lewis was acting "odd." Ester spoke with Lewis, who was in KP's room. Lewis claimed to be a drug dealer. Ester told Lewis to leave, which he did. KP started receiving Snapchats that Lewis was offering to pay someone to fight her as he accused her of stealing marijuana from him. A 3rd party person told KP that Lewis told them that his mother worked for the cartel and she was going to go to KP's house and kill her.

**Alexander Wade**

Home address: 8873 N Duskfire Dr

Wade was contacted with Lewis in reference to a PCSD case involving criminal damage in progress.

200727020 7/27/20 address of 1442 W. Sun Ridge, which is near Wade's address.

Lewis was contacted by deputies with an aluminum bat he was suspected of using to damage vehicles in the neighborhood. When contacted, he was wearing an empty handgun holster on his shorts, had a loaded pistol in his front pocket, and another handgun

in his backpack. He was arrested for criminal damage.

**Erica Napier**

Home address: 4328 W Pyracantha Dr

PCSD Drug case 200406304 Shots heard case 200406294

Napier was contacted with Lewis during the shots heard call, where Lewis was arrested for a narcotic drug violation. He had handguns. There were two spent shell casings on the driver's side floor and three spent shell casings in the console.

(Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 26.)

**<u>The Morning of the Shooting</u>**

149. On the morning of January 20, 2021, at around 0530 hours, Sgt. Moseley logged onto his MDC (PCSD Mobile Data Computer). He saw there was activity being reported in the area of a street called Morning Jewel. The suspect was Bradley Lewis. The call text stated that somebody in a truck was driving through the neighborhood trying door handles. With his extensive experience involving many years on midnight shifts and on day shifts, Moseley is aware that is descriptive of "car busts" in neighborhoods. It involves subjects searching for unlocked vehicle doors to open. They then enter the vehicle and steal things from the vehicle. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 27; Declaration Exhibit A transcript, p. 1, line 38, to p. 2, line 10.)

150. The deputy who was on the Morning Jewel "car bust" call was Deputy David Baird. Sgt. Moseley phone-called Deputy Baird to get more information. Deputy Baird explained that he believed the suspect to be Bradley Lewis based on the fact that he saw a

truck in the area matching Lewis's 2021 blue Toyota Tacoma. Deputy Baird described the truck as a really pretty truck. Deputy Baird said that he saw that truck at Ina Road and La Cholla Boulevard while he was on his way to the Morning Jewel call involving a suspicious person trying to open cars in a neighborhood. Morning Jewel is a side street of La Cholla Boulevard, approximately 2.5 miles north of Ina Road. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 28; Declaration Exhibit A transcript, p. 2, lines 10-22.)

151. Deputy Baird told Sgt. Moseley that when he got to the Morning Jewel "car bust" call, a couple of the people had "doorbell, Ring type" surveillance video footage that showed the vehicle involved but the video didn't show the color. A second victim contacted Deputy Baird and Baird viewed that person's video footage and was able to tell that the vehicle was blue in color and he believed it was a Toyota Tacoma. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 29; Declaration Exhibit A transcript, p. 2, lines 21-27.)

152. The information from Deputy Baird led Sgt. Moseley to believe that Bradley Lewis may be involved in the early morning "car busts" on Morning Jewel. Based on Moseley's training and experience, he believed Lewis would be in the area of the known associates Moseley had compiled while searching for Lewis. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 30.)

153. Sgt. Moseley left his house around 0544 hours. Moseley was driving his Ford Explorer fully marked PCSD Patrol SUV, a take-home vehicle. He got gas at the Pima County gas pumps on Ina Road. He drove to 4328 W. Pyracantha Drive, which involved a female acquaintance of Lewis named Erica Napier. He did not locate Lewis there. (Ex 4,

Declaration of Lieutenant Michael Moseley, ¶ 31; Declaration Exhibit A Transcript, p. 4, lines 18-23.)

154. Sgt. Moseley then drove to the CDLT (Camino de la Tierra) neighborhood, north of Ina, to 7501 N Ethan Allen Pl. This address was associated with an acquaintance of Lewis named William Silva. Moseley recalled that Lewis had been in a vehicle with William Silva, and they appeared to be friends. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 32; Declaration Exhibit A Transcript, p. 4, lines 25-29.)

155. While Sgt. Moseley was entering Lewis's grandparents' neighborhood, he put himself out with a Code 9 (periodic check) at the address which is directly to the left of Lewis's grandparents' house if you are facing it. That address is 6661 N. Paseo De Angel. That house had shots fired into it a couple weeks before January 20, 2021. (*See* ¶ 144(d) above.) Part of Moseley's morning routine was to do that Code 9 (periodic check) while also checking for Lewis's vehicle at Lewis's grandparents Ralph and Helen Stricklen's address 6671 N. Paseo De Angel. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 33; Declaration Exhibit A Transcript, p. 4, lines 30-37.)

**<u>Sgt. Moseley Encounters Lewis's Toyota Tacoma Truck Parked Beside The Road</u>**

156. When Sgt. Moseley turned from W. Positano Way onto N. Paseo De Angel, he saw Lewis's light blue Toyota Tacoma parked beside the road on N. Paseo De Angel, facing away from him, on the shoulder of the lefthand side of the road, and facing the direction of opposing traffic. Moseley saw that the truck had a temporary paper license plate. Moseley knew from the Assault With Deadly Weapon incident that the off-duty TPD officer reported

and described the truck as having a temporary paper license plate. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 34; Declaration Exhibit A Transcript, p. 4, line 37 to p. 5, line 13.)

157. Sgt. Moseley immediately stopped his patrol car. He radioed for additional units to respond to assist him. He had confirmed the Probable Cause Alert (PC alert) earlier that morning on my Mobile Data Computer. He had also read in the call text from Deputy Baird's call that there was a PC alert for Lewis. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 35; Declaration Exhibit A Transcript, p. 5, lines 14-19.)

158. Sgt. Moseley wondered why Lewis's truck was parked beside the road so far down the street from his grandparents' house. Moseley began to think that maybe he is doing car busts now, in this neighborhood. Recalling that Lewis was suspected in crimes involving guns, Moseley became fearful that sitting in his patrol car would make him an easy target. So, Moseley got out of his car and went to the back of it, putting the patrol car between himself and Lewis's truck. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 36; Declaration Exhibit A Transcript, p. 5 lines 25-33.)

159. While standing at the back of his car, Moseley noticed a motion light come on at a house on the corner of Positano and Paseo De Angel. That concerned him that it was possible that Lewis triggered the motion light and that he may be trying to make it back to his truck. Moseley decided not to go investigate that alone, but to wait for backup. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 37; Declaration Exhibit A Transcript, p. 5, lines 31-37.) The location of the blue truck on Paseo de Angel is depicted in Exhibit 28. *(See*

DSSOF 407, and attached Exhibit 28, Labeled Aerial photo of location of initial traffic stop and subsequent officer-involved shooting in the Stricklens' driveway, PCSD 6298 with added text.)

160. Deputy Anthony Pool arrived and Sgt. Moseley set him up to deploy tire puncturing road spikes at the intersection of W. Positano Way and N. Paseo De Angel, in case Lewis tried to flee in his truck through that intersection, which is the only way in and out of the neighborhood. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 38; Declaration Exhibit A Transcript, p. 5, lines 37-39.)

161. Deputy Justin Berry arrived and he and Moseley searched and cleared the front yard of the house on the corner of W. Positano and Paseo De Angel, where the motion light had come on. They returned to Moseley's parked patrol car. Deputy Matthew Gilbert had arrived. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 39; Declaration Exhibit A Transcript, p. 6, lines 5-7.)

162. It was still dark out and Moseley had his patrol car headlights turned on, but the other patrol cars had their vehicle lights turned off. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 40; Declaration Exhibit A Transcript, p. 6, lines 9-11.)

163. A white Jeep Cherokee approached us on N. Paseo De Angel, leaving the neighborhood. Moseley activated his overhead red and blue lights to stop that vehicle. After speaking to the driver, Moseley allowed him to go on his way, leaving the neighborhood. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 41; Declaration Exhibit A Transcript, p. 6, lines 13-18.)

164. At that point, Sgt. Moseley left his overhead red and blue lights on and instructed Deputy Berry and Deputy Matthew Gilbert to assist in doing a high risk stop on the Lewis truck. Around this time, Moseley requested Communications to find out about the availability of PCSD air support, which is a fixed wing light plane. Moseley's goal was to take Lewis into custody given the danger that he posed to the public. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 42; Declaration Exhibit A Transcript, p. 6, lines 18-25.)

165. After that, Sgt. Moseley had his department-issued 9mm handgun out of its holster. Deputies Justin Berry and Matthew Gilbert and Sgt. Moseley engaged in a high risk stop procedure that involved announcing their authority and addressing the Lewis truck and loudly commanding whomever was in the truck to get out of the truck with their hands up. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 43; Declaration Exhibit A Transcript, p. 6, lines 20-26.)

166. When giving commands they used Bradley Lewis's name and told him to get out of the truck with his hands up. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 44.)

167. In this timeframe, Moseley also took out his department issued patrol rifle and chambered a round into the barrel and put the rifle back into its secure rack, so that if he needed to use it, he would have quick access and not be delayed by chambering a round. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 45; Declaration Exhibit A Transcript, p. 6, lines 26-29.)

168. Also in this timeframe, Sgt. Moseley requested via radio for someone to bring protective ballistic shields from the PCSD substation located just north of Ina Road on

Shannon. Moseley was concerned that Lewis would be armed and he wanted to be able to shield the deputies from gunfire. Deputy Teddy Robles arrived with two protective ballistic shields. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 46; Declaration Exhibit A Transcript, p. 6, lines 31-44.)

169. Sgt. Moseley became aware that Deputy Gilbert Caudillo was enroute to Moseley's location. He was aware that Deputy Caudillo was a SWAT Team member and Moseley intended to discuss tactics with Caudillo when he arrived. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 47; Declaration Exhibit A Transcript, p. 6, lines 34-36.)

170. Sgt. Moseley was advised by Communications that the lady at the house with the activated motion light whose front yard they had cleared, had seen them, and she said that the fifth wheel travel trailer in her front yard had an unlocked door, and that they could search the trailer if necessary. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 48; Declaration Exhibit A Transcript, p. 6, lines 36-38.)

**<u>Deputy Caudillo's Arrival At The Scene</u>**

171. Deputy Caudillo arrived and they discussed how to proceed. They decided to first attempt to determine whether the Lewis truck was occupied, in an attempt to prevent Lewis from going mobile back into the public. If Lewis was not in the truck, then they would transition to the fifth wheel travel trailer. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 49; Declaration Exhibit A Transcript, p. 7, lines 2-5.)

172. Deputy Caudillo, with Deputy Robles in the backseat with a ballistic shield, drove his patrol Ford Explorer past the Lewis truck, then made a u-turn and drove up to the

front of the Lewis truck to block it from fleeing and to determine whether Lewis was in the truck. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 50; Declaration Exhibit A Transcript, p. 7, lines 7-12.)

173. Sgt. Moseley had witnessed that when making his u-turn, Caudillo encountered Lewis's grandfather attempting to drive his Ford F150 out of the neighborhood past where Lewis's truck was parked, and Moseley had heard Caudillo yell to Lewis's grandfather to return to his home at 6671 N. Paseo de Angel. The Ford F150 turned around and left. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 51; Declaration Exhibit A Transcript, p. 7, lines 12-14.)

**<u>Deputy Caudillo Advises That Lewis Is In The Truck</u>**

174. As soon as Deputy Caudillo stopped close to the front of the Lewis truck at roughly a 45-degree angle, Deputy Caudillo yelled words like "he's in there." Sgt. Moseley quickly realized that their other patrol vehicles were too far back behind the Lewis truck and Lewis could back up and then drive around Deputy Caudillo's vehicle. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 52; Declaration Exhibit A Transcript, p. 7, lines 14-18.)

175. Sgt. Moseley sprinted to his vehicle with the intention of driving it up close behind Lewis's truck to block him from backing up and driving forward around the front of Deputy Caudillo's vehicle. But Sgt. Moseley did not get close enough to the rear of Lewis's truck in time to prevent him from backing up and driving through the brush on the roadside around the front of Deputy Caudillo's vehicle. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 53; Declaration Exhibit A Transcript, p. 7, lines 22-24.)

**Lewis Flees The Scene In His Toyota Truck**

176. At this point, Moseley observed Lewis fleeing, driving his truck fast, in a southwest direction away from Moseley, then making a right turn, and driving fast in a northwest direction towards his grandfather Ralph Stricklen's house at 6671 N. Paseo De Angel. The Stricklen house is located in the end of a cul de sac. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 54.)

177. Moseley immediately engaged in a vehicle pursuit with overhead and front grill emergency lights activated. When Lewis reached the driveway of his grandfather's house, Lewis turned right into the driveway and then stopped near the entrance to the driveway. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 55; Declaration Exhibit A Transcript, p. 7, 32-36.)

178. At this time, Moseley expected Lewis's door to open and for him to get out. Moseley put his vehicle in Park and started trying to get out of my vehicle. But then Lewis started backing his truck directly at Moseley's vehicle. Moseley immediately drove forward and made contact with the rear of Lewis's truck to block him from backing out of the driveway. Moseley's purpose was to contain Lewis and to prevent him and his truck from going mobile. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 56; Declaration Exhibit A Transcript, p. 7, line 38, to p. 8, line 4.)

179. Lewis then drove forward again about halfway up the driveway. Moseley put his car in Drive and followed. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 57; Declaration Exhibit A Transcript, p. 8, lines 2-3.)

180. Lewis stopped his truck a second time. Moseley was concerned that Lewis would get out of his truck and start firing a gun into Moseley's windshield, so Moseley wanted to get out of his vehicle as fast as he could. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 58; Declaration Exhibit A Transcript, p. 8, lines 13-19.)

181. They had recently had training that advised to get out of their vehicle as fast as possible, that remaining in their vehicle is the most dangerous place to be in these circumstances. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 59; Declaration Exhibit A Transcript, p. 20, lines 22-26.)

**<u>Lewis Drives His Truck Backwards, Ramming It Into The Front of Sgt. Moseley's Patrol Explorer</u>**

182. While Sgt. Moseley was trying to get out of his vehicle and while he was drawing his handgun, Lewis put his truck into reverse gear and backed into the front of Moseley's vehicle, jarring Moseley pretty good. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 60; Declaration Exhibit A transcript, p. 8, lines 19-21.)

183. Sgt. Moseley stated in his Declaration, "During the vehicle collision events that took place in the grandfather's driveway, I was in fear for my life. I was afraid Lewis was going to jump out of his truck and start shooting at me through my windshield." Moseley stated in his interview at 0757 that morning to detectives, "I could not get out of my car fast enough …as I seriously believed there was a high possibility that he was just gonna get out and, uh, start firing into my windshield, so I wanted to be out of the vehicle as fast as I could." (Ex 4, Declaration of Lt. Moseley, ¶ 61; Declaration Exhibit A Transcript, p. 8, lines 17-21.)

184. Then Lewis began moving his truck forward again. During the time of the collisions in the driveway, Moseley was yelling at Lewis to stop. Moseley was pleading with Lewis to stop. Moseley was calling him by his name, "Bradley, stop." Moseley was begging him to stop. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 62; Declaration Exhibit A Transcript, p. 8, lines 21-36.)

185. Sgt. Moseley saw that Lewis's grandfather was out of his own truck and standing to the left of it. The grandfather's location at that time is labeled GF on Declaration Exhibit B, Moseley diagram. It looked like Lewis was trying to wedge his truck between his grandfather's truck and the house. As Moseley started pulling forward, a patrol vehicle drove past him on his right, which Moseley later learned was Deputy Caudillo. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 63; Declaration Exhibit A Transcript, p. 8, lines 21-37; Declaration Exhibit B, diagram.)

