Eduardo H. Coronado, SBN 022397
**CORONADO LAW FIRM, P.L.L.C.**
4700 W. White Mountain Boulevard, Suite A
Lakeside, Arizona  85929
(928) 532-4529 Telephone
(928) 532-0753 Fax
eduardocoronado@frontier.com

*Attorney for Plaintiffs*

**UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA**

| | |
|---|---|
| **Anna Christine Lewis and Bradley Lewis, as Personal Representative of The Estate of Bradley Alexander Lewis, Anna Christine Lewis, Bradley Lewis, Helen Stricklen, and Ralph Rust Stricklen,**<br>　　　　　**Plaintiffs,**<br>　　　　　Vs,<br>**Chris Nanos, individually and in his official capacity as Sheriff of Pima County, Arizona, Pima County Sheriff Deputy Gilbert Caudiillo, Individually and in his official capacity as an employee of the County of Pima, Arizona, and his official capacity as Sheriff Deputy of the Pima County Sheriff's Department, Pima County Sheriff Deputy Michael Moseley, Individually and in his official capacity as an employee of the County of Pima, Arizona, and his official capacity as Sheriff Deputy of the Pima County Sheriff's Office, Pima County.**<br><br>　　　　　**Defendants.** | Case No.: CV 21-00557-TUC-RM<br><br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**(ORAL ARGUMENT REQUESTED)** |

　　　Plaintiffs, Anna Christine Lewis and Bradley Lewis, as Personal Representatives of the Estate of Bradley Alexander Lewis, Anna Christine Lewis, Bradley Lewis, Helen Stricklen, and Ralph Rust Stricklen, by and through counsel undersigned and pursuant to Rule 56(a), F.R.Civ.P, hereby responds to Defendants' Motion for Summary Judgment

# INTRODUCTION

On January 20, 2021, Sheriff Deputy Gilbert Caudillo shot and killed Mr. Bradley Alexander Lewis, a young man who had just celebrated his nineteenth birthday approximately two weeks prior to his untimely death. The Pima County Sheriff's Department overzealously attempted to contact Bradley Alexander Lewis to question him when the operation escalated from an investigatory contact to a deadly confrontation. While Defendant Moseley was in charge of the operation, both Caudillo and Moseley created the circumstances that lead to the death of Mr. Bradley Alexander Lewis. Deputy Caudillo fired at Mr. Lewis when his hand was already raised where the officers could visibly see it. Furthermore, physical evidence illustrates that Mr. Lewis was falling, diving, or collapsing when Caudillo fired shots. Neighbor eye witnesses corroborate the physical evidence on surveillance video that Mr. Lewis was shot as he was getting down on the ground. Though Mr. Bradley Alexander Lewis appeared to be of no threat considering he was unarmed, exited the vehicle with his hands visible, and was getting on the ground, Gilbert Caudillo immediately jumped out of his vehicle and opened fire by firing three shots at Mr. Lewis. Gilbert Caudillo claims that Mr. Bradley Lewis exited his vehicle with a "black mass" in his hand as he ran full speed towards Caudillo. Physical evidence does not support Defendant's rapid approach/chest-forward theory. Considering Gilbert Caudillo was only a few feet away from Mr. Bradley Alexander Lewis and his hands were visible and well lighted from the headlights of the patrol vehicles surrounding him throughout the entire altercation, it is implausible that a key fob—or "black mass"— would have been perceived as a weapon given its size, shape, and color. Not once during the altercation that ensued on January 20, 2021 did