186. Sgt. Moseley got out of his vehicle and headed up the driver's side of the grandfather's truck, using that truck as cover to protect himself from Lewis if he exited his truck shooting a gun. Moseley yelled at the grandfather to get away. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 64; Declaration Exhibit A Transcript, p. 8, lines 37-43.)

187. Exhibit J to Sgt. Moseley's Declaration is an accurate representation of the location of the vehicles at the time of the shooting. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 65; Declaration Exhibit J.)

**Lewis Exited His Truck And Ran Rearward Towards Deputy Caudillo**

188. Sgt. Moseley held his handgun pointed at Lewis's driver's side truck door, using

the engine block of the grandfather's truck as cover. Lewis's driver's side truck door flew open. Moseley saw Lewis get out fast, holding something black in his right hand, the hand closest to Moseley. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 66; Declaration Exhibit A Transcript, p. 8, line 43, to p. 9, line 1; Declaration Exhibit C Transcript, p. 11, lines 16-19.)

189. It happened so fast, Lewis's door opened, he was there. Lewis looked directly to the rear of his own vehicle and bolted, so Moseley followed him with his handgun until Lewis disappeared from view. In his deposition, Moseley demonstrated the very quick movement of following Lewis with his handgun, describing it as "Boom, gone." (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 67; Declaration Exhibit A Transcript, p. 9, lines 2-5; Ex 5, Deposition of Michael Moseley, p. 122:3 – 17.)

190. Moseley absolutely at that moment felt in fear of his life. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 14, 68; Declaration Exhibit A Transcript, p. 9, lines 1-2.)

191. Lewis never acknowledged Moseley or looked at him. It did not appear to Moseley that Lewis was aware of him or of his location. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 69; Declaration Exhibit A Transcript, p. 9, line 3 and p. 21, lines 10-12.)

192. The reason Moseley said in one part of his statement that Lewis never posed a deadly threat to him personally when he came out of his truck so quick is Moseley didn't think Lewis saw him at that time in the few seconds Lewis was visible to Moseley. Moseley maintained cover, but what Moseley was thinking was he's going to come out and he is going to start shooting. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 70: Exhibit A

Transcript, page 21, lines 8-12.)

193. At this point Moseley thinks he had already made his peace with what could or couldn't happen, so his mindset was, we're gonna stop this, we gotta stop this guy. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 71; Declaration Exhibit A Transcript, p. 21, lines 4-8.)

194. Lewis's exit from the truck was lightning fast and he took off running rearward between the two trucks (Lewis's grandfather's truck and Lewis's truck) and towards where Moseley last saw a patrol vehicle drive past the passenger side of his patrol vehicle. Moseley later learned that to be Deputy Caudillo. When Lewis exited his truck, Lewis was holding a black object in his right hand. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 72; Declaration Exhibit C Transcript, p. 11, lines 16-19, and p. 12, lines 19-24.)

195. The lightning-fast way that Lewis exited his truck and sprinted rearward towards Deputy Caudillo with a black object in his hand alarmed and surprised Moseley. In his 22 years of law enforcement experience in the field, Moseley has engaged in many, many foot pursuits, vehicle pursuits, and other activities designed to subdue suspects. Moseley has never witnessed a fleeing suspect suddenly change from a fleeing tactic into an attacking tactic like he witnessed Lewis do. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 73; Declaration Exhibit C Transcript, p. 11, lines 20-31.)

196. Lewis looked directly to the rear of his own truck and he bolted that direction. Lewis was running at an all-out sprint. Moseley heard gunfire, pop, pop, pop, in quick succession. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 74; Declaration Exhibit A

Transcript, p. 9, lines 2-5; Declaration Exhibit C Transcript, p. 11, lines 16-19, p. 12, lines 19-24.)

197. Moseley did not know who was shooting, whether it was Lewis or one of the deputies. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 75; Declaration Exhibit A Transcript, p. 9, lines 1-6; Declaration Exhibit C Transcript, p. 16, lines 12-22.)

198. After hearing the gunfire, Moseley moved down the side of the grandfather's truck, around the rear of it, and came to position #2 in the diagram he drew, behind Deputy Caudillo (Declaration Exhibit B). Moseley saw Deputy Caudillo standing between his patrol vehicle and the grandfather's truck. Deputy Caudillo had his handgun drawn and pointed at Lewis, who was on the ground near the driver's side rear of Lewis's truck bed. Lewis was in a position where his right hand was kinda underneath his body. Moseley could see a black object. Caudillo said, he's got something in his right hand, and Moseley said I can see it. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 76; Declaration Exhibit A Transcript, p. 9, lines 1-12; Declaration Exhibit B, diagram.)

199. Moseley asked and Caudillo said he was okay. Moseley moved around the rear of Deputy Caudillo's patrol vehicle to position #3 on the diagram near the front of Caudillo's patrol vehicle (Declaration Exhibit B, diagram). Moseley was telling Lewis to spread his arms out and he either can't or won't. Moseley saw blood coming out of Lewis's mouth, leading him to believe Lewis had a wound to the torso. Deputy Caudillo then handcuffed Lewis and picked Lewis up by his upper body, and pulled him into a more open area to begin life-saving efforts. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 77; Declaration

Exhibit A Transcript, page 9, lines 5-23; Declaration Exhibit B, diagram.)

200. Moseley broadcast over the radio they were 998 (officer involved shooting). Moseley told Communications to start meds, for meds not to hold off, come directly to the scene. Moseley called for somebody to bring him an IFAK. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 78; Declaration Exhibit A Transcript, p. 9, lines 15-20.)

201. Moseley immediately called for an IFAK (Individual First Aid Kit). Moseley radioed for medical to respond. Meds had already been started. Moseley advised Communications that “Meds needs to move in as soon as they get here. Do not hold off.” Meds was to come directly to the scene. Moseley took the scissors from the IFAK, Deputy Caudillo held the shirt and they cut it off. It looked like Lewis had a gunshot wound to his forearm and to his shoulder. Lewis was spitting up blood and starting to fade pretty quickly. Another deputy started CPR. Lewis had stopped communicating with them. Moseley thinks somebody said he stopped breathing. That’s why they started CPR. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 79; Declaration Exhibit A Transcript, p. 9, lines 12-39, p. 26, lines 5-32.)

202. Before Northwest Fire medical personnel arrived, deputies were performing cardio-pulmonary resuscitation (CPR). (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 80; Declaration Exhibit A Transcript, p. 9, lines 35-39.)

203. The Northwest Fire District paramedics arrived within minutes and took over life-saving efforts. (Ex 4, Declaration of Lieutenant Michael Moseley, ¶ 81; Declaration Exhibit C Transcript, p. 17, lines 1-15.)

204. In Moseley's deposition, a short excerpt of the real-time radio traffic was played, which Lt. Moseley had previously reviewed, and Lt. Moseley explained what was happening and what was said at certain intervals, also using deposition Exhibit 17 as an outline. Exhibit 17 was notes by Moseley made regarding how many seconds elapsed between the events. To Moseley's knowledge, based on his review of the recording and his familiarity with radio traffic, the recording appeared to be real-time radio traffic that has not been altered, condensed, sped up, or anything of the sort. (Ex 5, Deposition of Lt. Moseley, p. 150:4-23; Ex 6, Audio Recording, excerpt of real time radio transmissions.)

205. Regarding the audio recording of the excerpt of the real-time radio recording, in deposition Lt. Moseley testified about the timeline starting with Caudillo stopping in front of Lewis's truck parked beside Paseo de Angel, spotting Lewis inside it, and announcing that Lewis is inside.

| | |
|---|---|
| p. 151 | At zero time, Deputy Caudillo says "He's inside. He's in the car." |
| p. 152 | At eight seconds, Deputy Caudillo says "block it in." |
| | At 16 seconds, Deputy Caudillo says "he's taking off." |
| pp. 152-153 | At 25 seconds, voice says 10-35, which is 10 Code for "limit radio traffic", in other words, don't speak unless you are part of the incident. |
| p. 153 | Beeps heard dispersed at regular intervals. |
| p. 154 | The beep lets them know that there's a priority call coming on and to limit your radio traffic, use radio discipline, and not transmit unless there is an emergency. |
| p. 154 | At 55 seconds, Deputy Matthew Gilbert says "shots fired, shots fired." |
| p. 154 | At 1:04, (one minute, four seconds) there are "warble tones", that are reserved for Code 999, officer needs assistance, or Code 998, officer-involved shooting. |

| | |
|---|---|
| p. 155 | At 1:09 (one minute, nine seconds), dispatcher advises 998, which signifies officer involved shooting. |
| p. 155 | Interrupting that at 1:11 was Moseley identifying himself as designator 188 and stating, "998", signifying officer involved shooting. |
| p. 157 | At 1:15, (one minute, fifteen seconds) Moseley says "start meds 10-18", meaning ASAP (as soon as possible). |
| p. 158 | At 1:38, Moseley says "We need an IFAK --- somebody bring an IFAK 10-18, (meaning as soon as possible). IFAK is Individual First Aid Kit. |
| | At 2:17, Sgt. Goritz says "roll meds", which is slang for start meds, that would be the second request for meds over the radio. |
| pp. 158-59 | At 2:28, dispatcher says meds have been started. |
| p. 159 | At 3:21, Moseley says that "meds need to move in as soon as they get here. Do not hold off." |

From the time at 55 seconds that Deputy Matthew Gilbert says on the radio, "Shots fired, shots fired" to the time Lt. Moseley says, Start Meds 10-18 (as soon as possible), the elapsed time is 20 seconds. From the time at 55 seconds that Deputy Gilbert says, "Shots fired, shots fired," to the time the dispatcher confirms that Meds have been started is 1 minute 33 seconds. From the time that Sgt. Moseley says, "998," (officer involved shooting), to the time Moseley says "start Meds 10-18" (as soon as possible) is 4 seconds.

(Ex 5, Deposition of Michael Moseley, pp. 150:24 – 160:15; 160:22 – 161:4; 161:6 – 12; Ex 6, Audio recording, PCSD 6925, Excerpt real time radio transmissions.)

## PCSD SERGEANT GILBERTO CAUDILLO

Introductory note by defense counsel Daryl Audilett about Sgt. Caudillo Declaration statements: The statements by Sgt. Caudillo below will cite to the specific numbered paragraphs of his Declaration. Where appropriate, said statements will also be separately

cited to the transcript of the interview (page/line) that Sgt. Caudillo gave to PCSD detectives on January 25, 2021. This will be done where the subject matters are raised, referenced, or discussed in the detective interview transcript. Sgt. Caudillo's Declaration is Exhibit 7 to Defendants' Separate Statement of Facts (DSSOF). The Sgt. Caudillo detective interview transcript is Exhibit D to Sgt. Caudillo's Declaration. The Caudillo detective interview transcript location cite will be designated: "Declaration Exhibit D Transcript, page ___, lines ___."

206. Gilberto Caudillo (Caudillo) is a 22-year deputy (now Sergeant) with the Pima County Sheriff's Department. On January 20, 2021 Caudillo shot Bradley Alexander Lewis (hereafter "Lewis") with his Pima County Sheriff Department issued Glock 17 9 mm handgun. At the time that Caudillo shot Lewis, Caudillo believed that the black object in Lewis's hand was a handgun. Caudillo was in genuine fear of losing his life. Caudillo believed at that time that Lewis posed a threat of death or serious bodily harm to Caudillo and to others in the vicinity. The contents of Caudillo's Declaration includes, but is not limited to, statements and descriptions Caudillo made during his interview with detectives on January 25, 2021. This Declaration also includes other recollections concerning Bradley Alexander Lewis and the events leading up to and including the shooting event, and other matters involving Caudillo's training and experience. (Ex 7, Declaration of Gilberto Caudillo, ¶ 1.)

**Training and Experience**

207. Caudillo was a member of the US Marine Corps infantry from 1992 to 1996.

He is a high school graduate. (Ex 7, Declaration of Gilberto Caudillo, ¶ 2.)

208. Caudillo came to the Pima County Sheriff's Department (PCSD) in 2001. He attended and completed the basic police training academy at SALETC, the Southern Arizona Law Enforcement Training Center in Tucson, Arizona. He then attended the Pima County Sheriff's Department advanced basic training, and then the PCSD 12-week field training program. (Ex 7, Declaration of Gilberto Caudillo, ¶ 3.)

209. Caudillo's first assignment with PCSD was patrol in Ajo, Arizona. He worked a year as the district detective in Ajo. He has worked San Xavier district patrol, Rincon district patrol, DUI squad, directed patrol, school resource officer, Foothills district day shift patrol and a year or two in directed patrol. (Ex 7, Declaration of Gilberto Caudillo, ¶ 4.)

210. By January 20, 2021, Caudillo had completed several training programs including DUI/HGN training, SWAT training, SWAT instructor training, FTO (Field Training Officer) instructor training, general instructor training, firearms instructor training, explosive breaching training, regular breaching training. Attached as Exhibit to Caudillo's Declaration is a training history, listing trainings he has attended. He is a firearms instructor for the department and he has taught firearms and SWAT courses. (Ex 7, Declaration of Gilberto Caudillo, ¶ 5; Declaration Exhibit D Transcript, p. 1, lines 13-21.)

211. On January 20, 2021 Caudillo had been a member of the PCSD SWAT Team since 2007. (Ex 7, Declaration of Gilberto Caudillo, ¶ 6; Declaration Exhibit D Transcript, p. 33, lines 12-19.)

212. Caudillo was promoted from patrol deputy to sergeant on March 23, 2023. He

is currently a patrol sergeant. Caudillo is still on the SWAT roster, but has taken a year off from SWAT to concentrate on his new position as patrol sergeant. (Ex 7, Declaration of Gilberto Caudillo, ¶ 7.)

**Deadly Force Used In Self-Defense**

213. Caudillo used deadly force against Lewis to defend himself from what he perceived to be a deadly threat created by Lewis when Lewis charged at him at full speed with a black object in his right hand and while bringing his right hand up. At the time that Lewis charged at him, Caudillo perceived that Lewis had a black gun in his hand. When Caudillo was interviewed by detectives, he told them that after Lewis fell his right hand was kind of underneath him, and at that time Caudillo thought he had a gun in his hand. Caudillo remembers telling other deputies coming up "he's got a gun in his hand." When the detectives asked what was his mindset at the time of the shooting Caudillo told the detectives, "He's got a weapon in his hand, a gun in his hand, and he's coming to kill me. I'm going to be in a face to face fire fight…right now." Caudillo told the detectives that he thought it was going to be a chest to chest fire fight and he knew if he didn't stop the threat he was going to get killed, shot. Those statements to the detectives are absolutely true statements. (Ex 7, Declaration of Gilberto Caudillo, ¶ 8; Declaration Exhibit D Transcript, p. 24, lines 6-24; p. 25, lines 26-33; p. 40, line 2, to p. 41, line 7; p. 44, line 18 to p. 45, line 6.)

214. In his approximately 20 years as a patrol officer, Caudillo had been involved in many, many activities that involved chasing suspects on foot and in vehicle pursuits. Caudillo had experienced many, many suspects attempting to get away from him by running, jumping

over walls and other obstacles, hiding, and driving dangerously. (Ex 7, Declaration of Gilberto Caudillo, ¶ 9.)

215. In all his experience chasing and subduing suspects, he had never had a suspect that engaged in the conduct that Bradley Alexander Lewis displayed during their attempts to take him into custody. (Ex 7, Declaration of Gilberto Caudillo, ¶ 10.)

216. In all his 20 years' experience in patrol, Caudillo had never had a suspect flee from him in such a dangerous and desperate manner, stop the vehicle, jump out and race back at Caudillo with a black object in his hand. (Ex 7, Declaration of Gilberto Caudillo, ¶ 11.)

217. That is what Lewis did. As he came at Caudillo at full speed, Caudillo saw a black object in Lewis's hand. When Caudillo fired his handgun at Lewis, Caudillo truly felt that Lewis had a gun in his hand, he was attacking Caudillo, that Caudillo's life was in danger, that Caudillo was going to be killed or shot. (Ex 7, Declaration of Gilberto Caudillo, ¶ 12; Declaration Exhibit D Transcript, p. 24, lines 6-24; p. 40, line 2 to p. 41, line 7; p. 44, line 18 to p. 45, line 6.)