Mr. Lewis display he was armed. Furthermore, Deputy Gilbert Caudillo continuously reaffirms that he did not see what he perceived as a weapon until Mr. Lewis was able to pass through the wedge between Mr. Lewis' Toyota Tacoma and Ralph Stricklen's F-150. Physical evidence confirms Mr. Lewis never made it through the wedge. Michael Moseley was already out of his vehicle with his weapon drawn when Mr. Lewis exited his vehicle and he chose not to shoot. It is reasonable to conclude that Michael Moseley did not fire his weapon because Mr. Lewis did not pose a lethal threat and there was not sufficient justification to utilize deadly force. It is reasonable to conclude that any threat was extinguished the second Mr. Bradley Alexander Lewis vacated his vehicle. Yet, this is when Deputy Gilbert Caudillo chose to expel deadly force against Mr. Bradley Alexander Lewis. While it is alleged that Mr. Bradley Alexander Lewis rammed his vehicle into the patrol vehicles, physical evidence does not corroborate Defendants' claims. Neither Gilbert Caudillo nor Michael Moseley described aggressive or threatening behavior exhibited by Alex, nor was it indicated that he reached for a weapon. Mr. Bradley Alexander Lewis posed no imminent threat of deadly force, yet when Gilbert Caudillo used deadly force and killed Alex, he created the deadly circumstances.

**PLAINTIFFS' INDEPENDENT MEDICAL EXAMINER, DR. MICHAEL ILIESCU:**

Please see Dr. Michael Iliescu's Independent Report of Autopsy and Dr. Iliescu's Declaration.

**PLAINTIFFS' USE OF FORCE EXPERT, WILLIAM HARMENING:**

Please see Mr. Harmening's Initial Report, Rebuttal Report and Declaration.

**PLAINTIFFS' BALLISTICS EXPERT, LUCIAN HAAG:**

Please see Mr. Haag's Initial Report, Rebuttal Report, and Declaration.

**PLAINTIFFS' EXPERT DR. JOSEPH PELES:**

Please see Dr. Peles' Initial Report, Rebuttal Report, and Declaration.

**COUNT I: USE OF EXCESSIVE FORCE 4TH AMENDMENT CLAIM:**

The use of deadly force on Decedent, Bradley Alexander Lewis, by Defendant Gilbert Caudillo was unreasonable under the totality of the circumstances. "Apprehension by deadly force is a seizure subject to the Fourth Amendment's reasonableness requirement." Wilkinson v. Torres, 610 F. 3d.546, 550 (2010) (citing Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). 42 U.S.C. § 1983; U.S. Constitution 4th Amendment; *Graham v. Connor*, 490 U.S. 386 (1989).

Therefore, the "determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases." Headwaters Forest Def. v. County of Humboldt, 240 F.3d 1185, 1205-06 (9th Circ. 1997). The reasonableness of force is "ordinarily a question of fact for a jury." Liston v. County of Riverside, 120 F.3d 965, 976 n. 10 (9th Circ. 1997). "Whether a particular use of force was reasonable is rarely determinable as a matter of law." Chew v. Gates, 27 F.3d 1432, 1443 (9th Cir. 1994).

*Graham v. Connor* provides an objective reasonableness test under the Fourth Amendment in reference to four key factors: (1) The severity of the crime involved; (2) The immediate threat to the safety of officers or others; (3) The suspect actively resisting seizure; & (4) Rapidly evolving circumstances.  The objective

reasonableness test is used to determine how a similarly trained and experienced officer would response in a similar fashion given the facts known at the time. Defendants only mention Caudillo in their discussion of how the criteria are met. Under the totality of circumstances, BOTH Caudillo and Moseley were faced with a test of "reasonableness" when making a decision on the amount of force necessary in this situation and whether or not Mr. Lewis posed an immediate deadly threat to the safety of themselves and OTHERS.  Under these standards, Moseley is then considered a similarly trained and experienced officer that could be compared to Caudillo.  Moseley, faced with the same objective reasonableness test, was already out of his patrol car, was in a better position to shoot with his gun already drawn, and he chose not to.  It can then be ascertained that Moseley, when faced with a test of "reasonableness" on the amount of force necessary, concluded that Alex did not pose an immediate deadly threat to Caudillo.  *Graham v. Connor* also establishes that a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. Defendants only discuss the "reasonableness" of Caudillo and fail to address that there was another reasonable officer on the scene faced with similar circumstances who chose NOT to shoot.