218. At the time of the shooting, Caudillo knew that Lewis had a history of an allegation of Assault with a Deadly Weapon, which had generated a probable cause alert. (Ex 7, Declaration of Gilberto Caudillo, ¶ 13; Declaration Exhibit D Transcript, p. 3, lines 1-5; p. 4, lines 18-21; p. 5, lines 5-9; p. 5, lines 24-29.)

**<u>Information About Lewis Prior To The Shooting</u>**

219. Before and at the time of the shooting, Caudillo was aware of what Lewis looked like, and he was aware that Lewis was alleged to have been involved in other criminal

activities involving guns, and that Lewis possessed a gun or guns. Caudillo had previously looked up Lewis's mug shot and involvements (law enforcement contacts) on the PCSD Spillman data system via his Mobile Data Computer that he has access to at all times while on patrol. (Ex 7, Declaration of Gilberto Caudillo, ¶ 14; Declaration Exhibit D Transcript, p. 12, lines 12-15, and lines 31-34; p. 43, lines 6-20.)

220. Caudillo was aware that there was a probable cause alert out on Bradley Alexander Lewis. A probable cause alert is issued when there is probable cause to physically arrest the subject of the alert, in this case, Bradley Alexander Lewis. (Ex 7, Declaration of Gilberto Caudillo, ¶ 15; Declaration Exhibit D Transcript, p. 3, lines 1-5; p. 4, lines 18-21; p. 5, lines 5-9 and lines 24-29.)

221. Caudillo was aware that the probable cause alert was generated from an allegation that Lewis had pointed a gun at and threatened a person or persons, which constitutes Assault with a Deadly Weapon (AWDW). Caudillo had previously read the contents of the probable cause alert. The description of the AWDW incident contained the description that Lewis had pulled out a black handgun and pointed it at a man and said, "I've dropped ten bodies before you're just a number to me. I'll do it again." (Ex 7, Declaration of Gilberto Caudillo, ¶ 16.)

222. On 01-04-2021, a couple of weeks before the shooting, other deputies and Caudillo had responded to 6661 N. Paseo de Angel, which is the house next door to Lewis's grandparents' house (Ralph and Helen Stricklen at 6671 N. Paseo de Angel), where it was believed that Lewis resided. The deputies responded to 6661 N. Paseo de Angel for a report

of shots fired at the 6661 house, and bullet casings found on the ground there. *(See* Declaration Exhibit B, PCSD Report No. 210103235, excerpted.) (Ex 7, Declaration of Gilberto Caudillo, ¶ 17; Declaration Exhibit D Transcript, p. 3, line 44 to p. 4, line 29.)

223. During that call at the 6661 N. Paseo de Angel address there was discussion about whether Lewis may be a suspect in, or a target of, the shots fired at the 6661 house next door to Lewis's grandparents' house. (Ex 7, Declaration of Gilberto Caudillo, ¶ 18; Declaration Exhibit D Transcript, p. 3, line 44 to p. 4, line 29.)

224. The owners at 6661 N. Paseo de Angel had called and said they located two shell casings in their yard. Two bullet impacts to the house were found and bullet rounds. During that investigation, Caudillo had a conversation with then Sergeant Moseley. Moseley told Caudillo that he checks the 6671 address daily looking for Lewis's blue Toyota Tacoma pickup truck, because of the probable cause alert. Caudillo was also within earshot of listening to conversations that happened with detectives, Robbery/Assault detectives, and Sergeant Moseley about the 6671 house and Bradley Alexander Lewis. (Ex 7, Declaration of Gilberto Caudillo, ¶ 19; Declaration Exhibit D Transcript, p. 3, line 44 to p. 4, line 29.)

225. On 11-02-2020, with other deputies Caudillo had investigated a road rage incident in front of the LA Fitness gym on Ina Road and Shannon. The victim pulled into the parking lot and someone stepped out of a vehicle and shot at the victim's vehicle. Caudillo located a spent shell casing at the entrance to the LA Fitness. *(See* Declaration Exhibit C, PCSD Report 201102154, excerpted.) (Ex 7, Declaration of Gilberto Caudillo, ¶ 20.)

226. Later, on 01-04-2021 when Sergeant Moseley and Caudillo were at the call

involving the shots fired at the 6661 N Paseo de Angel residence, they discussed whether there was a chance that Lewis was the shooter at the LA Fitness gym road rage shooting. Lewis's grandparents' house is approximately a mile south and east of the LA Fitness gym. The gym is at Ina and Shannon Road. The grandparents' home is just east of Shannon Road a mile south of Ina. (Ex 7, Declaration of Gilberto Caudillo, ¶ 21; Declaration Exhibit D Transcript, p. 13, lines 3-24.)

227. Caudillo knew when he learned that Sergeant Moseley was on Paseo de Angel doing a high risk stop on the blue Toyota pickup with a paper license plate, that Caudillo wanted ballistic shields in play at the scene because Caudillo knew they were dealing with Bradley Lewis. And Caudillo knew that he was dangerous. There was a probable cause alert on Lewis for a violent crime, threatening with a gun. (Ex 7, Declaration of Gilberto Caudillo, ¶ 22; Declaration Exhibit D Transcript, p. 5, lines 5-13; p. 2, line 22 to p. 3, line 14.)

228. They were not just dealing with a random suspicious person. They were dealing with a specific person, Bradley Alexander Lewis, that had involvement with guns and a felony probable cause alert that involved threatening people with a gun. (Ex 7, Declaration of Gilberto Caudillo, ¶ 23; Declaration Exhibit D Transcript, p. 5, lines 19- 29.)

229. On the day of the shooting, Caudillo's Foothills District work shift was 0600 to 1600. That morning Caudillo left his house in his take-home PCSD Patrol Explorer SUV. Caudillo had been on a SWAT callout the night before, but he had gotten plenty of sleep before work that morning. (Ex 7, Declaration of Gilberto Caudillo, ¶ 24; Declaration Exhibit D Transcript, p. 1, line 36 to p. 2, line 8.)

230. Caudillo was driving down Silverbell, headed to Ina Road to get gas at the Pima County gas pumps. Caudillo heard Sergeant Moseley on the radio say something about Moseley being on Paseo de Angel and a blue Toyota Tacoma pickup truck. (Ex 7, Declaration of Gilberto Caudillo, ¶ 25; Declaration Exhibit D Transcript, p. 2, lines 17-27.)

231. Caudillo immediately knew that Moseley was talking about Lewis's blue Toyota Tacoma pickup truck that Sergeant Moseley had previously briefed Caudillo on when they were at the 6661 N. Paseo de Angel residence on a shots fired call. Caudillo knew that Sergeant Moseley had been trying to locate that blue Toyota Tacoma for four, five, six weeks. (Ex 7, Declaration of Gilberto Caudillo, ¶ 26; Declaration Exhibit D Transcript, p. 2, lines 17-27.)

232. Caudillo knew that Sergeant Moseley had been checking that residence for a long time because the driver of the pickup truck, Bradley Alexander Lewis, was a suspect in violent crimes and there was a probable cause alert out on him. (Ex 7, Declaration of Gilberto Caudillo, ¶ 27; Declaration Exhibit D Transcript, p. 3, lines 1-5.)

233. That morning Caudillo was having trouble logging into his Mobile Data Computer (MDC) in his patrol vehicle. Caudillo contacted terminal OPS to reset his password and got logged on. Caudillo became aware that Sgt. Moseley was requesting ballistic shields from the Foothills District Office at Ina Road and Shannon. Ballistic shields are heavy, rifle-rated shields used for protection from gunfire. Deputies only call for ballistic shields when they reasonably believe they will face a threat of gunfire. Caudillo believed that having ballistic shields at the scene was an appropriate tactic, given the danger presented by

Lewis. (Ex 7, Declaration of Gilberto Caudillo, ¶ 28; Declaration Exhibit D Transcript, p. 2, line 38 to p. 3, line 14; p. 5, lines 5-29.)

234. Caudillo had started driving to the Foothills District Office to get the ballistic shields when Deputy Robles said on the radio that he had the ballistic shields and was en route to Sergeant Moseley's location. (Ex 7, Declaration of Gilberto Caudillo, ¶ 29; Declaration Exhibit D Transcript, p. 3, lines 8-11.)

**Deputy Caudillo's Arrival at N. Paseo de Angel**

235. Caudillo then drove to Sergeant Moseley's location near the intersection of W. Positano Way and N. Paseo de Angel. As Caudillo arrived at that location, he heard Sgt. Moseley telling Deputy Pool to set up road tire spikes. Road tire spikes are designed to be stretched across a roadway to puncture the tires of a passing, fleeing vehicle. (Ex 7, Declaration of Gilberto Caudillo, ¶ 30; Declaration Exhibit D Transcript, p. 3, lines 16-21.)

236. Caudillo was aware that there was an earlier call about suspicious activity on a street named Morning Jewel, and that Lewis was somehow involved in that call. (Ex 7, Declaration of Gilberto Caudillo, ¶ 31; Declaration Exhibit D Transcript, p. 3, lines 21-23.)

237. Attached as Exhibit D to Caudillo's Declaration is a true and accurate copy of the transcript of his interview with Detectives Jonathan Siress and Jason Davila. (Ex 7, Declaration of Gilberto Caudillo, ¶ 32.)

238. At his interview with PCSD Detective Jonathan Siress and Detective Jason Davila, Caudillo drew a diagram showing where Deputy Berry's patrol vehicle (labeled "B") and Sgt. Moseley's patrol vehicle (labeled "M") were located in reference to the blue pickup

truck "S". (*See* Caudillo diagram, Exhibit E to Declaration of Gilberto Caudillo) There is a triangle drawn on each vehicle indicating the direction the vehicle is facing. The drawing is not to scale and only approximates the positions of the vehicles. (Ex 7, Declaration of Gilberto Caudillo, ¶ 33; Declaration Exhibit E, Caudillo diagram.)

239. The blue pickup truck was parked on the dirt shoulder beside the pavement and facing away from the PCSD vehicles and facing oncoming traffic. It was near some bushes and cactus, shown on the diagram with multiple circular squiggly type lines. (Ex 7, Declaration of Gilberto Caudillo, ¶ 34; Declaration Exhibit E, Caudillo diagram.)

240. The two PCSD patrol cars were stationed behind the truck and offset from each other in a standard "high risk stop" formation. (*See* Declaration Exhibit E.) There were deputies challenging the blue truck, meaning that the deputies were shouting at any potential occupants of the truck to get out of the truck with their hands up. (Ex 7, Declaration of Gilberto Caudillo, ¶ 35; Declaration Exhibit D Transcript, p. 3, lines 27-38.)

241. Sergeant Moseley told Caudillo that he thought that Lewis was either in the blue pickup truck or in the large fifth-wheel travel trailer nearby, or running around the neighborhood somewhere. Sgt. Moseley and Caudillo discussed tactics, including whether to search the large fifth-wheel travel trailer first or the blue pickup truck. (Ex 7, Declaration of Gilberto Caudillo, ¶ 36; Declaration Exhibit D Transcript, p. 5, line 31 to p. 6, line 30.)

242. They decided to take the blue pickup truck first. Caudillo was in favor of that for a couple of reasons. First, the truck was the easiest to approach and to eliminate if Lewis is not in it. Second, taking the truck first takes Lewis's mobility out of play immediately.

They did not want Lewis to be able to flee into the public and to pose a danger to the public. (Ex 7, Declaration of Gilberto Caudillo, ¶ 37; Declaration Exhibit D Transcript, p. 6, lines 9-30.)

243. Caudillo suggested to Sergeant Moseley that Caudillo drive his patrol vehicle past the blue truck using his spotlight to try to see inside, and then Caudillo would make a U-turn and drive his patrol vehicle towards the front of the blue truck and stop close to it to block it from moving forward. Sgt. Moseley was already parked behind the blue truck. Sgt. Moseley agreed with that plan, and suggested that Caudillo have Deputy Robles ride with him and carry a ballistic shield. (Ex 7, Declaration of Gilberto Caudillo, ¶ 38; Declaration Exhibit D Transcript, p. 6, lines 18-30.)

244. Caudillo drove past the blue truck to the three-way N. Paseo De Angel "Y" intersection where he planned to make his u-turn and drive back to block the front of the blue truck. Caudillo could not see inside the blue truck even with his side mounted spotlight as he drove past because the back and side windows were very darkly tinted. (Ex 7, Declaration of Gilberto Caudillo, ¶ 39; Declaration Exhibit D Transcript, p. 6, lines 32-40; p. 22, line 33 to p. 23, line 4.)

245. When Caudillo got to the three-way "Y" intersection, there was a pickup truck coming toward him. Caudillo could see that an older gentleman was driving. Caudillo advised him to go back. He looked like he didn't understand. Caudillo wanted to convey to him the scariness of the situation and so Caudillo ended up shouting at him that there is a guy with a gun in that car (the blue pickup truck). Caudillo told him to go back to his house. He

turned his truck around and drove back the way he came. Caudillo learned later that that gentleman was Ralph Stricklen, Lewis's grandfather. (Ex 7, Declaration of Gilberto Caudillo, ¶ 40; Declaration Exhibit D Transcript, p. 6, line 32 to p. 7, line 3.)

246. At that point, Caudillo made his U-turn and drove back toward the blue pickup truck which was now facing him. Caudillo pulled up to the blue pickup truck at an angle, not nose to nose, not straight on. Caudillo didn't want there to be a crossfire situation among the other deputies and him. (Ex 7, Declaration of Gilberto Caudillo, ¶ 41; Declaration Exhibit D Transcript, p. 7, lines 5-9; p. 14, lines 17-23.)

247. When Caudillo stopped he was in a more or less 45-degree angle to the blue pickup truck at the truck's front passenger side. The diagram Caudillo drew, Declaration Exhibit E, shows where he stopped my patrol vehicle, labeled "Caudillo," in relation to the blue pickup truck. (Ex 7, Declaration of Gilberto Caudillo, ¶ 42; Declaration Exhibit E Caudillo Diagram; Declaration Exhibit D Transcript, p. 7, line 31 to p. 8, line 24.)

248. Caudillo stopped his patrol vehicle just inches from the blue pickup truck. He didn't want to give the blue pickup truck any room to move forward. He didn't want there to be space between his patrol vehicle and the blue pickup truck that would allow the blue pickup truck to get momentum and to ram him and plow through him. (Ex 7, Declaration of Gilberto Caudillo, ¶ 43; Declaration Exhibit D Transcript, p. 8, line 28 to p. 9, line 11.)

249. Caudillo's primary goal at this point was to keep that blue pickup truck from going mobile. When he pulled his patrol vehicle to the front of the blue truck, he exposed himself and placed himself in a potentially dangerous position to prevent the truck from going

mobile, escaping, and further endangering the public and any of the deputies at the scene. (Ex 7, Declaration of Gilberto Caudillo, ¶ 44; Declaration Exhibit D Transcript, p. 10, lines 1-25.)

250. When Caudillo stopped he could see that Lewis was in the driver's seat of the truck. Lewis had squeezed himself down to where it looked like his left ear was touching the door panel, with his head down where maybe the door handle is. It appeared Lewis was trying to hide, using the dashboard, trying to get underneath the light stream from Caudillo's spotlight. (Ex 7, Declaration of Gilberto Caudillo, ¶ 45; Declaration Exhibit D Transcript, p. 11, lines 19-22.)

251. Caudillo could see the right side of Lewis's face, his hair. Caudillo saw him moving, trying to crouch, like he was trying to hide. (Ex 7, Declaration of Gilberto Caudillo, ¶ 46; Declaration Exhibit D Transcript, p. 11, lines 22-24.)