    At the summary judgment stage, once the Court has 'determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record,' the question of whether an officer's actions were objectively reasonable ... is 'a pure question of law.' " *Krause v. Cnty. of Mohave*, No. CV-17-08185-PCT-SMB, 2020 WL 2541728, *5 (D. Ariz. May 18, 2020) (quoting *Scott v. Harris*, 550 U.S. 372, 281 n.8, 127 S. Ct. 1769, 167 L. Ed. 2s 668 (2007)).  See also

*Whitaker v. Pima Cnty*, 640 F. Supp. 2d 1095, 1102-03 (D. Ariz. 2009), where the essential facts are undisputed, the reasonableness of the officer's actions is properly determined by the Court, citing *Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 70 F. 3d. 1095, 1099 (9th Cir. 1995). *Cutler v. Nanos*, 546 F. Supp. 3d 856 (D. Ariz. 2021.)  For the case at bar, the essential facts are disputed and the reasonableness of the officer's actions are not properly determined by the Court at the summary judgment stage.  Pointing to *Romo v. Largen*, 723 F. 3d 670 (6th Cir. 2013), the dispute barring summary judgment was a factual dispute and the *Romo* court was properly bound by the district court's finding that competing factual narratives existed and that it could not, at summary judgment, choose between them.

Count 1 must proceed to trial given there is a genuine issue of material fact as to whether Defendants' actions were objectively reasonable.

Defendants are the only surviving eye witnesses.  Plaintiffs urge this Court to ensure that the Defendants do not take advantage of the fact that the witness most likely to contradict their story — the person shot dead — is unable to testify.  All the evidence in the record proffered by the Plaintiff in Plaintiffs' Separate Statement of Facts shows that the Defendants' story is internally inconsistent and inconsistent with other known facts.  *Hopkins,* 958 F. 2d. at 885-88; *Ting v. United States,* 927 F. 2d. 1504; 1510-11 (9th Cir. 1991).  The Court may not simply accept what may be a self-serving account by the police officers.  It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably.

Defendants cite *Lemmon v. City of Akron, Ohio*. In *Lemmon v. City of Akron, Ohio*, the deceased told law enforcement that "you're going to have to kill me" and that "you're going to have to shoot me." Shots were fired after he placed his hand in his waistband despite being unarmed, i.e., deliberate intent to get shot by law enforcement. With the case at bar, Mr. Lewis' intent was not suicide by cop. Mr. Lewis pleads with Moseley to save him during the final moments of his life. Moseley states, "So, uh, he starts saying that he's gonna die and he wants me to help him and not to, uh. He's basically like begging me not to let him die." (pg. 9) **(PSSOF Exhibit 22)**

## COUNT II: SUBSTANTIVE DUE PROCESS 14TH AMENDMENT CLAIM:

The conduct of the Defendants that resulted in the death of Decedent Bradley Alexander Lewis "shocked the conscience" and evidences "deliberate indifference" and/or "purpose to harm". 42 U.S.C. § 1983; U.S. Constitution 14th Amendment; *Wilkinson v. Torres*, 610 F.3d 546 (9th Cir., 2010).

When shooting Alex while he was unarmed and not posing any risk to any of the officers, Defendants acted in an objectively unreasonable manner and/or deliberate indifference to a significant risk of harm to Alex. The Defendants acted under color of law. The Defendants violated Alex's right to substantive due process. In the Caruther's zoomed in surveillance footage, Traci Caruther can be heard stating the following: "They shot the kid as he was getting on the ground." **(PSSOF Exhibit 23)** Mrs. Caruther's statements reflect a suspect abiding by law enforcement and not behaving in a threatening manner towards law enforcement or the public. Mrs. Caruther's statements also corroborate Defendants' expert Matt Noedel and Plaintiffs' expert Luke