252. Then Lewis sat up and started the truck. Caudillo recognized him as Bradley Lewis. Before this day, Caudillo had pulled up Lewis's PCSD Spillman record mugshot and involvements on his Mobile Data Computer (MDC) and looked at his mug shot and reviewed his involvements. (Ex 7, Declaration of Gilberto Caudillo, ¶ 47; Declaration Exhibit D Transcript, p. 11, line 24 to p. 12, line 15.)

253. Caudillo had previously reviewed the Probable Cause Alert for AWDW (Assault With a Deadly Weapon). Caudillo read the description of the December 4, 2020 incident in which Lewis pulled a black handgun on two young men and threatened to kill them. (Ex 7, Declaration of Gilberto Caudillo, ¶ 48.)

254. Caudillo has listened to the recording of the radio traffic and he can be heard saying loudly over the radio, "He's inside. He's in the car." (Ex 7, Declaration of Gilberto Caudillo, ¶ 49; Declaration Exhibit D Transcript, p. 11, lines 27-40.)

255. Lewis put the truck in reverse and floored it. He was going in reverse full throttle, at a high rate of speed. Caudillo thought at the time that he had contact with a patrol vehicle behind him. (Ex 7, Declaration of Gilberto Caudillo, ¶ 50; Declaration Exhibit D Transcript, p. 13, lines 32-35; p. 15, lines 2-4.)

256. Lewis then threw it into drive and went forward, wheels spinning, dust flying. Lewis drove around the front of Caudillo's patrol vehicle, through the desert vegetation depicted in the diagram. The vegetation was very thick and tall. Lewis's truck was bouncing up and down violently going through it. (Ex 7, Declaration of Gilberto Caudillo, ¶ 51; Declaration Exhibit D Transcript, p. 15, lines 5-9.)

257. It required full throttle from the Lewis truck to get through the desert vegetation. Caudillo's impression and observation was that Lewis had to push that truck to its maximum capacity to get through the desert vegetation. (Ex 7, Declaration of Gilberto Caudillo, ¶ 52; Declaration Exhibit D Transcript, p. 15, lines 32-34.)

258. Caudillo let Deputy Robles out of his patrol vehicle. Caudillo turned on lights and siren. Caudillo did not realize that Lewis was heading into a cul-de-sac. Caudillo thought Lewis was going to flee onto public roads into the public. Caudillo wanted the lights and siren to alert anyone in the area such as early morning walkers. (Ex 7, Declaration of Gilberto Caudillo, ¶ 53; Declaration Exhibit D Transcript, p. 16, lines 1-10.)

259. Caudillo did a reverse three-point turn. While doing that, another patrol vehicle passed Caudillo in pursuit of Lewis. That turned out to be Sergeant Moseley. (Ex 7, Declaration of Gilberto Caudillo, ¶ 54; Declaration Exhibit D Transcript, p. 16, lines 15-27.)

260. Caudillo followed in pursuit. He saw the Lewis truck going up into the driveway of 6671 N. Paseo de Angel. (Ex 7, Declaration of Gilberto Caudillo, ¶ 55; Declaration Exhibit D Transcript, p. 16, lines 29-34.)

261. Somewhere in this, Caudillo shut off his siren that he had turned on to warn early morning walkers and other vehicles, since he realized that Lewis was going into a residential private property neighborhood and not into the public. He also knew that Lewis's grandparents lived there. (Ex 7, Declaration of Gilberto Caudillo, ¶ 56; Declaration Exhibit D Transcript, p. 17, lines7-19.)

262. Caudillo had done two checks on the house next door at 6661 N Paseo de Angel as a result of the shots fired call on 01-03-2021. While doing that he had also been looking for the blue Tacoma at the 6671 N Paseo de Angel address where Lewis's grandparents lived. (Ex 7, Declaration of Gilberto Caudillo, ¶ 57; Declaration Exhibit D Transcript, p. 17, line 22 to p. 18, line 8.)

263. As Caudillo approached the 6671 driveway, he could hear metal crunching. When Caudillo got into the driveway he saw the blue truck moving forward. (Ex 7, Declaration of Gilberto Caudillo, ¶ 58; Declaration Exhibit D Transcript, p. 16, lines 29-34.)

264. As the blue truck was moving forward, Caudillo's window was down, and he could hear metal scraping and scratching. (Ex 7, Declaration of Gilberto Caudillo, ¶ 59;

Declaration Exhibit D Transcript, p. 18, lines 8-13.)

265. Caudillo could tell there was a barrier of some sort to the left of the blue pickup truck. He later learned that the barrier was Lewis's grandfather's (Ralph Stricklen's) pickup truck. (Ex 7, Declaration of Gilberto Caudillo, ¶ 60; Declaration Exhibit D Transcript, p. 19, lines 8-20.)

266. Lewis was moving his blue pickup truck between the barrier (grandfather's truck) on his left and the house on his right. Caudillo heard scratching noises like he was damaging his truck. (Ex 7, Declaration of Gilberto Caudillo, ¶ 61; Declaration Exhibit D Transcript, p. 19, lines 20-27.)

267. Caudillo remembers thinking, this guy is driving his own vehicle violently with total disregard for his vehicle and other people's property, he is destroying stuff. (Ex 7, Declaration of Gilberto Caudillo, ¶ 62; Declaration Exhibit D Transcript, p. 19, lines 27-30.)

268. It looked to Caudillo like a desperate attempt to get away by someone who is out of control. It was like Lewis was trying to force a square peg into a round hole. (Ex 7, Declaration of Gilberto Caudillo, ¶ 63; Declaration Exhibit D Transcript, p. 19, lines 30-32.)

269. The engine was revving and Caudillo could not tell if there was something in front of Lewis that he was trying to push. (Ex 7, Declaration of Gilberto Caudillo, ¶ 64; Declaration Exhibit D Transcript, p. 19, lines 26-27.)

270. Caudillo was trying to keep his patrol vehicle close to the rear of Lewis's blue truck to take his mobility away, to keep him from going in reverse and getting past Caudillo like he did earlier. (Ex 7, Declaration of Gilberto Caudillo, ¶ 65; Declaration Exhibit D

Transcript, p. 20, lines 1-7.)

271. Then the blue truck stopped. Caudillo's thought was that Lewis was going to take off running into the desert behind the house. Caudillo knew there was a large opening of desert space back there from his earlier response to the shots fired call at the 6661 house next door. (Ex 3, Declaration of Gilberto Caudillo, ¶ 66; Exhibit D Transcript, page 20, lines 1-7.)

272. When the Lewis blue truck stopped, Caudillo could see Lewis's tailgate, truck bed, and most of the rear window. The rear window was darkly tinted and Caudillo could not see into the blue truck. (Ex 7, Declaration of Gilberto Caudillo, ¶ 67; Declaration Exhibit D Transcript, p. 21, lines 22-27; p. 22, line 33 to p. 23, line 11.)

273. Lewis's blue truck was at an angle to Caudillo's patrol vehicle, and Caudillo is not sure whether he could see the A pillar on the driver's side. Caudillo knows he could not see the A pillar on the front passenger side. (Ex 7, Declaration of Gilberto Caudillo, ¶ 68; Declaration Exhibit D Transcript, p. 21, lines 27-30.)

274. Sitting in his driver's seat, Caudillo could not see all of Lewis's blue truck. Caudillo never saw Lewis's driver's side door open. (Ex 7, Declaration of Gilberto Caudillo, ¶ 69; Declaration Exhibit D Transcript, p. 21, lines 30-32.)

275. When the truck stopped, things happened very fast, really quick, within an instant actions were taking place. (Ex 7, Declaration of Gilberto Caudillo, ¶ 70; Declaration Exhibit D Transcript, p. 23, lines 26-29.)

276. Caudillo did not see Lewis come out of his truck. Caudillo thinks that's what

Sergeant Moseley was able to see. Caudillo heard Sergeant. Moseley's voice shout, "watch out, watch out." He said it in a frantic voice, in a voice that Caudillo was not used to hearing out of Sergeant Moseley. Caudillo immediately believed that Sergeant Moseley was seeing and warning him of some kind of threat that Caudillo was not seeing. (Ex 7, Declaration of Gilberto Caudillo, ¶ 71; Declaration Exhibit D Transcript, p. 23, lines 26-38.)

277. Caudillo was still sitting in his driver's seat when he saw Lewis. He saw a human figure who he recognized, dark hair, slender, just flying at him, moving so fast. He had a black object in his hand that Caudillo believed was a gun. He was coming right at Caudillo, right for him, attacking Caudillo while Caudillo is still sitting in his driver's seat. (Ex 7, Declaration of Gilberto Caudillo, ¶ 72; Declaration Exhibit D Transcript, p. 24, lines 1-24.)

278. Sitting in the driver's seat is a dangerous place for a law enforcement officer to be. There is no mobility. Caudillo is a sitting duck, a stationary target. Caudillo is aware through training that officers have been shot in their vehicles just sitting in their patrol vehicle at an intersection because they can't move out of the way. (Ex 7, Declaration of Gilberto Caudillo, ¶ 73; Declaration Exhibit D Transcript, p. 25, lines 3-11.)

279. Lewis went from trying to get away from Caudillo to now attacking him. Caudillo took one step out of his patrol vehicle with his left foot, immediately drew his gun, and came up with both hands, pointed his gun at Lewis and fired. (Ex 7, Declaration of Gilberto Caudillo, ¶ 74; Declaration Exhibit D Transcript, p. 24, lines 11-24.)

280. Just before and at the time Caudillo fired, he looked at Lewis. Lewis was moving his arms. Caudillo saw a black object, a black thing in his right hand. Caudillo was focused

on his hands. Caudillo could see a black item that he believed was a gun. (Ex 7, Declaration of Gilberto Caudillo, ¶ 75; Declaration Exhibit D Transcript, p. 24, lines 12-24; p. 39, line 26 to p. 41, line 7.) At deposition, Deputy Caudillo described: "I see a gun. A black mass. A black square that looks just like a Glock. *** (H)is hand is in a position, as, like, if you were to hold a coffee cup. And above his index finger, on top of his -- there is a black mass that – it looks square. I think it's a Glock. I think it's a gun. And he's within *** six to eight feet from me, coming at me. I am -- I fear for my life." (Ex 8, Deposition of Gilberto Caudillo, p. 73:8-22.)

281. Caudillo doesn't recall if he gave commands. Based on his training and experience, the likelihood is that he said something like show me your hands, but he doesn't remember saying it. (Ex 7, Declaration of Gilberto Caudillo, ¶ 76; Declaration Exhibit D Transcript, p. 24, lines 22-31.)

282. It was so fast, and Lewis was the distance from Caudillo's door to the front of Caudillo's hood, and just in front of that. (Ex 7, Declaration of Gilberto Caudillo, ¶ 77; Declaration Exhibit D Transcript, p. 24, lines 28-31.)

283. When Caudillo saw his face initially, he saw focus and someone looking right at him and going right to him. There was no deviation of which way Lewis was looking. He was looking right at Caudillo and propelling his body as fast as he could. He was coming right at Caudillo, he was coming right for Caudillo, and Caudillo is seeing that this guy's attacking him while Caudillo is his front seat. Lewis went from trying to get away, and he could have run into the desert behind the house, to now he is attacking Caudillo and Caudillo

is a sitting duck in his seat. (Ex 7, Declaration of Gilberto Caudillo, ¶ 78; Declaration Exhibit D Transcript, p. 24, lines 32-42; and p. 24, lines 6-14.)

284. Caudillo jumps out of his car, takes one step out and immediately draws his gun. He comes up with both hands, point, Caudillo is looking at Lewis and he's moving his arms and Caudillo can see he's got a black thing in his hand. He was coming at Caudillo like he couldn't make his body move any faster. He was pushing his body at top speed directly in front of my vehicle coming at Caudillo. Caudillo could see a black thing, a black item in his right hand that Caudillo believed was a gun. (Ex 7, Declaration of Gilberto Caudillo, ¶ 79; Declaration Exhibit D Transcript, p. 24, lines 14-24; p. 25, lines 15-21; p. 40, line 24 to p. 41, line 7.)

285. When Caudillo saw Lewis running at him with a black mass in his hand, considering the time and distance, the combination of his speed and distance, Lewis was so close that Caudillo only had time to draw his gun, point and shoot. Caudillo believed at that moment that his life was in danger and that it was necessary to shoot in self-defense. (Ex 7, Declaration of Gilberto Caudillo, ¶ 80; Declaration Exhibit D Transcript, p. 25, lines 15-19; and p. 40, line 24 to p. 41, line 7.)

286. It was so close, it seemed like the three-yard line. Caudillo did not have time to aim with the front sight on the gun. Caudillo did not see a sight picture. Caudillo only had time to point and shoot. (Ex 7, Declaration of Gilberto Caudillo, ¶ 81; Declaration Exhibit D Transcript, p. 25, lines 15-21.)

287. Caudillo thought it was going to be a chest to chest fire fight and Caudillo knew

that if he didn't stop the threat he was going to get killed, shot. The distance was so close it made the danger so high that there was no one, neither had an advantage. Caudillo had no other choice. Caudillo doesn't feel that he had any other choice to save his own life. Caudillo felt that if he hesitated he would have got killed. He would have got shot. (Ex 7, Declaration of Gilberto Caudillo, ¶ 82; Declaration Exhibit D Transcript, p. 40, line 24, to p. 41, line 7.)

288. Lewis collapsed to the ground. Caudillo immediately backed away to take cover at the back of my patrol vehicle. (Ex 7, Declaration of Gilberto Caudillo, ¶ 83; Declaration Exhibit D Transcript, p. 25, lines 26-28.)

289. Lewis's right hand was kind of underneath him. Caudillo thought he had a gun in his hand. Caudillo remembers telling others approaching that he's got a gun in his hand. (Ex 7, Declaration of Gilberto Caudillo, ¶ 84; Declaration Exhibit D Transcript, p. 25, lines 28-33.)

290. Commands were given to Lewis to show me your hands. Lewis said I can't move my arm. Lewis was able to pull his right arm from underneath him and extend it enough to let go of what he had in his hand. (Ex 7, Declaration of Gilberto Caudillo, ¶ 85; Declaration Exhibit D Transcript, p. 25, lines 33-36.)

291. At that time, Caudillo could see it was a black object but it wasn't a gun. It looked like a key fob and a black lanyard. Caudillo could see that his left hand was empty. (Ex 7, Declaration of Gilberto Caudillo, ¶ 86; Declaration Exhibit D Transcript, p. 25, lines 35-39.)

292. Caudillo then moved up and handcuffed Lewis behind his back. Spacewise it

was very tight where Lewis lay between the vehicles. Caudillo turned him around, put his arms through Lewis's arms and dragged him backwards, face up, to a more open area to render aid. Caudillo started looking for bullet impact injuries and couldn't find any wounds to Lewis's frontal area. (Ex 7, Declaration of Gilberto Caudillo, ¶ 87; Declaration Exhibit D Transcript, p. 25, line 41 to p. 26, line 23.)

293. Caudillo heard Sgt. Moseley say they need meds (medical) 10-18, or as soon as possible, or something like that. Deputy Berry had an IFAK (Individual First Aid Kit). Somebody said scissors, and Caudillo saw someone cut the front of Lewis's shirt open. Caudillo saw the wound to Lewis's right shoulder. (Ex 7, Declaration of Gilberto Caudillo, ¶ 88; Declaration Exhibit D Transcript, p. 26, line 39,to p. 27, line 4.)

294. Caudillo was aware that a call had been made for medical (paramedics) to respond. Others began attending to Lewis and Caudillo stepped away. (Ex 3, Declaration of Gilberto Caudillo, ¶ 89; Exhibit D Transcript, page 27, lines 1-8.)

295. Caudillo was recently shown photographs of police expert Steve Ijames holding the key fob and lanyard. (*See* photographs, Declaration Exhibit F.) Upon seeing those photographs, Caudillo immediately recognized and stated out loud, "That's what I saw." By that he meant that's the way that Lewis was holding the black object that he perceived at the time to be a gun. (Ex 7, Declaration of Gilberto Caudillo, ¶ 90.)