Haag that Lewis was falling, collapsing, or diving when shots are sustained. Defendants claim that the "deliberate indifference" test does not apply because deliberation is not possible if the officers encounter fast paced circumstance presenting competing public safety obligations. Defendants have continuously reaffirmed that Lewis was "flying" towards Caudillo and moving his body as fast as humanly possible. During Deputy Justin Berry's Deposition, he states the following: "Q. Just for the record, you open the driver door. A. Right. Correct." **(PSSOF Exhibit 24)** Given that Lewis took the time to shut his door, Plaintiffs are highly critical that Lewis was "flying" towards Deputy Caudillo as he describes. Plaintiffs expert Dr. Joseph Peles also opined in his rebuttal accident reconstruction analysis that Defendants rapid approach/chest forward theory could not occur, nor could the event occur in fractions of a second as Defendants claim. Despite Caudillo stating upon numerous occasions that he did not make the decision to shoot until Alex cleared the gap, the blood pool at the scene confirms that Alex never cleared the gap. Defense Expert Matt Noedel and Plaintiff Expert Luke Haag both agree that Alex never cleared the gap. The physical evidence does not support the Defendants statements, nor does the physical evidence reflect that the Defendants behaved according to legitimate law enforcement objectives. The Defendants deliberate indifference and purpose to harm Alex shocks the conscience.

Count II must proceed to trial given there is a genuine issue of material fact as to whether Defendants' actions reflect legitimate law enforcement objectives.

## COUNT III: WRONGFUL DEATH CLAIM

The Defendants' conduct related to the attempt to capture and arrest and including the shooting of Decedent Lewis by Gilberto Caudillo was wrongful inasmuch as that

conduct was negligent and/or grossly negligent and/or intentionally wrongful and/or objectively unreasonable.  (ARS §§ 12-611, 612.)  The Defendants owed a duty to act reasonably in their use of force. They had a duty to conform to an objectively reasonable standard of conduct as to the circumstances for which use of force was warranted. The Defendants had a duty to not deprive Alex of his inalienable rights to enjoy and defend his life. The Defendants breached those duties when Alex was shot and killed while unarmed and posing no risk to any of the officers. They further breached those duties when they failed to procure adequate medical attention within a reasonable time. They continued to hold Alex down to handcuff him instead of getting prompt medical attention when he was unarmed, not a danger to officers or the public, and experiencing agonal breathing. They breached those duties when they searched the scene looking for a nonexistent firearm before providing first aid when it was clear Alex was in distress. So egregious were their actions, that even paramedics dispatched to the scene commented on the attending officers' complete disinterest in providing needed details for trauma physicians who might need the information to possibly help save Alex's life.  When one emergency medical technician asked what had occurred, he was told that Alex was a very bad person. James Bailey was one of the first responders with the Northwest Fire District.  He stated the following during his Deposition: "A. Well, I was trying to relay in my answer that I was trying to figure out everything or how I was gonna treat this patient.  And I remember asking some questions and not getting much information back." **(PSSOF Exhibit 25)**

    The County of Pima, Pima County Sheriff's Department, and Pima County Sheriff Chris Nanos are responsible for the actions of Pima County Sheriff Deputy Gilbert

Caudillo and Pima County Sheriff's Department Sergeant Michael Moseley under respondeat superior. The Defendants breach of the duty they owed to Plaintiffs caused injuries and damages to them, including Alex's wrongful death and the loss of adult consortium for Alex's mother, Anita Lewis, Alex's father, Bradley Lewis, Alex's maternal grandmother, Helen Stricklen, Alex's maternal grandfather, Rusty Stricklen, Alex's paternal grandmother, Jerlene Jones, and Alex's paternal grandfather, Preston Lewis. See A.R.S. S 12-611 et. seq.

Count III must proceed to trial given there is a genuine issue of material fact as to whether Defendants use of deadly force was objectively reasonable.

## **COUNT IV: LOSS OF CONSORTIUM CLAIM**

The Defendants have liability through one or more of the legal theories set forth in Plaintiffs' Complaint for the death of Decedent Lewis and that said liability entitles them to damages for the loss of companionship/association of Decedent Lewis. *Pierce v. Casas Adobes Baptist Church*, 62 Ariz. 269, 272 (1989).

Count IV must proceed to trial given there is a genuine issue of material fact as to whether Defendants use of deadly force was objectively reasonable.