296. Attached as Declaration Exhibit G are photos of Caudillo as he appeared at the time of and immediately after the incident. (Ex 7, Declaration of Gilberto Caudillo, ¶ 91.)

297. In his deposition, Sgt. Caudillo was asked, What made this small black mass

deadly? His answer was this:

> A. Well, from the beginning, we have to rewind all the way back and the whole history behind how the Sheriff's Department got involved in this, where Mr. Lewis was a suspect in pointing a black handgun at some individuals, threatening them with death. "I've dropped ten bodies" or something like that, making claims of killing people.
>
> Forward that into an investigation, forward that into probable cause alert, and into the events of that morning where Sergeant Moseley found the vehicle. I believe I was dealing with a suspect that was very dangerous, that had a probable cause alert, that is known to threaten people with those firearms that he has the probable cause alert for.
>
> We've given him the chance to have a peaceful surrender using our basic felony stop tactics. His response is to throw it in reverse, and what I thought was crash into a patrol vehicle, then using his vehicle in full throttle, bounding over a large barrel cactus in a manner that was completely reckless and with any – any regard for anybody there, then flee into a property that I know his relative's there, damage his vehicle in a manner that I felt was someone that was acting in a complete dangerous and desperate manner to escape.
>
> A person out of his mind. A person – no reasonable person would do this. And given a large desert directly to the front, I know that area from a previous shooting investigation that I've done next door, that we suspected that he possibly could have some involvement with another shooting investigation that took place at the L.A. Fitness within a mile away, that there was a theory that he might have been the shooter in that.
>
> All that played into play once he came out and ran towards me, holding what I perceived to be a gun in his hand, at full force, full speed, not even letting this little, tiny gap between two vehicles stop him. When he could have simply turned around and ran into the darkness of the desert behind him, if he was really trying to flee. I was presented with an immediate threat of my life. So, now, that we know it's a fob, it's easy to say, "Well, you're allowed to shoot people with a fob?" (Question mark inserted as a deposition correction.)

> All the information I had was that a very dangerous person, who I made every effort to look at his hands – in my mind, I'm saying, "hands, hands, hands." I see what I think is a gun coming at me to kill me. I did what I did to protect myself in that immediate instance of a threat that's six to eight feet away.
>
> (Ex 8, Deposition of Sgt. Gilberto Caudillo, pp. 152:4 – 154:5.)

**PCSD DEPUTY JUSTIN BERRY**

Introductory note by defense counsel Daryl Audilett about Deputy Berry Declaration statements: The statements by PCSD Deputy Justin Berry below will cite to the numbered paragraphs of his Declaration. Where appropriate, said statements will also be separately cited to the transcript of the interview (page/line) that Deputy Berry gave to PCSD detectives on January 20, 2021. This will be done where the Declaration subject matters are raised, referenced, or discussed in the detective interview transcript. Deputy Berry's Declaration is Exhibit 9 to Defendants' Separate Statement of Facts (DSSOF). The Deputy Berry detective interview transcript is Exhibit A to Deputy Berry's Declaration. The Deputy Berry detective interview transcript cite will be designated: "Declaration Exhibit A Transcript, page ___, lines ___".

298. Deputy Justin Berry (Berry) is a deputy with the Pima County Sheriff's Department (PCSD). (Exhibit 9, Declaration of Deputy Berry, ¶ 1.)

299. On January 20, 2021, Deputy Berry responded to Sgt. Moseley's call for assistance to the area of West Positano Way and N. Paseo De Angel. (Exhibit 9, Declaration of Deputy Berry, ¶ 2.)

300. Exhibit A is a transcript of Deputy Berry's audio-recorded interview by

Detective J. Rodriguez and Detective J. Siress on January 20, 2021. The interview was conducted in the area of Paseo De Angel and Positano. Berry has listened to the audio recording while reading the transcript and the transcript appears to be an accurate transcript of the audio-recorded interview. (Exhibit 9, Declaration of Deputy Berry, ¶ 3.)

301. Exhibit B is a drawing Deputy Berry made during his interview with the detectives to show where certain vehicles were located in the driveway at 6671 N. Paseo De Angel. The "#5" with an arrow drawn to a circle represents where Deputy Berry encountered Ralph Stricklen. Number "5" means Caucasian Male. (Exhibit 9, Declaration of Deputy Berry, ¶ 4.)

302. Prior to becoming a deputy with PCSD, Berry spent approximately 10 years as a law enforcement officer with the Norfolk Police Department in Norfolk, Virginia. During that time, he received training in K-9, SWAT, hostage negotiation, radar, vehicle patrol, bike patrol, and DUI certification. (Exhibit 9, Declaration of Deputy Berry, ¶ 5.)

303. Before being a police officer in Norfolk, Virginia, Berry served in the U.S. Navy for 5 years as an air crewman. (Exhibit 9, Declaration of Deputy Berry, ¶ 6.)

304. To become a deputy with PCSD Berry attended the Pima County Sheriff's Department academy. After completing the basic academy, he completed the Advanced Academy and then the 12-week Field Training program. (Exhibit 9, Declaration of Deputy Berry, ¶ 7.)

305. On January 20, 2021, Berry was working patrol on the day shift (0600 to 1400 – corrected to 1600 in his deposition) in the Foothills District. He had been working patrol in

the Foothills District for about four months. On that morning Berry was dressed in his Sheriff's Department uniform, as depicted in Declaration Exhibit C, and he was driving a marked Sheriff's Department vehicle. (Exhibit 9, Declaration of Deputy Berry, ¶ 8.)

306. On that morning Deputy Berry heard Sgt. Moseley on the radio requesting a couple of units at his location, Positano and Paseo de Angel. (Exhibit 9, Declaration of Deputy Berry, ¶ 9; Berry Declaration Exhibit A, Transcript, p. 3, lines 1-13.)

307. Berry drove to that location and met with Sgt. Moseley. Deputy Pool was already there. Sgt. Moseley told Berry that there was an individual who was known to carry a firearm associated with the truck that Berry could see was parked beside the pavement on Paseo de Angel and facing oncoming traffic. (Exhibit 9, Declaration of Deputy Berry, ¶ 10; Berry Declaration Exhibit A, Transcript, p. 3, lines 18-20.)

308. Sgt. Moseley told Berry that the individual's name was Bradley Lewis, and there was a probable cause alert on Lewis. Sgt. Moseley said we have his truck, which means that Sgt. Moseley ran the truck information through their system and it came back to Bradley Lewis, and that the truck was known to be involved in other instances. (Exhibit 9, Declaration of Deputy Berry, ¶ 11; Berry Declaration Exhibit A, Transcript, p. 3, line 35, to p. 4, line 3.)

309. Sgt. Moseley said we are going to treat it like the suspect is inside the truck. Sgt. Moseley wanted them to clear the house directly next to where the truck was parked because he had seen a motion sensor light come on and go off. (Exhibit 9, Declaration of Deputy Berry, ¶ 12; Berry Declaration Exhibit A, Transcript, p. 3, lines 19-31.)

310. Sgt. Moseley and Deputy Berry walked over to the parking area of that house

with the 5th wheel travel trailer parked there. They made sure there was nobody in or around that area. (Exhibit 9, Declaration of Deputy Berry, ¶ 13; Berry Declaration Exhibit A, Transcript, p. 3, lines 22-34.)

311. While Sgt. Moseley and Deputy Berry were at the corner of Positano and Paseo de Angel waiting for another patrol unit to arrive, a white Jeep Cherokee drove up from the Paseo de Angel direction. Sgt. Moseley and Deputy Berry both activated their emergency lights and began to drive forward toward the white Jeep Cherokee. They spoke with the driver who was not associated with Bradley Lewis or his truck and they allowed the Jeep to pass through and go on its way. (Exhibit 9, Declaration of Deputy Berry, ¶ 14; Berry Declaration Exhibit A, Transcript, p. 4, lines 8-21.)

312. At that point in time, Moseley and Berry were close enough to the suspect truck that Sgt. Moseley decided to post up there. Sgt. Moseley's vehicle was behind the blue truck. Sgt. Moseley took a position behind his driver's door, and Berry took a position behind his front passenger door. Sgt. Moseley started challenging the truck, meaning yelling commands to any people in the vehicle. (Exhibit 9, Declaration of Deputy Berry, ¶ 15; Berry Declaration Exhibit A, Transcript, p. 4, lines 23-24.)

313. The blue Toyota pickup truck was light blue and it had a temporary license plate. It had dark tinting on all the windows and was facing away from them and their patrol vehicles. (Exhibit 9, Declaration of Deputy Berry, ¶ 16; Berry Declaration Exhibit A, Transcript, p. 4, lines 28-36.)

314. By the time they started challenging the truck, Deputy Matthew Gilbert had

arrived and he was standing by Berry's vehicle using Berry's vehicle spotlight to illuminate the truck. (Exhibit 9, Declaration of Deputy Berry, ¶ 17; Berry Declaration Exhibit A, Transcript, p. 5, lines 3-6.)

315. Shortly after that, Sgt. Moseley asked Deputy Berry to take up Moseley's position on the driver's side of Moseley's vehicle and start doing the call outs, which Berry did. The call outs went like, "This is the Sheriff's Department. Bradley Lewis, place your hands outside of the vehicle. All occupants in the vehicle, place your hands outside of the vehicle." (Exhibit 9, Declaration of Deputy Berry, ¶ 18; Berry Declaration Exhibit A, Transcript, p. 5, lines 12-16.)

316. Berry did not see any motion from the truck. Berry turned Sgt. Moseley's vehicle spotlight to illuminate the truck and still did not see anything inside the truck. There was no motion. Berry continued to do the call outs periodically. (Exhibit 9, Declaration of Deputy Berry, ¶ 19; Berry Declaration Exhibit A, Transcript, p. 5, lines 16-19.)

317. Sgt Moseley then advised that another patrol vehicle was going to pull between Berry's patrol vehicle and Sgt. Moseley's patrol vehicle, and to be aware of crossfire. (Exhibit 9, Declaration of Deputy Berry, ¶ 20; Berry Declaration Exhibit A, Transcript, p. 5, lines 21-23.)

318. Soon after, Deputy Berry saw a marked Sheriff's deputy patrol vehicle pull between his vehicle and Moseley's vehicle, drive down a ways, swing around and face back towards the truck. That patrol vehicle stopped, facing the truck at an angle. (Exhibit 9, Declaration of Deputy Berry, ¶ 21; Berry Declaration Exhibit A, Transcript, p. 5, lines 23-

25.)

319. Deputy Berry was stationed about one to one-and-a-half car lengths behind the pickup truck. (Exhibit 9, Declaration of Deputy Berry, ¶ 22; Berry Declaration Exhibit A, Transcript, p. 5, lines 32-36.)

320. Then Berry saw the suspect truck turn on, and he saw movement inside the truck in the form of the truck actually rocking back and forth. (Exhibit 9, Declaration of Deputy Berry, ¶ 23; Berry Declaration Exhibit A, Transcript, p. 5, lines 24-29.)

321. Deputy Berry saw the truck's back-up lights come on, so he thought Lewis was coming back towards them. Then the truck driver placed it into drive. (Exhibit 9, Declaration of Deputy Berry, ¶ 24; Berry Declaration Exhibit A, Transcript, p. 6, lines 28-30.)

322. Deputy Berry called out that there was somebody inside the truck, and that it had started up. (Exhibit 9, Declaration of Deputy Berry, ¶ 25; Berry Declaration Exhibit A, Transcript, p. 6, lines 28-30.)

323. Sgt. Moseley told Berry to step aside, away from his vehicle, which Berry did. Sgt. Moseley got into his vehicle as the truck started pulling away. (Exhibit 9, Declaration of Deputy Berry, ¶ 26; Berry Declaration Exhibit A, Transcript, p. 6, lines 32-34.)

324. The truck ran over a tree and continued driving forward down Paseo de Angel in a southwesterly direction. When the truck hit and ran over the tree Deputy Berry heard what sounded like tires popping, so he called out to the guys in the area that tires are popped. His intent was to give Deputy Pool, who was back there ready to deploy the road spikes, a heads up that the truck's tires had been popped. (Exhibit 9, Declaration of Deputy Berry, ¶ 27;

Berry Declaration Exhibit A, Transcript, p. 12, line 37 to p. 13, line 12.)

325. Deputy Berry watched two PCSD vehicles, Sgt. Moseley and Deputy Caudillo, take off after the truck. Berry ran to his vehicle, got into it, and followed. (Exhibit 9, Declaration of Deputy Berry, ¶ 28; Berry Declaration Exhibit A, Transcript, p. 7, lines 6-14.)

326. Deputy Berry followed all the way to the driveway, which was about 100 yards away from where the truck had been parked. (Exhibit 9, Declaration of Deputy Berry, ¶ 29; Berry Declaration Exhibit A, Transcript, p. 7, lines 12-20.)

327. When Deputy Berry got to the driveway, he saw an older Caucasian male standing off to the side of the driveway behind the two PCSD marked patrol vehicles (Sgt. Moseley and Deputy Caudillo). (Exhibit 9, Declaration of Deputy Berry, ¶ 30; Berry Declaration Exhibit A, Transcript, p. 7, lines 25-29.)

328. In front of where the two PCSD vehicles were stopped, Berry could see the blue truck, which looked like it was crammed between the house and another truck. The two PCSD vehicles had all their lights on. (Exhibit 9, Declaration of Deputy Berry, ¶ 31; Berry Declaration Exhibit A, Transcript, p. 8, lines 25-37.)

329. Berry stopped his vehicle, got out, and challenged the older male, asking that he show Berry his hands. He did not comply. He was smoking a cigarette with one hand and his other hand was down by his waist. (Exhibit 9, Declaration of Deputy Berry, ¶ 32; Berry Declaration Exhibit A, Transcript, p. 7, lines 25-32.)

330. As Deputy Berry was approaching the older male, Berry heard challenges (commands), then he heard gunshots, approximately three gunshots. Berry doesn't recall the

words of the commands. He just knew it was commands. (Exhibit 9, Declaration of Deputy Berry, ¶ 33; Berry Declaration Exhibit A, Transcript, p. 7, lines 31-34; p. 9, lines 24-26.)

331. Berry didn't hear 998 but he did hear somebody yell shots fired soon after the shots came out. (Exhibit 9, Declaration of Deputy Berry, ¶ 34; Berry Declaration Exhibit A, Transcript, p. 13, lines 14-16.)

332. After the gunshots Deputy Berry heard Sgt. Moseley and Deputy Caudillo both giving commands. (Exhibit 9, Declaration of Deputy Berry, ¶ 35; Berry Declaration Exhibit A, Transcript, p. 9, line 33, to p. 10, line 1.)

333. Deputy Berry did a quick pat down of the older man, grabbed him by the back of his shirt, and told him to step away from the area. He was hesitant and reluctant, and Berry had to physically pull on his shirt to get him to step away from the area. (Exhibit 9, Declaration of Deputy Berry, ¶ 36; Berry Declaration Exhibit A, Transcript, p. 7, line 36, to p. 8 line 3.)

334. As soon as Berry got him (the older male) 10 to 15 yards away, Berry pointed to the other responding vehicles and told him to keep walking back to those cars. (Exhibit 9, Declaration of Deputy Berry, ¶ 37; Berry Declaration Exhibit A, Transcript, p. 8, lines 1-3.)

335. The older male did not comply and he stayed there. Berry knew that gunshots had just gone off. Berry knew that he did not feel anything around the older man's waist when he checked there, so Berry pressed on toward the shooting scene. (Exhibit 9, Declaration of Deputy Berry, ¶ 38; Berry Declaration Exhibit A, Transcript, p. 8, lines 5-6.)

336. Berry heard Sgt. Moseley calling for an IFAK (Individual First Aid Kit) and

tourniquet. Berry grabbed a tourniquet and started asking where to place it. (Exhibit 9, Declaration of Deputy Berry, ¶ 39; Berry Declaration Exhibit A, Transcript, p. 8, lines 6-12.)