## **COUNT V: DAMAGE TO PROPERY CLAIM**

The Defendants negligently, and/or grossly negligently, and/or objectively unreasonably, and/or intentionally, and without legal excuse, damaged Plaintiffs Ralph Strickeln's and 2019 Ford F-150 pick-up truck. Plaintiffs sustained approximately $4,538.18 in damages. **(PSSOF Exhibit 31)**

Count V must proceed to trial given there is a genuine issue of material fact as to whether Deputy Caudillo firing the bullets was objectively reasonable, justified, or necessary.

## QUALIFIED IMMUNITY:

Defendants claim that immunity and/or qualified immunity for the acts which led to Alex's death apply.  Plaintiffs contend that such acts were outside the scope of their authority because Defendants violated Alex's constitutional rights and their misconduct was clearly established at the time.  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

Defendants cite *Waid v. County of Lyons* when alleging the Defendants are entitled to qualified immunity.  Unlike the case at bar, in *Waid v. County of Lyons*, Anderson was in a narrow hall and rapidly approaching the officers, with no barrier between them.  It was cited in *Waid v. County of Lyons* that he could have accessed the officers' weapons at any time or otherwise harmed them.  Mr. Lewis was obstructed by the narrow gap between the vehicles and there was a barrier between him and Caudillo.  Furthermore, Plaintiffs' experts have shown that the physical evidence discredits the Defendants' rapid approach/chest forward theory.  Plaintiffs disagree with Defendants stance that *Waid v. Lyons* is factually similar to the case at bar.

For the case at bar, there is a battle of experts on a material issue of fact, which cannot be decided at summary judgment as a matter of law.  See *Act Up!/Portland v. Bagley*, 988 F. 2d. 868, 878 (9th Cir. 1993).  In the above-referenced case, the Court

concluded that, "If a genuine issue of fact exists preventing a determination of qualified immunity at summary judgment, the case must proceed to trial."

### PIMA COUNTY AND SHERIFF NANOS:

Pima County and Sheriff Nanos established policies, customs, practices, decisions, usages, etc., that unconstitutionally deprived Mr. Lewis of his rights.  Pima County and Sheriff Nanos failed to properly train, manage, control and equip Deputy Caudillo and Sgt. Moselely.  Pima County and Sheriff Nanos refused to assess Deputy Caudillo's wrongful conduct by not conducting a proper investigation, which demonstrates deliberate indifference of a constitutional injury.  Plaintiffs and Laura Conover with the Pima County Attorney's Office (PCAO) both learned in March that criminal charges had been declined by this Office, not from proper channels, but through the media.  In fact, officers involved in the January 20th, 2021 incident were all released back into the force only a few days later and before notifying Plaintiffs and the PCAO that the officers were cleared of any wrongdoing.  Because of Pima County Sheriff's Department failure to investigate properly, Laura Conover decided to personally start anew the entire investigation, along with PCAO Chief Deputy Tamara Mulembo and Chief Criminal Deputy Dan South.  Rather than go through the proper channels, Pima County and Sheriff Nanos slandered Mr. Lewis in the press, deprived Plaintiffs of a proper investigation before conducting a press release, and notified the press before notifying Mr. Lewis' family of their decision.  Had Pima County and Sheriff Nanos conducted a proper investigation, the physical evidence shows that the event did not unfold the way it was described by Caudillo and Moseley and how PCSD reported it to the press.  To this day, Pima County Sheriff's Department,