337. Berry could see a wound on the right shoulder, but too high up for a tourniquet. Berry could see blood coming from Lewis's mouth. Berry did not notice any other injuries. (Exhibit 9, Declaration of Deputy Berry, ¶ 40; Berry Declaration Exhibit A, Transcript, p. 8, lines 10-14.)

338. The suspect was on the ground. He was looking around, saying that he'd been shot, that he needed help. Others were attending to the suspect. (Exhibit 9, Declaration of Deputy Berry, ¶ 41; Berry Declaration Exhibit A, Transcript, p. 10, lines 1-6.)

339. At that time, Berry realized that there was a possibility that nobody had cleared the suspect vehicle, the blue truck. Berry asked out loud if they knew the truck was empty. Sgt. Moseley said no, we don't know that the truck is empty. (Exhibit 9, Declaration of Deputy Berry, ¶ 42; Berry Declaration Exhibit A, Transcript, p. 10, lines 11-13.)

340. Deputy Berry told Sgt. Moseley that he was going to clear the blue truck. Another deputy was behind Berry and tapped Berry on the shoulder and they moved around the Ford F150 truck to the blue truck. Berry took the rear door of the blue truck and the other deputy took the front door. They both opened the blue truck doors and the truck was empty. (Exhibit 9, Declaration of Deputy Berry, ¶ 43; Berry Declaration Exhibit A, Transcript, p. 10, lines 13-19.)

**PCSD SERGEANT MATTHEW GILBERT**

341. Matthew Gilbert (Gilbert) is a deputy with the Pima County Sheriff's Department (PCSD). He has been a deputy with PCSD since June 23, 2006. He began his law enforcement career by attending the PCSD basic law enforcement academy. After the PCSD Academy, he attended the 12-week Field Officer Training program. He was promoted to sergeant on November 30, 2023. (Ex 10, Declaration of Sgt. Matthew Gilbert, ¶ 1.)

342. On January 20, 2021, Deputy Gilbert worked the Foothills District, day shift, 0600 to 1600. His involvement that day in the Bradley Alexander Lewis officer involved shooting incident is detailed in his supplemental narrative attached to his Declaration as Exhibit A. The contents of that document are true and accurate. (Ex 10, Declaration of Sgt. Matthew Gilbert, ¶ 2.)

343. On January 20, 2021, at approximately 0618 hours, Deputy Gilbert heard Sgt. Moseley request additional units to respond to Positano Way and Paseo De Angel in reference to getting containment for a suspect vehicle possibly involved in some thefts that occurred earlier that morning. (Ex 10, Declaration of Sgt. Matthew Gilbert, ¶ 3.)

344. Sgt. Moseley had located a vehicle related to the earlier incident and had eyes on that vehicle. (Ex 10, Declaration of Sgt. Matthew Gilbert, ¶ 4.)

345. When Deputy Gilbert arrived at the intersection of Positano Way and Paseo De Angel, he made contact with Sgt. Moseley. Sgt. Moseley was calling out to any possible occupants of a blue Toyota Tacoma pickup truck. Deputy Gilbert took a position towards the back driver's side of the blue truck with his weapon drawn while commands were

continuously given by either Sgt. Moseley or Deputy Berry. (Ex 10, Declaration of Sgt. Matthew Gilbert, ¶ 5.)

346. Deputy Caudillo and Deputy Robles arrived with two ballistic shields. Deputy Caudillo, with Deputy Robles as a passenger, drove past the blue truck, then u-turned, then stopped facing the blue truck near its front bumper. Gilbert heard Deputy Caudillo say on the radio that there was a subject inside the blue truck. (Ex 10, Declaration of Sgt. Matthew Gilbert, ¶ 6.)

347. Commands were still being given to the blue truck, when the driver of the blue truck started the engine. Deputy Gilbert heard the blue truck's engine rev loudly several times, as it attempted to maneuver over some desert vegetation and it drove initially backward then forward and around the front of Deputy Caudillo's patrol vehicle. (Ex 10, Declaration of Sgt. Matthew Gilbert, ¶ 7.)

348. The blue truck accelerated westbound at a high rate of speed. Deputy Caudillo and Sgt. Moseley pursued in their vehicles. Deputy Gilbert ran back to his patrol vehicle in order to pursue. Upon reaching his patrol vehicle, Deputy Gilbert heard several gunshots from the direction of where the suspect vehicle went. Deputy Gilbert advised over the radio "shots fired". When Deputy Gilbert heard the gunshots and immediately announced "shots fired" on the radio, he was still at the location on Paseo De Angel where the blue truck had been sitting and then fled from. (Ex 10, Declaration of Sgt. Matthew Gilbert, ¶ 8.)

349. Deputy Gilbert drove to the location of Deputy Caudillo and Sgt. Moseley, a residence located at 6671 N. Paseo De Angel. (Ex 10, Declaration of Sgt. Matthew Gilbert,

¶ 9.)

350. Upon arrival, Deputy Gilbert exited his vehicle and ran up the driveway area. He observed Bradley Alexander Lewis lying on his stomach and bleeding. Mr. Lewis was talking and asking for help. Commands were being repeatedly given to Mr. Lewis to show his hands, which were tucked underneath him. The deputies were eventually able to move up to Mr. Lewis. After pulling his hands from underneath him, they saw that Lewis did not have any weapons. (Ex 10, Declaration of Sgt. Matthew Gilbert, ¶ 10.)

351. First aid was rendered. Deputy Gilbert grabbed a box of gloves from his vehicle. Deputy Michael Joseph began CPR on Mr. Lewis after he stopped breathing. Deputy Gilbert attempted to stuff combat gauze into the gunshot wound in Mr. Lewis's right shoulder, which was bleeding heavily. Gilbert kept pressure on the wound until medical personnel arrived. (Ex 10, Declaration of Sgt. Matthew Gilbert, ¶ 11.)

352. Medical personnel arrived and took over first aid for Mr. Lewis. They asked Deputy Gilbert to remove the handcuffs from Mr. Lewis, and he did that. (Ex 10, Declaration of Sgt. Matthew Gilbert, ¶ 12.)

353. Deputy Gilbert was advised that Mr. Lewis would be transported to Banner-University Medical Center for further care. He relayed that information to Sgt. Moseley. (Ex 10, Declaration of Sgt. Matthew Gilbert, ¶ 13.)

**PCSD DEPUTY MICHAEL JOSEPH**

354. Michael Joseph.is currently a Pima County Sheriff Deputy. He has been so employed since May of 2007 after completing the Sheriff Department Law Enforcement

Academy and becoming certified as a law enforcement officer by the Arizona Police Officer Standards and Training (AZ POST). (Ex 11, Declaration of PCSD Deputy Michael Joseph, ¶ 1.)

355. On January 20, 2021, Deputy Joseph responded to the officer involved shooting scene at 6671 N. Paseo de Angel. His supplemental narrative of his involvement is attached as to his Declaration as Exhibit A. The contents of that document are true and accurate. (Ex 11, Declaration of PCSD Deputy Michael Joseph, ¶ 2.)

356. Upon arrival to the scene, Deputy Joseph had Deputy Ruiz Torres grab his Individual First Aid Kit (IFAK) from my patrol vehicle. (Ex 11, Declaration of PCSD Deputy Michael Joseph, ¶ 3.)

357. Deputy Joseph immediately ran up to the scene and assisted Deputy T. A. Robles #1342 with clearing the suspect's blue truck, meaning checking to see whether there were any individuals inside the suspect's blue truck. (Ex 11, Declaration of PCSD Deputy Michael Joseph, ¶ 4.)

358. With his duty weapon drawn, Deputy Joseph approached the truck on the driver's side to make sure the vehicle was cleared. There were no individuals in the blue truck. (Ex 11, Declaration of PCSD Deputy Michael Joseph, ¶ 5.)

359. Once the truck was cleared, Deputy Joseph holstered his weapon and went back to the suspect who was lying on the ground in handcuffs at this time. (Ex 11, Declaration of PCSD Deputy Michael Joseph, ¶ 6.)

360. Deputy Joseph assisted Deputy Caudillo with pulling the suspect out from

between the patrol vehicle and the suspect's truck. The suspect had his shirt that was partially cut at that time and he was wearing shorts. (Ex 11, Declaration of PCSD Deputy Michael Joseph, ¶ 7.)

361. The suspect was placed on his back. Deputy Joseph noted that there was a gunshot wound to the suspect's right shoulder. The suspect was later identified as Bradley Lewis. (Ex 11, Declaration of PCSD Deputy Michael Joseph, ¶ 8.)

362. Deputy Joseph immediately turned Mr. Lewis over onto his side to make sure there were no exterior exit wounds from the gunshot. (Ex 11, Declaration of PCSD Deputy Michael Joseph, ¶ 9.)

363. Deputy Joseph then placed Mr. Lewis on his back as Mr. Lewis was experiencing agonal respiration, meaning that Mr. Lewis seemed to have difficulty breathing, was taking labored breaths, making gasping sounds. (Ex 11, Declaration of PCSD Deputy Michael Joseph, ¶ 10.)

364. At that time, Deputy Joseph immediately started doing CPR (chest compressions) as he felt Mr. Lewis's carotid artery on the side of his neck and noticed that his pulse was faint. (Ex 11, Declaration of PCSD Deputy Michael Joseph, ¶ 11.)

365. Deputy Joseph continued with CPR for three or four minutes until Northwest Fire District (NWFD) arrived on scene and took control of life-saving measures on Mr. Lewis. (Ex 11, Declaration of PCSD Deputy Michael Joseph, ¶ 12.)

**<u>PCSD CASE DETECTIVE MIGUEL FLORES</u>**

366. Miguel Flores (Flores) is a homicide detective with the Pima County Sheriff's

Department. (Ex 12, Declaration of PCSD Detective Miguel Flores, ¶ 1.)

367. Flores was the case detective, the lead detective for the investigation of the Officer Involved Shooting (OIS) event on January 20, 2021 involving Bradley Alexander Lewis, who was fatally shot by Deputy Gilbert Caudillo, PCSD Case No. 210120022. (Ex 12, Declaration of PCSD Detective Miguel Flores, ¶ 2.)

368. During Detective Flores's investigation he became aware that during Deputy David Baird's investigation of the attempted vehicle burglaries on West Morning Jewel Place, Tucson, on the morning of January 20, 2021, Deputy Baird, using his department issued camera with video function, had taken a video of the phone screens of the two residential surveillance systems that captured video of the suspect, Bradley Lewis, attempting to open car doors in driveways in the neighborhood. Det. Flores sent a technician from the Sheriff's Department Digital Forensic Lab out to capture the surveillance videos with greater resolution. Those videos were stored on Evidence CD SV2, and copies of the videos are attached to Detective Flores's Declaration as Exhibits A and B from 2133 W. Morning Jewel Place, and Exhibits C and D from 2202 W. Morning Jewel Place. (Ex 12, Declaration of PCSD Detective Miguel Flores, ¶ 3.)

369. Attached to Det. Flores's Declaration as Exhibit E is an aerial photograph taken 1-20-2021 of the shooting scene in the driveway of 6671 N. Paseo de Angel by a Sheriff's Department ID technician, with labels superimposed on the vehicles. The labels are accurate as to whose vehicles they are. (Ex 12, Declaration of PCSD Detective Miguel Flores, ¶ 4.)

370. Attached as Exhibit F to Detective Flores's Declaration is a real-time audio

recording of a portion of the radio traffic from that day concerning this incident, provided to Detective Flores by Kathryn Parker, PSSS Communications. (Ex 12, Declaration of PCSD Detective Miguel Flores, ¶ 5.)

371. Attached as Exhibit G to Detective Flores's Declaration is a true and accurate copy of the CAD Master Call Table for Call 210120022, pp. PCSD 2455 – 2446. (Ex 12, Declaration of PCSD Detective Miguel Flores, ¶ 6.)

372. Attached as Exhibit H to Detective Flores's Declaration is a true and accurate copy of the Radio Log Summary Report for Call 210120022, pp. PCSD 2465 – 2473. (Ex 12, Declaration of PCSD Detective Miguel Flores, ¶ 7.)

373. Attached as Exhibit I to Detective Flores's Declaration is a true and accurate copy of the Transcript of the 911 calls and radio transmissions, Call No. 210120022, pp. PCSD 2123 – 2140. For purposes of this statement of facts, the transcript is excerpted after a time past the incident and the transport of Lewis to UMC Main. (Ex 12, Declaration of PCSD Detective Miguel Flores, ¶ 8.)

## <u>BYSTANDERS WHO HEARD COMMANDS GIVEN</u>

### Jeffrey Garrett, neighbor

374. Jeffrey Garrett lives at 2741 W. Positano Way. His property backs up, slightly kitty-corner across a desert area, to the property of Ralph and Helen Stricklen at 6771 N. Paseo de Angel, in whose driveway the incident occurred. (Uncontested.) The distance between the two properties is no more than 100 yards. (Ex 13, Deposition of Jeffrey Garrett, p. 21:12 – 16.)

375. On January 20, 2021, Mr. Garrett had gotten up to get a cup of coffee. He went outside to the back of his house. When he went outside is when he heard a siren, a different beep, beep, beep noise. Within a few seconds, he heard somebody yell, show me your hands. And within a few seconds, then he heard three gunshots – boom, boom, boom. (Ex 13, Deposition of Jeffrey Garrett, p. 6:19-23; 8:4-12.)

376. Mr. Garrett was completely outside of his house when he heard someone say, show me your hands. (Ex 13, Deposition of Jeffrey Garrett, p. 14:12-14.)

377. Mr. Garrett was completely outside of his house when, a few seconds after hearing show me your hands, he heard three consecutive gunshots. He is familiar with gunshots during family hunting trips, and he has shot a lot of guns before, rifles, pistols, shotguns. (Ex 13, Deposition of Jeffrey Garrett, p. 14:12-20; p. 20:13-25.)

378. Mr. Garrett is very positive he heard the words, show me your hands, before he heard the gunshots. (Ex 13, Deposition of Jeffrey Garrett, p. 19:11-13.)

379. The yelling of show me your hands was very loud, loud enough for anybody to hear it, even in their homes if they were close. (Ex 13, Deposition of Jeffrey Garrett, p. 17:15-22.)

380. Mr. Garrett stated in his detective interview the day of the incident that he believed this was around 6:35 in the morning when he walked out his back door and heard these things. (Ex 13, Deposition of Jeffrey Garrett, p. 25:22-25; Ex 14, Transcript of recorded interview of Jeffrey Garrett, p. 1:23-27.)

381. From where he was on his property, Mr. Garrett couldn't see the events in the

Stricklen driveway. He could only see the emergency lights reflecting off the 6661 house next door to the west of the Stricklen house. (Ex 13, Deposition of Jeffrey Garrett, p. 12:12-17; p. 29:3-21.)

382. Jeffrey Garrett reviewed the audio recording of his 1-20-21 interview with detectives, along with the transcript of that interview, and the transcript is an accurate transcript of the interview. The recording is an accurate and un-tampered with recording. (Ex 13, Deposition of Jeffrey Garrett, 10:6-23; Ex 14, Transcript of Jeffrey Garrett recorded detective interview.)

**Helen Stricklen**

383. Lewis's grandmother, Helen Stricklen, from inside the house heard officers calling out, saying "Hands in the air." She went in and grabbed clothes. She knew there was a police action going on so she didn't go out. She heard a noise that sounded like something hitting a vehicle, but thinks in retrospect it was a gunshot. She believes it would be correct she heard officers calling Hands in the air before she heard the gunshot. (Ex 15, Deposition of Helen Stricklen, p. 53:22 – 54:21; and Deposition Exhibit 7, Transcript, Statement of Helen and Ralph Stricklen, p. 12:1-7; 16:1-2.)