Deputy Caudillo, and Sergeant Moseley still maintain that Bradley Alexander Lewis rammed a patrol vehicle and that they responded with lethal force because of this supposed ramming. Given Plaintiffs were burdened with conducting an independent investigation because Pima County and Sheriff Nanos did not conduct a proper investigation, it has become exceedingly clearer that Defendants' investigation amounted to nothing more than engaging in defensive tactics to blur their wrongful conduct. Pima County and Sheriff Nanos ignored Plaintiffs' Preservation of Evidence Letter when they compromised data from the patrol vehicles that would have further reaffirmed that Mr. Lewis did not ram the police officers. Rather, the police officers rammed Mr. Lewis. Furthermore, Pima County's non-DPS Crime Laboratory mis-characterized small mineral particles loosely adhering to the sleeve of Mr. Lewis shirt as unconsumed gun powder particles. Both Defendants' and Plaintiff's ballistic and criminology experts agree that their findings are at odds with Pima County Sheriff's Department non-DPS Crime Laboratory report, which is monumental because this reflects that Mr. Lewis was not as close to Caudillo as he claims when he shot and killed Mr. Lewis. To this date, Pima County and Sheriff Nanos have not investigated whether their rapid approach/chest forward theory is corroborated with the physical evidence. In fact, it does not. Pima County and Sheriff Nanos have a duty to ensure proper oversight of established policies and procedures and a duty to conduct a proper investigation of an in-custody death. Pima County and Sheriff Nanos fail on both counts and their wrongdoing demonstrates a deliberate indifference of the Plaintiffs' Constitutional rights. It should be further noted that Defendants designate several pages in their Motion for Summary Judgment discussing how Mr. Lewis is a

"bad guy," which is not justification of depriving Mr. Lewis of his Constitutional rights. Plaintiffs urge the Court to solely evaluate the incident that occurred on January 20, 2021. Defendants shot an unarmed nineteen year old that was in the process of giving himself up when he was wrongfully murdered by the Defendants. Pima County and Sheriff Nanos condoned the Defendants unconstitutional use of excessive force and Pima County and Sheriff Nanos' policy helped aid and abet the constitutional wrong in proxy of their deliberate indifference. Pima County and Sheriff Nanos turned a blind eye to Mr. Lewis' constitutional deprivation. Pima County's and Sheriff Nanos' systematic and gross deficiencies are evidenced by their inaction to properly supervise its officials and employees in proxy of their failure to reprimand. *Orozco v. Dart*, 64 F.4th 806, 824 (7th Cir. 2023). While Defendants claim that Sheriff Nanos was not personally involved in the incident that occurred on January 20, 2021, Section 1983 liability may be imposed on a governmental authority when the final decision-making authority is directly responsible for the deprivation. *Gernetzke v. Kenosha Unified School District No. 1*, 274 F.3d. 464 (7th Cir. 2001.) Plaintiffs *Monell* claim must proceed to trial given there is a genuine issue of material fact as to whether Defendants deprived Mr. Lewis of a federal right, whether governmental action can be traced to the deprivation, whether policy and custom demonstrate fault, i.e. deliberate indifference, and whether municipal action was the moving force behind the federal violation. *Dean v. Wexford Health Service, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021).

    Plaintiffs would like to note that the case at bar is not a singular incident of deliberate indifference in which Sheriff Nanos has failed to properly investigate and failed to discipline employees of Pima County Sheriff's Department. On October 23,

2023, Jose Montreal Jr. was arrested for two felony shoplifting incidents. Nanos convened a leadership panel and did not follow the unanimous decision by his appointed commanders to terminate Jose Montreal Jr.  Instead, Nanos disciplined Jose Montreal Jr. with a brief suspension with pay and reinstated him.  On the news, Nanos further stated, "It wasn't the first time he's (Sheriff Nanos) protected his staff from serious consequences.  We've had people (deputies) arrested, convicted of DUIs, shoplifting, and domestic violence, and they still work with us."  Jose Montreal's case demonstrates Nanos' disregard for procedure and lack of discipline of his deputies.  Nanos created an entity and did not carry out its resolution.  **(PSSOF Exhibit 29)**  Nanos has established a pattern of behavior within PCSD where deputies receive no serious repercussions for their actions.  PCSD Sergeant Ricky Garcia is another example of Nanos' disregard for procedure, lack of discipline of his deputies, and an established pattern of behavior in which PCSD deputies receive little to no repercussions for their actions.  Even more glaringly, Sergeant Ricky Garcia's case, similar to the case at bar, illustrates that Nanos interfered with the investigation as well.  A fellow PCSD deputy was sexually assaulted by Sergeant Ricky Garcia at a Christmas party in which her lieutenant, captain, and chief were all present and aware that she was being actively sexually assaulted by her Sergeant, Ricky Garcia, and refused to intervene for eighty (80) minutes.  PCDO claims Nanos held up the internal investigation as to how the supervisors and commanders initially handled the case.  Brinkman, Vice President of PCDO, said Nanos had six months before the claim was filed against the Sheriff's Department to make a decision on what was going on and they didn't do it.  **(PSSOF Exhibit 27)**  The Pima County Board of Supervisors are