**Ralph Stricklen**

384. Ralph Stricklen was asked by Detective Davila in a recorded interview that day if he heard anything from the time Alex arrived to the time he heard any gunshots, and he answered no. He is asked if he heard any commands. Ralph answered, "I heard some noises, stop, put it down, and that's it." He was asked if he knew who was saying this, and he said

he would have recognized it if it was Alex, and it wasn't Alex saying it. Mr. Stricklen testified in deposition that it is safe to assume that he believed it was one of the deputies who said, "Stop. Put it down." (Ex 16, Deposition of Ralph Stricklen, p. 111:1-23; and Deposition Exhibit 7, Transcript, Statement of Helen and Ralph Stricklen, p. 27:13-21.)

**DEFENDANTS' POLICE PROCEDURES EXPERT STEVE IJAMES**

385. Defense Police Expert Steve Ijames (Ijames) is a 44-year veteran law enforcement officer (April 1979 to present). (Ex 17, Steve Ijames' CV, pp. PCSD 7695-7696.)

386. Throughout his law enforcement career, Ijames has served extensively as an Instructor, Evaluator, Lead Instructor, Course Developer, Consultant (Ex 17 Steve Ijames' CV, pp. PCSD 7696-7711.)

387. Mr. Ijames has authored approximately 87 publications addressing law enforcement issues. (Ex 18, Ijames Rule 26(b) Disclosures, pp. PCSD 7688-7691.)

388. Mr. Ijames has served extensively as an expert witness involving police issues. (Ex 18, past four years list of 28 cases, pp. PCSD 7691-92.)

389. Mr. Ijames offers the following police expert opinions, including the factual basis for those opinions on the pages cited.

1. Opinion One. Sgt. Moseley's supervisory decisions were appropriate and consistent with police training, policy, and practice. (Ex 19, Ijames Expert Report, pp. PCSD 7633-34.)
2. Opinion Two. Deputy Caudillo's operational decisions (contacting and pursuing the fleeing Lewis truck) were appropriate and consistent with police training, policy, and

practice. (Ex 19, Ijames Expert Report, at pp. PCSD 7634-35.)

3. Opinion Three. Deputy Caudillo's use of deadly force was consistent with generally accepted police training, policy, and practice. (Id., see extensive discussion at pp. PCSD 07636-54, including photographs at pp. 07653-54, demonstrating how the key fob could be held to resemble a handgun.)
4. Opinion Four. The involved deputies acted appropriately as it relates to "less than deadly force" and verbal warnings. (Id., at PCSD 07654-56.)
5. Opinion Five. Sheriff Nanos, PCSD, and Pima County provided Deputy Caudillo with adequate training regarding the appropriate use of force. (Id., at PCSD 07656.)
6. Opinion Six. Sheriff Nanos, PCSD, and Pima County provided Deputy Caudillo with adequate training regarding the appropriate interaction with people under stressful circumstances, and how to de-escalate such stressful circumstances. (Id., at PCSD 7756.)
7. Opinion Seven. Medical aid was provided to Bradley Alexander Lewis in a timely and reasonable manner after he was shot by Deputy Caudillo. (Id., at PCSD 07656-60.)
8. Opinion Eight. The failure to provide deputies with body worn cameras does not encourage deputies to be less vigilant regarding their duties to their community, and there is no national standard that requires law enforcement agencies to use body worn cameras and a significant number of agencies do not use them or consider them worth the cost when compared to other items. (Id., at PCSD 07660-61.)
9. Opinion Nine. The 2012 "re-tweeting" of a George Orwell quote in no way suggests that Deputy Caudillo has a preference for violence. Deputy Caudillo was not disciplined for that "re-tweet", nor should he have been. (Id., at PCSD 07661.)
10. Opinion Ten. Sheriff Nanos/PCSD, and Pima County have not established, maintained, enforced, and/or ratified policies, regulations, official decisions, customs, practices, or usages which unconstitutionally deprive citizens of the right to be free from the use of excessive force, nor have they through their policymakers and

managers had prior actual or constructive knowledge of the use of excessive force by their employees and/or ratified such conduct after the fact. (Id., at PCSD 7661-63.)

**<u>PLAINTIFFS' BIOMECHANICAL EXPERT JOSEPH PELES</u>**

390. After testing with a human model, Plaintiffs' Biomechanical expert Joseph Peles concluded the following: "The traverse times (from exiting the Toyota driver door with both feet approximately touching the ground to the Ford F150 side view mirror) ranged from 2.7 to 4 seconds. The model also attempted to jump while in the gap or traverse the gap via the tire and found this to be an unattainable feat to align with the biomechanical analysis." (Ex 20, Rebuttal Report of Plaintiffs' Biomechanical Expert Joseph Peles, p. 8, ¶ 16.)

**<u>DEFENDANTS' BIOMECHANICAL/HUMAN FACTORS EXPERT MICHAEL KUZEL</u>**

391. The CV of Defendants' Biomechanical/Human Factors Expert Michael Kuzel is attached as Exhibit 21. (Ex 21, CV Michael Kuzel.)

392. Under these circumstances, Caudillo had 2 to 4 seconds of time, and the decision (to shoot) has to be made before that. So now we're down to less than, one or less than one second of time. He has to make a decision that is predictive in nature, not reactive. (Ex 22, Deposition of Michael Kuzel, p. 43:5-10.)

393. An officer in a circumstance such as this has to predict what the person is going to do next. Because we know from research if you are in reaction mode, action beats reaction. An officer who is waiting to react is potentially a(t) greatest risk, or point of greatest risk. (Ex 22, Deposition of Michael Kuzel, p. 43:13-20.)

**DEFENDANTS' BALLISTICS/FORENSIC SCENE RECONSTRUCTION EXPERT MATTHEW NOEDEL**

394. Matthew Noedel is a forensic scientist and an expert in ballistics and shooting scene reconstruction. The CV of Defendants' Ballistics/Forensic Scene Reconstruction expert Matthew Noedel is attached here as Exhibit 23. (Ex 23, CV of Matthew Noedel.)

395. Noedel conducted a live fire reenactment of Deputy Caudillo exiting his patrol car, standing, and delivering three shots from between his open door and the A pillar. Noedel concluded: (1) the timing for Deputy Caudillo to exit his vehicle and deliver three gunshots was likely in the range of 3 to 4 seconds (Ex 24, Matthew Noedel report pp. 26, 41); (2) the fired cartridge cases mostly landed on the passenger side windshield, consistent with where two of the three fired cartridge cases landed on January 20, 2021. (Ex 24, Matthew Noedel report, p. 26); (3) Lewis fell with his head/shoulders 2.5 feet behind his Toyota truck and 6.5 feet in front of Deputy Caudillo's shooting position. (Ex 24, Matthew Noedel report, pp. 32, 41).

**PARAMEDIC DAN SCHUR AND RECORDS FROM NORTHWEST FIRE DISTRICT**

396. An engine and a paramedic truck/ambulance responded from the Northwest Fire District station at Ina Road and Shannon, approximately one mile from the Stricklens' residence where the shooting occurred. (Uncontested) Exhibit 25 is the Northwest Fire District records subpoenaed from that entity, excerpted. Attached to the records is a Custodian of Records Affidavit. (Ex 25, Northwest Fire District Records, excerpted.)

397. The shooting occurred at 06:44:19. (Ex 12, Declaration of Case Detective

Miguel Flores, ¶ 6; Declaration Exhibit H Radio Log Summary, p. PCSD 2467 "998".) The Northwest Fire District response time records show that the call taker (PSAP) was notified at 06:44:38. NW Fire District dispatch was notified at 06:45:08. The responding unit was dispatched (sent) at 06:45:18. The responding unit was enroute at 06:47:10. The responding unit was at the scene at 06:50:57. The responding unit was at the patient at 06:52:16. (Ex 25, Northwest Fire District Records, pp. PCSD 8978 – 8979; Ex 27, Deposition of NWFD Paramedic Dan Schur, p. 9:7 – 11:10; 11:11 – 15:19.)

398. Mr. Schur is a paramedic with Northwest Fire District with a paramedic certification since 2007. (Ex 27, Deposition of Dan Schur, pp. 4:24 - 5:12.)

399. Mr. Schur participated in the Northwest Fire District response to the request for medical assistance involving the penetrating trauma injury to Bradley Alexander Lewis. (Ex 27, Deposition of Dan Schur, pp. 22:19 - 23:4)

400. Initially, they were instructed to hold off, but while enroute they were given the all clear and told to go into the scene and that is what they did. (Ex 27, Deposition of Dan Schur, pp. 22:19 – 23:4.; pp. 23:25 - 24:15.)

401. Upon Mr. Schur's arrival to the scene, Pima County Sheriff Officers were doing CPR, and applying pressure and a QuickClot dressing to the gunshot wound to the right shoulder. (Ex 27, Deposition of Dan Schur, pp. 28:15 – p. 29:16.)

402. Lewis's condition was GCS 3 (Glasgow Coma Scale), unconscious and unresponsive, pulseless and apneic (not breathing) (Ex 27, Deposition of Dan Schur, pp. 33:22 - 34:9.)

403. Lewis was not alert, not responsive to pain. A GCS 3 is the lowest score you can get. Basically, somebody who is dead has a GCS of 3. Lewis was pulseless and not breathing . His heart had stopped. His respiratory system had stopped. (Ex 27, Deposition of Dan Schur, pp. 34:10 - 36:8.)

404. Generally speaking, Lewis's physical and medical condition is not survivable. Less than .1 percent of traumas, if you're pulseless, ever survive. (Ex 27, Deposition of Dan Schur, pp. 82:8 - 83:2.)

405. During the transport to Banner UMC, prior to arrival, a last rhythm check showed Lewis to be in asystole. So, he is pulseless, not breathing, and there is no electrical activity in his heart. Lewis is for all intents and purposes deceased. (Ex 27, Deposition of Dan Schur, pp. 46:23 – 47:11.)

## CHRONOLOGY

406. The following is a chronology of the events on Wednesday, January 20, 2021:

NOTE: This chronology cites to the following exhibits attached to Ex 12, Declaration of Case Detective Miguel Flores:

Ex G CAD Master Call Table, verified in Flores Declaration, ¶ 6.
Ex H Radio Log Summary Report Call 210120022 verified in Flores Declaration, ¶ 7
Ex I Transcript 911 Calls and Radio, 210120022, verified in Flores Declaration ¶ 8

The chronology also cites to Ex 3, Declaration of Deputy David Baird, and Declaration Ex A, Baird Supplemental Incident Report.

The chronology also cites to Ex 25, Northwest Fire District records, and to Ex 26, the Banner UMC Hospital records.

03:21:38 - A 9-1-1 call comes in reference a truck on the street that has the driver looking for open doors on vehicles. (CAD Master Call Table, p. PCSD 2455.)

Michelle Stewart at 2133 W. Morning Jewel Place 911 call, who had video; Deputy Baird also contacted Joshua Stine at 2143 W. Morning Jewel Place; Baird was also flagged down by E. De Senney of 2202 W. Morning Jewel Place, who had video. (Ex 3, Declaration Deputy David Baird, ¶¶ 4, 5, 7, 11, 16, 17-19; and Declaration Ex A, Baird Supplemental Incident Report.)

03:23:38 – 486 Deputy David Baird #5393 indicates he is Code 76, en route to this call. (Radio Log Summary Report, p. PCSD 2465.)

Baird supplement p. PCSD 9240 indicates that while en route he observed a blue Toyota Tacoma Crew Cab pickup truck, newer model, traveling southbound on La Cholla, then westbound onto Ina. It was the only vehicle proceeding through the intersection. However, the info Baird had received was for a black pickup truck. (Ex 3, Declaration of Deputy David Baird, and Declaration Ex A, Baird Supplemental Incident Report.)

03:32:02 – 486 Deputy David Baird advised he was at the scene (23) reference this call. (Radio Log Summary Report, p. PCSD 2465.)

03:36:15 – 478 Another Deputy arrived at Morning Jewel Place. He was Code 60, in the vicinity reference this call. (Radio Log Summary Report, p. PCSD 2465.)

03:48:34 – 478 Deputy advised he completed this assignment. (Radio Log Summary Report, p. PCSD 2465.)

04:07:54 486 Deputy Baird reviewed additional video and advised the truck was most likely a newer model Toyota Tacoma. (Radio Log Summary Report, p. 2465.)

Baird's supplement indicates he contacted Communications and requested an attempt to locate be put out on the vehicle. Baird was contacted by Marana PD and advised the MPD had been attempting to locate the vehicle earlier in reference to an unrelated incident. Baird was provided with the name of Bradley Lewis, and Lewis's birthdate. Baird ran that name and saw a photo and description of Lewis age 19, 6 feet tall, thin, weighing 150 pounds. Baird noted there was a probable cause alert in reference to AWDW for Lewis. Deputies responded to 6671 N. Paseo De Angel and advised Lewis's vehicle was not there. (Baird Supplement, pp. PCSD 9240-9242.)

*See also* Lt. Moseley's description of communication with Deputy Baird in Moseley Declaration, DSSOF Exhibit 4, ¶¶ 27 – 30.

04:25:07 571 Deputy Sean Stoemer #7131 advises poss susp na #653835 (name number) (Radio Log Summary Report, p. PCSD 2465.)

04:28:07 486 Deputy Baird NMINQ MDC name = LEWIS, BRADLEY (Radio Log Summary Report, p. PCSD 2465.)

04:28:08 486 Deputy Baird Driver's license info MDC name = LEWIS, BRADLEY (Radio Log Summary Report, p. PCSD 2465.)

04:32:55 486 Deputy Baird, 43 = info, mpd (Marana PD) also looking for subj na#1987051 pc alert for agg C12 (C12 = assault) Run rnq for toyt Tacoma (Radio Log Summary Report, p. PCSD 2465.)

1987051 is PCSD name number for Bradley A. Lewis

04:35:30 486 Deputy Baird Drivers license info dl = D10443622 (Radio Log Summary Report, p. PCSD 2465.)

D10443622 is Bradley A. Lewis's drivers license.

04:35:31 486 Deputy Baird, STINQ NMCAD 486 AZ D10443622 (Radio Log Summary Report., p. PCSD 2465.)

06:13:04 – 188 Sergeant Michael Moseley #1227 advised he was at a periodic check, C9, in the area of 6661 North Paseo De Angel (next door to 6671; at 6661 there was also a prior call of shots fired). (Radio Log Summary Report, p. PCSD 2466.)

06:15:39 – 408 Deputy Gilbert Caudillo and 748 Deputy Justin Berry advise they are en route (Code 76) to the area of Positano and Paseo De Angel. Both entries contain the notation "awdw," Assault with a deadly weapon. (Radio Log Summary Report, p. PCSD 2466.)

06:16:56 188 Sergeant Michael Moseley advised he was in the vicinity (Code 60) of 6671 N. Paseo de Angel watching a blue Toyota Tacoma. (Radio Log Summary Report, p. PCSD 2466.)

06:18:41 756 Deputy Anthony Pool advised he was en route to Positano and Paseo de Angel. (Radio Log Summary Report, p. PCSD 2466.)

06:18:54 (MDC) 476 Deputy Matthew Gilbert advised he was en route, assisting 408 Caudillo. (Radio Log Summary Report, p. PCSD 2466.)

06:19:05 188 Sgt. Moseley advised 756 Deputy Pool to be prepared to deploy spikes if needed at Positano and Paseo de Angel. (Radio Log Summary Report, p. PCSD 2466.)

06:19:45 476 Deputy Matthew Gilbert submits a NMINQ (name inquiry) on MDC, NameNumber 1987051 = Lewis, Bradley (Radio Log Summary Report, p. PCSD 2466.)

06:22:50 188 Moseley "req surv" (requesting air unit) (Radio Log Summary Report, p. PCSD 2466.)

06:24:10 188 Moseley checking area where motion light came on house on SW corner. (Radio Log Summary Report, p. PCSD 2466.)

06:24:37 748 Deputy Berry Back-up 188 Moseley (Radio Log Summary Report, p. PCSD 2466.)