pushing ahead for a review of Nanos' handling of the sexual assault case. Supervisors voted on October 11, 2023 to seek outside inquiry into how Nanos conducted the internal review of his agencies handling of the alleged sexual assault of a deputy by a colleague.  In a four (4) to one (1) vote, followed by a closed-door discussion with a county prosecutor, concerns were raised pertaining to the lack of oversight that the Pima County Board of Supervisors have over Nanos and they ultimately voted to investigate Sheriff Nanos.  **(PSSOF Exhibit 28)**  In retaliation of the Board's decision, Nanos threatened to pull security from the meetings.  **(PSSOF Exhibit 26)**  Furthermore, Pima County Sheriff Chris Nanos illegally withheld public information four times during his first five months alone on the job according to several experts in Arizona's public-records law.  The experts ruled unanimously that Nanos has ignored decades of Arizona Supreme Court rulings to repeatedly block the release of public records.  **(PSSOF Exhibit 30)**  While Nanos has publicly pledged his commitment to openness and transparency, the sheriff has instead repeatedly broke the law.  With the case at bar and several other cases, there is a clear pattern of obstruction.  David Cullier, one of four experts who reviewed Nanos' public-records decisions states, "These are not gray areas where the law is unclear.  These cases are black and white for anyone who knows how to read."  Since taking office, Sheriff Nanos has repeatedly shown little recognition of the law and his duty to comply with it. With the case at bar, Nanos wrongfully withheld public records obligating Plaintiffs to sue to obtain the records.  Nanos misused public-records law by concealing a key shooting detail for weeks.  Nanos should have immediately revealed that Lewis was unarmed.  Instead, Nanos wrongfully claimed that he did not have to reveal if Lewis

was armed because the incident was still under investigation. It took two weeks for Nanos to publicly disclose that Lewis, who was shot dead, did not have a gun his hand, but rather, a key fob mistaken for a gun. State law does not allow the sheriff to withhold basic facts about a fatal law enforcement encounter simply because an investigation is ongoing. To this date, Sheriff Nanos and Pima County are still in non-compliance with the Supreme Court of the Unites States *Brady Doctrine* (1963), US Freedom of Information Act (1967), State Sunshine Law (2007), Open Government Act (2007), Open Government Initiative (2009), and Open Government Directives (2009), issued by the United States Department of Justice. With the case at bar, Pima County and Sheriff Nanos have must be held accountable for their conduct and systematic abuse within the legal system.

### **CONCLUSION:**

Count I, Count II, Count III, Count IV, Count V, Plaintiffs' *Monell* claim against Pima County and Sheriff Nanos, and whether Defendants are entitled to qualified immunity must all proceed to trial given there is a genuine issue of material fact requiring a jury or judge to resolve the parties' differing versions of the truth at trial and a battle of experts on a material issue of fact, which cannot be decided at summary judgment as a matter of law.

**RESPECTFULLY SUBMITTED** this 20th day of March, 2024.

**CORONADO LAW FIRM, P.L.L.C.**

/s/ Eduardo H. Coronado
Eduardo H. Coronado, Esq.
Attorneys for the Plaintiffs

CERTIFICATE OF SERVICE

      I hereby certify that on March 20, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmitted a Notice of Electronic Filing to:

Daryl Audilett, Esq.
Audilett Law PC
335 N. Wilmot Road Suite 500
Tucson, AZ 85711-2636
520-349-5468
daa@audilettlaw.com

*By: /s/ Casandra Pederson*