06:28:08 – 188 Sergeant Michael Moseley requested that a ballistic shield be brought to their location. (Radio Log Summary Report, p. PCSD 2466.)

06:28:38 188 Moseley 10-29 Check for wanted/stolen Pl = 60706b = (Lewis blue Toyota Tacoma temporary plate number)
06:28:39 STINQ VHCAD 188 60706B AZ 2021 PC
06:30:41 188 Moseley 10-29 Check for wanted/stolen 60706b
06:30:42 188 STINQ VHCAD 188 060706B AZ 2021 PC
(Radio Log Summary Report, p. PCSD 2466.)

06:32:02 - Amber, who resides at 2661 West Positano, advised that her Ring doorbell just woke her up and that there were several deputies in her yard.
(CAD Master Call Table, p. PCSD 2456.)

06:32:08 370 Deputy Theodore Robles en route with shield (Radio Log Summary Report, p. PCSD 2466.)

06:36:55 370 Deputy Robles to back-up 188 Sergeant Moseley (Radio Log Summary Report, p. PCSD 2466.)

06:33:44 - Amber from 2661 W Positano advised that her fifth wheel was unlocked and that the deputies could check it out. Amber would like a call from a deputy. Amber was advised to stay inside and lock her doors. (CAD Master Call Table, p. PCSD 2456.)

06:38:47 408 Deputy Caudillo to back-up 188 Moseley (Radio Log Summary Report, p. PCSD 2466)

06:43:09 - Deputy requested 10-35, or radio silence. (Radio Log Summary Report, p. PCSD 2466.) 10-35 = Limit radio traffic, major crime

06:44:19 – 476 Deputy Matthew Gilbert #5968 advised Shots fired, shots fired, noted on the Radio Log Summary Report by the dispatcher, as Code 998, officer-involved shooting. (PCSD 2467, Radio Log Summary Report.) Deputy Gilbert was still at the location of the initial traffic stop at that time, and heard the shots that were fired in the driveway of the nearby Stricklen residence. (Radio Log Summary Report, p. PCSD 2467; Ex 10, Declaration of Deputy Matthew Gilbert, ¶¶ 8, 9. *See* also Ex 12, Flores Declaration Exhibit I, p. PCSD 2137, Radio Traffic transcript.)

14 seconds after Deputy Gilbert advised Shots fired, the Dispatcher advised there had been a "998" or officer-involved shooting. Interrupting the Dispatcher at 16 seconds after Deputy Gilbert advised Shots fired, Lt. Moseley stated 998, 998 over the radio. 20 seconds after Deputy Gilbert heard the shots and called, Shots fired, Lt. Moseley stated "Start meds 10-18" over the radio. 10-18 means as soon as possible.
(DSSOF ¶¶ 204, 205; Ex 5, Deposition of Michael Moseley, pp. 150:24 – 160:15; 160:22 – 161:4; 161:6 – 12; Ex 6, Audio recording, PCSD 6925, Excerpt real time radio transmissions.)

06:44:38 Northwest Fire District report, "Response Times and Mileage"
PSAP 6:44:38 – Call received at Public Safety Answering Point or Access Point (Ex 25, NWFD Records, p. PCSD 8978.)

06:44:51 F85 Gabriel Ruiz enroute, #8761 (Radio Log Summary Report, p. PCSD 2467.)

06:45:08 Northwest Fire District report, "Response Times and Mileage"
Dispatcher Notified 06:45:08 (Ex 25, NWFD Records, p. PCSD 8978.)

06:45:18 Northwest Fire District report, "Unit notified." (Ex 25, NWFD Records, p. PCSD 8978.)

06:45:18 Northwest Fire District report, "Response Times and Mileage"
Unit Dispatched 06:45:18 (Ex 25, NWFD Records, p. PCSD 8978.)

06:45:30 – 408 Deputy Gilbert Caudillo requests Meds (C901) NOTE: On the Radio Log Summary Report (p. PCSD 2467) this entry is input by the dispatcher; according to

radio audio, it was 188 Sgt. Moseley that requested Meds. (Transcript of 911 calls and radio transmissions, p. PCSD 2137; DSSOF ¶¶ 204, 205; Ex 5, Deposition of Michael Moseley, pp. 150:24 – 160:15; 160:22 – 161:4; 161:6 – 12; Ex 6, Audio recording, PCSD 6925, Excerpt real time radio transmissions.)

06:45:36 F86 Manuel Ruiz Torres #9017 arrived at scene. (Radio Log Summary Report, p. PCSD 2467.)

06:45:57 Northwest Fire District report, notes say first CPR, provided prior to EMS Arrival by first responder (Ex 25, Northwest Fire District Records, p. PCSD 8976.)

Deputy Michael Joseph started CPR immediately after he saw Lewis was having difficulty breathing and his pulse was faint. Deputy Joseph continued CPR for three or four minutes until Northwest Fire District paramedics arrived and took over CPR. (Ex 11, Declaration of Deputy Michael Joseph, ¶¶ 10 – 12.)

06:46:23 F71 Christopher Hendrick #9007 en route (Radio Log Summary Report, p. PCSD 2467.)

06:46:35 408 Deputy Gilbert Caudillo, Meds advised to move in (don’t wait).

NOTE: This is on the radio log summary (p. PCSD 02467) input by the dispatcher; a review of the radio audio recording shows it was a transmission by 188 Sgt. Moseley. (Transcript of 911 calls and radio transmissions, p. PCSD 02137; DSSOF ¶¶ 204, 205; Ex 5, Deposition of Michael Moseley, pp. 150:24 – 160:15; 160:22 – 161:4; 161:6 – 12; Ex 6, Audio recording, PCSD 6925, Excerpt real time radio transmissions.)

06:46:45 156 Sgt Hans Goritz #1202 arrived at scene (incident commander). (Radio Log Summary Report, p. PCSD 2467.)

06:47:10 Northwest Fire District Report, “Response Times and Mileage”
Enroute 06:47:10 (Ex 25, Northwest Fire District Records, p. PCSD 8978.)

Northwest Fire District Station 33 is at Ina Road and Shannon, 2821 W. Ina Road, one mile from the incident scene. (undisputed)

06:47:33 156 Sgt Hans Goritz has incident command. (Radio Log Summary Report, p. PCSD 2467.)

06:47:48 Lt. Moseley advised CPR had been started. (Transcript of 911 calls and radio transmissions, p. PCSD 2138; Radio Log Summary Report, p. PCSD 2467.)

06:50:57 Northwest Fire District Report, "Response Times and Mileage" At Scene 06:50:57 (Ex 25, Northwest Fire District Records, p. PCSD 8978.)

06:51:06 - Sergeant Hans Goritz #1202 advised that medical units were on scene, 10-23. (Radio Log Summary Report, PCSD 2467.)

06:52:16 Northwest Fire District Report, "Response Times and Mileage" At Patient 06:52:16 (Ex 25, Northwest Fire District Records, p. PCSD 8978)

06:52:42 Northwest Fire District Report, NWFD EMT Jose Kati doing CPR (Ex 25, Northwest Fire District Records, p. PCSD 8976.)

06:53:52 - A training unit known as F86 advised that medical units had taken over CPR. (F86 listed as Manuel Ruiz Torres.) (Radio Log Summary Report, p. PCSD 2467.)

06:54:16 Northwest Fire District Report, Oxygen given by inhalation (Ex 25, Northwest Fire District Records, p. PCSD 8976.)

06:54:22 Deputy Gilbert Caudillo was transported to the Foothills District Office with a cover officer. (Radio Log Summary Report, p. PCSD 2467.)

06:55:16 Northwest Fire District Records, EPI (epinephrine, Code arrest) Intraosseus (Ex 25, Northwest Fire District Records, p. PCSD 8976.)

07:03:16 Northwest Fire District Report, EPI (epinephrine, Code arrest) Intraosseus (Ex 25, Northwest Fire District Records, p. PCSD 8976.)

07:03:48 – 476 Deputy Matthew Gilbert advised, "Suspect going to Banner UMC Main." (PCSD 2468 Radio Log Summary Report)

07:05:08 Northwest Fire District Report, "Response Times and Mileage" Depart: 07:05:08 (Ex 25, NWFD Records, pp. PCSD 8978-8979.)

07:21:56 Northwest Fire District Report, Normal saline Intraosseus (Ex 25, Northwest Fire District Records, p. PCSD 8976.)

07:21:56 Northwest Fire District Report, "Response Times and Mileage" Arrive Destination: 07:21:56 (Banner UMC, 1625 N. Campbell Avenue Tucson, 85719, approximately 11 miles) (Ex 25, Northwest Fire District Records, p. PCSD 8979.)

07:24 University Medical Center record, (Ex 26, p. PCSD 5444) Time of death called by Dr. Douglas, trauma attending.

07:30:08 – 347 Deputy Robert Murray #1275 of the Motor Unit advised that the subject was deceased (C900) at the hospital as of 0724 hours. (pronounced at 0724). (Radio Log Summary Report, p. PCSD 2469.)

407. Attached as Exhibit 28 is a labeled aerial photo of the locations of the initial traffic stop and the subsequent officer-involved shooting in the Stricklens' driveway. (Uncontested.) (Ex 29, labeled aerial photo.)

408. Attached as Exhibit 29 are two PCSD Evidence photos of the keyfob and lanyard. (Uncontested) (Ex 29, Evidence photos of keyfob and lanyard, PCSD 1465 – 1466.)

409. From *O'Reilly v Navarro, et al.*, US District Court No. CV 21-00168-TUC-JAS, attached are copies of Exhibit 30 to the Defendants' Separate Statement of Facts (Doc. 26) in Support of Motion for Summary Judgment, Declaration of Daryl Audilett. (Doc. 26-3, p. 75 – 76 of 158, Headers removed from filing in O'Reilly case.) Paragraph 8 of the Declaration describes, with attached photos and cites to supporting testimony, that the dark-colored object found at the shooting scene in the O'Reilly case was the only object found near the decedent's body, outside and apart from his clothing. Two photos of the dark-colored object are attached

to the Declaration here, from Exhibit 17 to the SSOF in O'Reilly case. (Doc. 26-2, pp. 17, 18 of 46) Paragraph 9 of the Declaration provides foundation for photographs that show that holding that dark-colored device in the hand can be made to resemble a gun being held in the hand. Two of the photos attached in the O'Reilly SSOF are attached here, originally part of Exhibit 33 to the O'Reilly Defendants' Separate Statement of Facts. (Doc. 26-3, pp. 94, 95 of 158.) (Ex 30, from *O'Reilly v Navarro, et al*., US District Court No. CV 21-00168-TUC-JAS, Ex 30, Declaration of Daryl Audilett, ¶¶ 8, 9, verifying two Photos from Exhibit 17 and two photos from Exhibit 33 to Defendants' Separate Statement of Facts (Doc. 26) in the O'Reilly case.)

**<u>PIMA COUNTY SHERIFF CHRIS NANOS</u>**

410. Chris Nano is the duly elected Sheriff of the Pima County Sheriff's Department (hereafter "PCSD"), and has held this position since being elected by the citizens of Pima County in 2020; he took office in January 2021. He previously held the position of Sheriff during 2015-2016, after being appointed to that position upon the retirement of former Sheriff Clarence Dupnik. Before being appointed Sheriff in 2015, he held the position of Chief Deputy from 2014 to 2015. Before that he held various positions with the Pima County Sheriff's Department beginning as a Corrections Officer at the jail in 1984, then he served as a Deputy, Detective, Sergeant, Lieutenant, Captain, and Bureau Chief of Investigative Bureau. (Ex 31, Declaration of Sheriff Chris Nanos, ¶ 1.)

411. All of Sheriff Nanos's information about the January 20, 2021 shooting of Bradley Alexander Lewis by Deputy Gilberto Caudillo (hereafter "Lewis shooting incident")

is second-hand, primarily from legal counsel, command staff, and department supervisors. (Ex 31, Declaration of Sheriff Chris Nanos, ¶ 2.)

412. Sheriff Nanos has not spoken directly with any of the involved deputies about the Lewis shooting incident. (Ex 31, Declaration of Sheriff Chris Nanos, ¶ 3.)

413. Sheriff Nanos was not present at or during any portion of the Lewis shooting incident, or any of the events that led up to the shooting, or any of the events that occurred thereafter. (Ex 31, Declaration of Sheriff Chris Nanos, ¶ 4.)

414. Sheriff Nanos did not personally participate in any portion of the Lewis shooting incident, or any events that led up to the Lewis shooting incident, or any events that occurred thereafter. (Ex 31, Declaration of Sheriff Chris Nanos, ¶ 5.)

415. Sheriff Nanos did not personally provide any direct order or direction to any deputies or command staff or supervisors that were involved in the Lewis shooting and/or investigation of the Lewis shooting. (Ex 31, Declaration of Sheriff Chris Nanos, ¶ 6.)

416. Sheriff Nanos did not personally or indirectly provide any order or direction to any deputies or command staff that were involved in the Lewis shooting incident and or investigation of the Lewis shooting incident. (Ex 31, Declaration of Sheriff Chris Nanos, ¶ 7.)

417. Sheriff Nanos was not present at the scene of the Lewis shooting incident during the investigation of the incident, except that he went to the scene for a five-minute debrief. (Ex 31, Declaration of Sheriff Chris Nanos, ¶ 8.)

418. Sheriff Nanos was not personally involved in the investigation of the Lewis

shooting incident. (Ex 31, Declaration of Sheriff Chris Nanos, ¶ 9.)

419. Sheriff Nanos did not personally provide any orders or directions relating to the investigation of the Lewis shooting incident. (Ex 31, Declaration of Sheriff Nanos, ¶ 10.)

420. Sheriff Nanos did not personally provide any training to any deputies, command staff, or supervisors involved in the Lewis shooting incident or the investigation of the Lewis shooting incident. (Ex 31, Declaration of Sheriff Chris Nanos, ¶ 11.)

421. While Sheriff Nanos approves the overall training regimen for PCSD, he is not the person most knowledgeable regarding individual deputies' training or the training practices in effect on January 20, 2021, the day of the Lewis shooting incident. (Ex 31, Declaration of Sheriff Chris Nanos, ¶ 12.)

422. While Sheriff Nanos approves the policies and procedures for PCSD, he is not the person most knowledgeable regarding the research, preparation and/or implementation of the policies and procedures, the training practices which implement the policies and procedures and/or the version of the various policies and procedures which were in effect on January 20, 2021. (Ex 31, Declaration of Sheriff Chris Nanos, ¶ 13.)

423. Sheriff Nanos's involvement related to the Lewis shooting incident was limited to his review of the Shooting Review Board Report (Exhibit A, not attached here), and concurring with the finding that the use of deadly force by Deputy Gilberto Caudillo was reasonable and appropriate. (Ex 31, Declaration of Sheriff Chris Nanos, ¶ 14.)

424. Sheriff Nanos was also informed in writing by the Pima County Attorney's Office, Chief Trial Counsel Rick Unklesbay that he (Unklesbay) concluded that the shooting

of Mr. Lewis by Deputy Caudillo was justified. (Exhibit B, not attached here.) (Ex 31, Declaration of Sheriff Chris Nanos, ¶ 15.)

425. Sheriff Nanos was further subsequently informed in writing by Pima County Attorney Laura Conover that she concluded that the shooting of Mr. Lewis by Deputy Caudillo was justified. (Exhibit C, not attached here.) (Ex 31, Declaration of Sheriff Chris Nanos, ¶ 16.)

DATED this 19th day of January, 2024.

*AUDILETT LAW PC*

/s/ Daryl Audilett

Daryl A. Audilett
Attorney for Defendants Nanos, Caudillo, Moseley and Pima County

CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Eduardo H. Coronado, Esq.
CORONADO LAW FIRM, P.L.L.C.
4700 W. White Mountain Boulevard, Suite A
Lakeside, AZ 85929
**Attorney for Plaintiffs**

By /s/ Karen Audilett