JL

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Anna Christine Lewis, et al.,

               Plaintiffs,

v.

Chris Nanos, et al.,

               Defendants.

No. CV-21-00557-TUC-RM

**ORDER**

    Plaintiffs Anna Christine Lewis and Bradley Lewis, on their own behalf and as personal representatives of the estate of Bradley Alexander Lewis,[1] brought this civil rights action, through counsel, pursuant to 42 U.S.C. § 1983.  Defendants Pima County, Sheriff Chris Nanos, and Deputies Gilbert Caudillo and Michael Moseley move for summary judgment on the merits of Plaintiff's § 1983 excessive force, due process, state-law wrongful death, loss of consortium, and property damage claims.  (Doc. 64.)  The Motion is fully briefed.  (Doc. 75, 81).

    The Court will grant in part and deny in part the Motion for Summary Judgment.

## I. Second Amended Complaint

    In the operative Second Amended Complaint ("SAC"), Plaintiffs sue Pima County and Defendants Nanos, Caudillo, and Moseley in their individual and official capacities,

---

[1] Anna Christine Lewis and Bradley Lewis are Bradley Alexander Lewis's mother and father.  (Doc. 14 at 3 ¶¶ 5-6.)  The Second Amended Complaint also identifies as Plaintiffs Helen Stricklen, Ralph Rust Stricklen, Jerlene Jones, and George Preston Lewis, who are Bradley Alexander Lewis's grandparents.  (*Id.* ¶¶ 7-10.)

asserting constitutional violations arising from the shooting death of Bradley Alexander Lewis ("Lewis") on January 20, 2021.  (Doc. 14 at 1-4.)  Plaintiffs allege that Defendants created circumstances that led to Defendant Caudillo shooting and killing Lewis, who was unarmed and not posing a threat.  (*Id.* at 5.)  Specifically, Plaintiffs claim Defendant Caudillo shot and killed Lewis, and Defendant Moseley created the circumstances that led to Lewis's death by "escalat[ing] the operation from an investigatory contact to a deadly confrontation."  (*Id.* at 5-6.)  Plaintiffs contend Defendants Pima County and Nanos established a policy, regulation, official decision, custom, practice, or usage, with reckless or deliberate indifference to the rights of others; failed to "properly train, manage, control and equip" Defendants Caudillo and Moseley; "ratified their wrongful conduct after the fact; "and/or engag[ed] in a cover up of their wrongful conduct."  (*Id.* at 14-15.)  Plaintiffs assert a Fourth Amendment excessive force claim in Count One and a Fourteenth Amendment substantive due process claim in Count Two against all Defendants; a wrongful death claim in Count Three against Defendants Nanos, Caudillo, and Moseley; a claim for loss of consortium in Count Four against all Defendants; and a claim for damage to Helen and Ralph Rust Stricklen's property in Count Five against all Defendants.  (*Id.* at 13-21.)

In a December 22, 2022 Order, the Court dismissed Jerlene Jones and George Preston Lewis from the case and dismissed Helen Stricklen and Ralph Rust Stricklen from Counts One through Four.  (Doc. 22.)  The Court dismissed Pima County from Count Three.  (*Id.*)

## II.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co. v. Fritz Co.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and to show (1) that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and (2) that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

### III. Plaintiffs' Non-Compliance with Local Rules

The Court first addresses Defendants' arguments in their Reply that Plaintiffs' Response does not comply with the Court's Local Rules. (Doc. 81 at 2.) First, Defendants contend Plaintiffs failed to file a Controverting Statement of Facts, in violation of Local Rule 56.1(b), and the Court should therefore deem admitted paragraphs 1 through 425 of Defendants' Statement of Facts. (*Id.*) Second, Defendants assert that Plaintiffs' Separate Statement of Facts in Support of their Response to the Motion for Summary Judgment lacks citations to the record, in violation of Local Rule 56.1(b)(2). (*Id.* at 3.) Third, Defendants argue that Plaintiffs' Response Brief violates Local Rule 56.1(e) because it does not include citations to the specific paragraphs in their Statement of Facts that support

the assertions made in their brief regarding any material fact on which the party relies. (*Id.*)

Defendants contend the Court should deem their facts to be undisputed in their entirety.

(*Id.* at 4.)

> Rule 56.1(b) of the Local Rules of Civil Procedure states:
>
> Any party opposing a motion for summary judgment must file a statement, separate from that party's memorandum of law, setting forth: (1) for each paragraph of the moving party's separate statement of facts, a correspondingly numbered paragraph indicating whether the party disputes the statement of fact set forth in that paragraph and a reference to the specific admissible portion of the record supporting the party's position if the fact is disputed; and (2) any additional facts that establish a genuine issue of material fact or otherwise preclude judgment in favor of the moving party.

LRCiv 56.1(b).  Plaintiffs' Separate Statement of Facts does not indicate, for each paragraph of Defendants' Statement of Facts, whether they dispute the statement of fact set forth in that paragraph and a reference to the specific admissible portion of the record supporting Plaintiffs' position if the fact is disputed, and therefore does not comply with Rule 56.1(b).  Failure of the non-movant to comply with LRCiv 56.1(b) is grounds for the Court to disregard a controverting statement of facts and deem as true the moving party's separate statement of facts in support of the motion for summary judgment. *Szaley v. Pima Cnty.*, 371 F. App'x 734, 735 (9th Cir. 2010).

In addition, as Defendants assert, where Plaintiffs directly respond to certain paragraphs in Defendants' Statement of Facts, Plaintiffs "provide unsupported explanations and arguments." (*Id.* at 2.)  For example, paragraph 184 of Defendants' Statement of Facts states: "During the time of the collisions in the driveway, Moseley was yelling at Lewis to stop.  Moseley was pleading with Lewis to stop.  Moseley was calling him by his name, 'Bradley, stop.'  Moseley was begging him to stop." (Defendants' Statement of Facts ("DSOF"), Doc. 65 at 45 ¶ 184.)  In their Separate Statement of Facts, Plaintiffs state: "When Sergeant Michael Moseley states 'Bradley, stop,' he is alone in his patrol vehicle and has his windows rolled up.  [Lewis] does not hear this, other police officers on scene do not hear this, the statement is said without the presence of anyone

around to hear it." (Pls.' Separate Statement of Facts ("PSSOF"), Doc. 75-1 at 41 ¶¶ 271-72.) Plaintiffs do not cite the record for these statements. "LRCiv 56.1 'does not permit explanation and argument supporting the party's position to be included in the ... statement of facts. Argument may be made in the response or reply brief on the motion for summary judgment.'" *Marceau v. Int'l Broth. of Elec. Workers*, 618 F. Supp. 2d 1127, 1141 (D. Ariz. 2009) (quoting *Pruett v. State*, 606 F. Supp. 2d 1065, 1075 (D. Ariz. 2009)).

The Court will disregard Plaintiffs' Separate Statement of Facts to the extent that it fails to comply with the Court's Local Rules, but the Court declines to accept as undisputed the entirety of Defendants' Statement of Facts.

## IV. Facts

### A. Background

Defendant Moseley was a sergeant with the Pima County Sheriff's Department ("PCSD") during the relevant time. (DSOF ¶ 122.) Moseley has been a commissioned law enforcement officer with the PCSD since 1998. (*Id.* ¶ 123.) Defendant Caudillo has been employed by the PCSD for 22 years. (*Id.* ¶ 206.) Caudillo completed several training programs, including DUI/HGN training, SWAT training, SWAT instructor training, FTO (Field Training Officer) instructor training, general instructor training, firearms instructor training, explosive breaching training, and regular breaching training. (*Id.*) Caudillo is a firearms instructor for the department, and he has taught firearms and SWAT courses. (*Id.*) On January 20, 2021, Caudillo had been a member of the PCSD SWAT Team since 2007. (*Id.*)

At the time of the shooting, PCSD's deadly force policy stated,

In accordance with A.R.S. § 13-403, A.R.S. § 13-404, and A.R.S. § 13-409, members shall use only that amount of force reasonably necessary to:

1. Make an arrest/detention;

2. Prevent an escape;

3. Protect him/herself or a third person against another's use of unlawful force.

4. In department correctional facilities, members may use force in order

1    to preserve order, or to prevent the commission of any crime.[2]

2    (*See* Doc. 75-5 at 17-18.)

3        **B.    PCSD Interaction with Lewis Before January 20, 2021**

4        On December 4, 2020, Deputy Anthony Pool was working as a PCSD patrol deputy

5    in the Foothills District of Tucson, Arizona.  (DSOF ¶ 3.)  Deputy Pool responded to the

6    intersection of North Thornwood Road and West Meadow Briar Drive in reference to a

7    report of an incident of a person armed with a deadly weapon.  (*Id.* ¶ 4.)  Communications

8    told Deputy Pool that the incident involved a white male in a blue Toyota Tacoma, last

9    seen heading northbound, and the Toyota Tacoma had a temporary paper license plate,

10    with an unknown plate number.  (*Id.* ¶ 10.)  Communications told Deputy Pool that the

11    white male, who was identified as "Bradley," had stepped out of the vehicle and pointed a

12    gun at another person.  (*Id.* ¶¶ 11-12.)

13        At the scene, Deputy Pool spoke with Darren Williams, who informed Deputy Pool

14    that he was an off-duty Tucson Police Department officer and had witnessed what had just

15    occurred.  (*Id.* ¶ 14.)  Williams told Deputy Pool that a white male, last seen wearing a

16    camouflage hat and a white tank top, stepped out of a blue Toyota Tacoma and pointed a

17    gun at another individual, Chip Frank.  (*Id.* ¶ 15.)  Deputy Pool asked Frank "what had

18    gone on," and Frank told Deputy Pool that while he and his friend were walking along the

19    sidewalk at the intersection of Thornwood Road and Meadow Briar Drive, an individual

20    whom Frank identified as an ex-coworker, Bradley, had "pulled up and started talking

21    shit."  (*Id.* ¶ 16.)  Frank said that as the argument escalated, Bradley stepped out of the blue

22    Toyota Tacoma and then reached in his front waistband and pulled out what looked like a

23    black handgun and pointed it at Frank, stating, "I've dropped ten bodies before and you're

24    just a number to me.  I'll do it again."  (*Id.* ¶ 17.)  Deputy Pool later learned from Frank

25    that Bradley's last name is Lewis.  (*Id.* ¶ 19.)

26

27    ──────────────

28        [2]  The  deadly  force  policy  was  revised  in  July  2022.  *See*
https://pimasheriff.org/application/files/7916/5895/3256/Chapter_3-_Major_Policies.pdf
(last visited Sept. 4, 2024).

1   Deputy Pool contacted Sergeant D.A. Welch and advised him of the situation.  (*Id.*

2   ¶ 22.)  Sergeant Welch told Deputy Pool that Bradley Lewis was a person of interest in a

3   burglary and directed Deputy Pool to contact Sergeant M.A. Rosalik in the

4   Robbery/Assault Unit to advise him of the situation and to determine the next steps for the

5   investigation involving the Assault with a Deadly Weapon ("AWDW") incident involving

6   Bradley Lewis and Chip Frank.  (*Id.* ¶ 23.)  Lewis's last known address, 6671 N. Paseo De

7   Angel, was already in PCSD's database.  (*Id.* ¶ 24.)  Deputy Pool contacted Sergeant

8   Rosalik, who told Deputy Pool to take taped statements from all parties (the victim and the

9   witnesses) on scene, and detectives would follow up at Lewis's last-known address later.

10  (*Id.* ¶ 25.)  Detective Chamonix Valdez was assigned to do a follow-up investigation

11  concerning the December 4, 2020 incident.  (*Id.* ¶¶ 57, 61.)

12      On December 16, 2020, Detective Valdez and Detective G. Houston went to

13  Lewis's last-known address, 6671 N. Paseo De Angel, looking for Lewis or for information

14  that could lead them to contacting Lewis.  (*Id.* ¶ 67.)  Detectives Valdez and Houston spoke

15  with Ralph Stricklen, who told the detective that Lewis was his grandson, that he had

16  moved out of the house approximately two months earlier, and that he did not know where

17  his grandson was living and did not have a phone number for his grandson.  (*Id.* ¶¶ 68-69.)

18  Stricklen told the detectives that Lewis was driving a blue truck.  (*Id.* ¶ 70.)

19      On December 18, 2020, Detective Valdez initiated a Probable Cause Alert on Lewis.

20  (*Id.* ¶ 77.)  The Probable Cause Alert identified the suspect or "Wanted Person" as Bradley

21  Alexander Lewis.  (*Id.* ¶ 79.)  It provided a general race (Caucasian) and gender (male)

22  description, and a known address, 6671 N. Paseo De Angel, Tucson.  (*Id.* ¶ 80.)  The

23  Probable Cause alert described the December 4, 2020 incident and stated that Lewis was

24  suspected of committing assault with a deadly weapon.  (*Id.* ¶¶ 81-82.)

25      Lewis first came to Defendant Moseley's attention when Moseley became aware

26  that detectives were "checking out" an address and looking for an individual suspected of

27  committing aggravated assault with a deadly weapon.  (*Id.* ¶ 141.)  For three to five weeks

28  before January 20, 2021, Defendant Moseley tried to locate Lewis.  (*Id.* ¶ 142.)  Defendant

Moseley drove past Ralph and Helen Stricklen's house at 6671 N. Paseo De Angel "on a very regular basis," looking for Lewis.   (*Id.* ¶ 147.)

On January 4, 2021, Defendants Moseley and Caudillo responded to 6661 N. Paseo De Angel, the house next door to Lewis's grandparents' house, for a report of shots fired and bullet casings found on the ground.  (*Id.* ¶ 222.)  During that call, there was discussion about whether Lewis may be a suspect in, or a target of, the shots fired.  (*Id.* ¶ 223.) Defendant Moseley told Defendant Caudillo that he checked the grandparents' house daily looking for Lewis's blue Toyota Tacoma pickup truck.  (*Id.* ¶ 224.)

**C.    January 20, 2021**

On January 20, 2021, at 3:22 a.m., Deputy David Baird responded to a report of a suspicious person, a Caucasian male in a black truck who was "going down the street checking for open (unlocked) car doors."  (*Id.* ¶¶ 89-90.)  As Deputy Baird drove to the incident location, he noticed a blue Toyota Tacoma crew cab pickup truck at an intersection, but at that point, he was on the lookout for a black pickup truck.  (*Id.* ¶¶ 93-94.)  Deputy Baird arrived at the address, checked the neighborhood, and did not see any black pickup trucks.  (*Id.* ¶ 95.)  He then spoke with the person who called police, who showed him surveillance footage of the suspicious person.  (*Id.* ¶ 96.)  Deputy Baird spoke with another resident in the neighborhood who also had video of the suspicious person. (*Id.* ¶ 108.)  In that video, the pickup truck appeared to be a newer, blue truck with off-road tires.  (*Id.* ¶ 109.)

Deputy Baird went to Lewis's address to locate the blue Tacoma, but Lewis was not there.  (*Id.* ¶ 119.)  Deputy Baird circled the area but could not locate the truck.  (*Id.* ¶ 120.)

Defendant Moseley came on duty at 6:00 a.m. and called Deputy Baird seeking more information about the vehicle break-in call that Baird was investigating.  (*Id.* ¶ 121.) Deputy Baird told Defendant Moseley about the blue truck shown on the neighbors' video footage and that he believed the suspect was Lewis.  (*Id.*)  While Defendant Moseley was driving, he saw a light blue Toyota Tacoma with a temporary paper license plate parked

beside the road on N. Paseo De Angel.  (*Id.* ¶ 156.)  Defendant Moseley stopped his patrol car and radioed for additional units to respond to assist him.  (*Id.* ¶ 157.)

Deputy Pool arrived at 6:18 a.m. to assist Defendant Moseley.  (*Id.* ¶ 40.)  Moseley advised Deputy Pool that there was a blue Toyota Tacoma pickup truck in the vicinity that was a "suspicious vehicle related to a previous call" and that the suspect with the truck was Lewis.  (*Id.* ¶¶ 41-42.)  Defendant Moseley directed Deputy Pool to set up road spikes (used to puncture vehicle tires) to deploy across the roadway.  (*Id.* ¶ 45.)

Deputy Berry arrived, and he and Defendant Moseley searched and cleared the front yard of the house where the motion light had come on.  (*Id.* ¶ 161.)  Defendant Moseley and Deputy Berry returned to Moseley's patrol car.  (*Id.*)  It was still dark, and Defendant Moseley had his patrol car headlights on, but the other patrol vehicles had their vehicle lights off.  (*Id.* ¶ 162.)  Defendant Moseley stopped a vehicle that was leaving the neighborhood, spoke to the driver, and let him go.  (*Id.* ¶ 163.)  After that, Defendant Moseley left his overhead red and blue lights on and instructed Deputy Berry and Deputy Matthew Gilbert to assist in "doing a high risk stop on the Lewis truck."  (*Id.* ¶ 164.)

Defendant Moseley requested Communications to find out about the availability of PCSD air support, that is, a fixed-wing, light plane.  (*Id.*)  At that point, Defendant Moseley had his department-issued handgun out of its holster.  (*Id.* ¶ 165.)  Defendant Moseley and Deputies Berry and Gilbert "engaged in a high risk stop procedure that involved announcing their authority and addressing the Lewis truck and loudly commanding who[]ever was in the truck to get out of the truck with their hands up."  (*Id.*)  When giving commands, the deputies used Lewis's name and told him to get out of the truck with his hands up.  (*Id.* ¶ 166.)  Defendant Moseley took out his department-issued patrol rifle, chambered a round into the barrel, and put the rifle back into its secure rack.  (*Id.* ¶ 167.)  Defendant Moseley also requested via radio for someone to bring protective ballistic shields from the PCSD substation.  (*Id.* ¶ 168.)  Deputy Robles arrived with two protective ballistic shields.  (*Id.*)

Defendant Moseley "became aware" that Defendant Caudillo was en route to the location and that Caudillo was a SWAT Team member. (*Id.* ¶ 169.) Defendant Caudillo arrived, and Moseley and Caudillo discussed how to proceed. (*Id.* ¶ 171.) They decided to first attempt to determine whether the truck was occupied, to prevent Lewis from going mobile back into the public. (*Id.*) If Lewis was not in the truck, then they would transition to a fifth wheel travel trailer that was in the front yard of a neighbor's house. (*Id.*) Defendant Caudillo, with Deputy Robles in the backseat with a ballistic shield, drove his patrol Ford Explorer past the Tacoma. (*Id.* ¶ 172.) Caudillo could not see inside the blue truck even with his side-mounted spotlight as he drove past because the back and side windows were very darkly tinted. (*Id.* ¶ 244.)

When Defendant Caudillo got to the three-way "Y" intersection, there was a pickup truck coming toward him. (*Id.* ¶ 245.) Caudillo could see that an older man was driving. (*Id.*) Caudillo shouted at the man that there was a "guy with a gun in that car" and told him to go back to his house. (*Id.*) The man turned his truck around and drove back the way he came. (*Id.*) Caudillo later learned the man was Ralph Stricklen, Lewis's grandfather. (*Id.*)

Defendant Caudillo made a U-turn and drove back toward the blue Tacoma, which was now facing him. (*Id.* ¶ 246.) Caudillo pulled his patrol vehicle up to the Tacoma at an angle and stopped just inches from the truck so that there was no room for the truck to move forward. (*Id.* ¶¶ 247-48.) Caudillo could see that Lewis was in the driver's seat of the truck and had "squeezed himself down to where it looked like his left ear was touching the door panel." (*Id.* ¶ 250.) Caudillo could see the right side of Lewis's face and hair and saw him moving, trying to crouch. (*Id.* ¶ 251.) Then Lewis sat up and started the truck. (*Id.* ¶ 252.) Defendant Caudillo said loudly over the radio, "He's inside. He's in the car." (*Id.* ¶ 252.) Lewis put the truck in reverse "and floored it." (*Id.* ¶ 255.) At that point, Defendant Moseley realized that the other patrol vehicles were too far behind the Tacoma. (*Id.* ¶ 174.) Defendant Moseley sprinted to his vehicle to block the Tacoma from backing up and driving forward around the front of Defendant Caudillo's vehicle. (*Id.* ¶ 175.)

Lewis "threw [the truck] into drive" and drove around the front of Defendant Caudillo's patrol vehicle. (*Id.* ¶ 256.) Defendant Caudillo let Deputy Robles out of his patrol vehicle and turned on the vehicle's lights and siren. (*Id.* ¶ 258.) Caudillo did not know Lewis was heading into a cul-de-sac. (*Id.*) Caudillo did a reverse three-point turn, and as he did so, Defendant Moseley's patrol vehicle passed Caudillo. (*Id.* ¶ 259.)

Defendant Moseley observed Lewis "fleeing, driving his truck fast, in a southwest direction away from Moseley, then making a right turn, and driving fast in a northwest direction." (*Id.* ¶ 176.) Defendant Moseley "immediately engaged in a vehicle pursuit with overhead and front grill emergency lights activated." (*Id.* ¶ 177.) When Lewis reached the driveway of his grandfather's house, Lewis turned right into the driveway and then stopped near the entrance to the driveway. (*Id.*) Moseley put his vehicle in Park and started trying to get out of the vehicle. (*Id.* ¶ 178.) Lewis started backing his truck directly at Moseley's vehicle. (*Id.*) Moseley immediately drove forward and hit the rear of Lewis's truck to block him from backing out of the driveway. (*Id.*) Lewis drove forward again about halfway up the driveway. (*Id.* ¶ 179.) Moseley put his car in Drive and followed. (*Id.*) Lewis stopped his truck a second time. (*Id.*)

While Defendant Moseley was trying to get out of his vehicle and drawing his handgun, Lewis put his truck into reverse and backed into the front of Moseley's vehicle, jarring Moseley "pretty good." (*Id.* ¶ 182.) Lewis began moving his truck forward again. (*Id.* ¶ 184.) During the collisions in the driveway, Moseley was yelling at Lewis to stop. (*Id.*) Moseley saw that Lewis's grandfather was out of his own truck and standing to the left of it. (*Id.* ¶ 185.) As Moseley started pulling forward, a patrol vehicle drove past him on his right, which Moseley later learned was Defendant Caudillo. (*Id.*)

Moseley got out of his vehicle and headed up on the driver's side of the grandfather's truck, using that truck as cover. (*Id.* ¶ 186.) Moseley yelled at the grandfather to get away. (*Id.*) Moseley held his handgun pointed at Lewis's driver's side truck door, using the engine block of the grandfather's truck as cover. (*Id.* ¶ 188.) Lewis's driver's side truck door "flew open." (*Id.*) Moseley saw Lewis "get out fast, holding

something black in his right hand, the hand closest to Moseley." (*Id.*)  Lewis looked directly to the rear of his own vehicle and "bolted." (*Id.* ¶ 189.)  Moseley "followed him with his handgun until Lewis disappeared from view." (*Id.*)  Lewis never acknowledged Moseley or looked at him. (*Id.* ¶ 191.)

Lewis "took off running rearward" between his truck and his grandfather's truck and toward where Defendant Moseley had last seen a patrol vehicle drive past the passenger side of his patrol vehicle. (*Id.* ¶ 194.)  Sitting in the driver's seat of his patrol vehicle, Defendant Caudillo could not see all of Lewis's truck. (*Id.* ¶ 274.)  Caudillo never saw Lewis's driver's side door open, and he did not see Lewis come out of his truck. (*Id.*)  Caudillo heard Defendant Moseley shout, "watch out, watch out." (*Id.* ¶ 276.)  Caudillo was still sitting in his driver's seat when he saw Lewis "flying at him, moving so fast." (*Id.* ¶ 277.)  Lewis "c[ame] right at Caudillo." (*Id.*)  Caudillo took one step out of his patrol vehicle with his left foot, immediately drew his department-issued Glock 17 9mm handgun, pointed his gun at Lewis, and fired. (*Id.* ¶¶ 206, 279.)

Deputy Gilbert heard the gunfire and radioed "shots fired." (*Id.* ¶ 348.)  Defendant Moseley heard gunfire in quick succession. (*Id.* ¶ 196.)  Moseley did not know who was shooting. (*Id.* ¶ 197.)  After hearing the gunfire, Moseley moved down the side of the grandfather's truck, around the rear of it, and came behind Defendant Caudillo. (*Id.* ¶ 198.)  Moseley saw Caudillo standing between his patrol vehicle and the grandfather's truck. (*Id.*)  Caudillo had his handgun drawn and pointed at Lewis, who was on the ground near the driver's side rear of Lewis's truck bed. (*Id.*)  Lewis's right hand was underneath his body, but Moseley could see a black object in his hand. (*Id.*)  Caudillo said, "he's got something in his right hand," and Moseley said, "I can see it." (*Id.*)

Deputy Gilbert arrived, exited his vehicle, and ran up the driveway. (*Id.* ¶ 350.)  Deputy Gilbert saw Lewis lying on his stomach and bleeding. (*Id.*)  Lewis was talking and asking for help. (*Id.*)  Commands were "repeatedly" given to Lewis to show his hands, which were tucked underneath him. (*Id.* ¶¶ 290, 350.)  Lewis said he could not move his arm but was able to pull his right arm from underneath him and extend it enough to let go

of what he had in his hand.  (*Id.* ¶ 290.)  Defendant Caudillo could see that the object was a black key fob with a black lanyard.  (*Id.* ¶ 291.)  Lewis's left hand was empty.  (*Id.*)  Deputy Gilbert could see that Lewis did not have any weapons.  (*Id.* ¶ 350.)

Defendant Caudillo handcuffed Lewis and picked Lewis up by his upper body and pulled him into a more open area to begin life-saving efforts.  (*Id.* ¶ 291.)  Defendant Moseley broadcast over the radio that there had been an officer-involved shooting and told Communications to "start meds" and that "meds" needed to "come directly to the scene."  (*Id.* ¶ 200.)  Defendant Moseley immediately called for an IFAK (Individual First Aid Kit) and radioed for medical to respond.  (*Id.* ¶ 201.)  Moseley advised Communications that "Meds needs to move in as soon as they get here.  Do not hold off."  (*Id.*)  Defendant Moseley took the scissors from the IFAK, and Defendant Caudillo held Lewis's shirt while Defendant Moseley cut it off.  (*Id.*)  It looked like Lewis had a gunshot wound to his forearm and to his shoulder.  (*Id.*)  Lewis was spitting up blood and "starting to fade pretty quickly."  (*Id.*)

Deputy Joseph responded to the call regarding an officer-involved shooting.  (*Id.* ¶ 355.)  When he arrived, Deputy Joseph had Deputy Ruiz Torres grab Joseph's IFAK from his patrol vehicle.  (*Id.* ¶ 356.)  Deputy Joseph ran up to the scene and assisted Deputy T. A. Robles with clearing the blue Tacoma, that is, checking to see whether there was anyone inside the truck.  (*Id.* ¶ 357.)  With his duty weapon drawn, Deputy Joseph approached the truck on the driver's side and saw no one was inside.  (*Id.* ¶ 358.)  Deputy Joseph went back to where Lewis was lying on the ground in handcuffs and assisted Defendant Caudillo with pulling Lewis out from between the patrol vehicle and the Tacoma.  (*Id.* ¶¶ 359-60.)  They placed Lewis on his back, and Deputy Joseph noted that Lewis had a gunshot wound to his right shoulder.  (*Id.* ¶ 361.)  Deputy Jospeh turned Lewis onto his side to make sure there were no exit wounds from the gunshot and then placed him back on his back because he was having difficulty breathing, taking labored breaths, and making gasping sounds.  (*Id.* ¶¶ 362-63.)  Deputy Gilbert attempted to stuff combat gauze into the gunshot wound in Lewis's right shoulder, which was bleeding heavily.  (*Id.* ¶ 351.)  Deputy Gilbert kept

pressure on the wound.  (*Id.*)  Deputy Joseph felt Lewis's carotid artery and noticed his pulse was faint.  (*Id.* ¶ 364.)  Deputy Joseph performed CPR for three or four minutes until Northwest Fire District paramedics arrived.  (*Id.* ¶ 365.)

Paramedics asked Deputy Gilbert to remove the handcuffs from Lewis, which Gilbert did.  (*Id.* ¶ 352.)  Paramedics told Deputy Gilbert that Lewis would be transported to Banner-University Medical Center, and Gilbert relayed that information to Defendant Moseley.  (*Id.* ¶ 353.)  Lewis was pronounced dead at the hospital.  (*Id.* ¶ 406.)

### D.    Investigations into the Shooting

The "Shooting Review Board" issued a report finding that Defendant Caudillo's use of deadly force was reasonable and appropriate.  (*Id.* ¶ 423.)  Defendant Nanos reviewed the report and concurred with the finding.  (*Id.*)  Rick Unklesbay, Chief Trial Counsel for the Pima County Attorney's Office informed Defendant Nanos in writing that it had concluded that the shooting was "justified."  (*Id.* ¶ 424.)  Pima County Attorney Laura Conover also informed Defendant Nanos in writing that she concluded the shooting was "justified."[3]  (*Id.* ¶ 425.)

## V.    Section 1983 Claims

### A.    Individual versus Official-Capacity Claims

A suit against a defendant in his *individual* capacity seeks to impose personal liability upon the official.  *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).  For a person to be liable in his individual capacity, "[a] plaintiff must allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights."  *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998).  By comparison, a suit against a defendant in his *official* capacity represents only another way of pleading an action against the entity that employs the defendant.  *Kentucky*, 473 U.S. at 165.  That is, the real party in interest is not the named defendant, but the entity that employs the

---

[3] Defendants cite a Declaration of Defendant Nanos in their Statement of Facts.  In the Declaration, Defendant Nanos cites the Shooting Review Board Report and the decisions from Rick Unklesbay and Laura Conover as Exhibits, but Defendants have not provided the Exhibits with Nanos's Declaration.  (Decl. of Chris Nanos, Doc. 68-2 at 3 ¶¶ 14-16; *see* Doc. 65-1 at 4.)

defendant.  *Id.*  To bring a claim against an individual in his official capacity, a plaintiff must show that the constitutional deprivation resulted from the entity's policy, custom, or practice.  *Id.*; *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 694 (1978).

Plaintiffs have named Defendants Nanos, Moseley, and Caudillo in their individual and official capacities.  Plaintiffs' official-capacity claims against Defendants Nanos, Moseley, and Caudillo are duplicative of their claims against Pima County because the real party in interest for the official-capacity claims is the entity that employs them, that is, Pima County.  The Court will therefore grant summary judgment in favor of Defendants as to Plaintiffs' official-capacity claims against Defendants Nanos, Moseley, and Caudillo. The Court will discuss the individual-capacity claims below.

**B.    Excessive Force**

**1.    Legal Standard**

"Under the Fourth Amendment, police may use only such force as is objectively reasonable under the circumstances." *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000).  To assess the objective reasonableness of an officer's actions, the Court considers: "(1) the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted, (2) the government's interest in the use of force, and (3) the balance between the gravity of the intrusion on the individual and the government's need for that intrusion." *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021) (quoting *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017) (en banc)) (cleaned up).

In assessing the government's interest in the use of force, the Court must consider (i) the severity of the suspected crime, (ii) whether the suspect posed an immediate threat to the officers' safety, and (iii) whether the suspect was actively resisting or attempting to evade arrest.  *See Graham v. Connor*, 490 U.S. 386 (1989).  The most important of these factors is the second.  *Rice*, 989 F.3d at 1121.  But the *Graham* factors are not exclusive. *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011).  "Rather, [the court] examines the totality of the circumstances and considers 'whatever specific factors may be appropriate

in a particular case, whether or not listed in *Graham*.'" *Id.* (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)).  The enumerated factors are "only to illustrate the types of objective circumstances potentially relevant to a determination of excessive force." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).  The Court must consider the totality of the circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396.  "The reasonableness calculus considers that police officers are often forced to make split-second judgments— in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force necessary in a particular situation."  *Kingsley*, 576 U.S. at 396.

### 2.    Defendant Moseley

There is no evidence that Defendant Moseley used any force against Lewis.  "In general, one does not subject someone to a deprivation of a constitutional right—or cause [someone] to be subjected to such a deprivation—simply by watching others violate the Constitution."  *Peck v. Montoya*, 51 F.4th 877, 889 (9th Cir. 2022).  To be liable under section 1983, a defendant official "must be more than a 'mere bystander.'" *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 941 (9th Cir. 2020) (brackets omitted) (quoting *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1090 (9th Cir. 2011)).  An official whose "individual actions" do "not themselves rise to the level of a constitutional violation" may be held liable under section 1983 only if the official is an "integral participant" in the unlawful act. *Id.* (citation and internal quotation marks omitted).  In *Peck*, the Ninth Circuit held that a defendant can only be held liable under § 1983 as an integral participant if he "knew about and acquiesced in the constitutionally defective conduct as part of a common plan with those whose conduct constituted the violation," or "set in motion a series of acts by others which the defendant knew or reasonably should have known would cause others to inflict the constitutional injury."  51 F.4th at 891.

Here, the evidence does not support that Defendant Moseley was an "integral participant" in Lewis's shooting.  The shooting was "completely unplanned," and "there is no suggestion that [Moseley and Caudillo] formed a plan that [Caudillo] would deploy

excessive force." *Id.* As the Ninth Circuit in *Peck* observed, "perhaps it was foreseeable that a shooting might take place when the deputies arrived on the scene" involving an individual who was known to possess firearms and had previously threatened others with firearms. *Id.* But Moseley "had no reason to know that an *unconstitutional* shooting would take place." *Id.* On this record, no reasonable jury could conclude that Defendant Moseley used excessive force against Lewis. The Court will grant Defendants' Motion for Summary Judgment as to the Fourth Amendment excessive force claim against Defendant Moseley.

### 3. Defendant Caudillo

#### a. Type and Amount of Force Used

Defendant Caudillo used deadly force when he shot Lewis. *See Tennessee v. Garner*, 471 U.S. 1, 9 (1985) (recognizing that shooting a suspect constitutes deadly force); *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 950 (9th Cir. 2017) (same). "The intrusiveness of a seizure by means of deadly force is unmatched." *Garner*, 471 U.S. at 9. "The use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a 'fundamental interest in his own life' and because such force 'frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment.'" *A.K.H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) (quoting *Garner*, 471 U.S. at 9). Accordingly, the Court's inquiry "reduces to 'whether the governmental interests at stake were sufficient to justify it.'" *Hart v. City of Redwood City*, 99 F.4th 543 (9th Cir. 2024) (quoting *Vos v. City of Newport Beach*, 892 F.3d 1024, 1031 (9th Cir. 2018)).

#### b. Government's Interest in the Use of Force

Next, the Court considers the *Graham* factors: the severity of the crime at issue, whether Lewis posed an immediate threat to the safety of the officers or others, and whether Lewis was actively resisting arrest or attempting to escape. "[T]hese factors are not exclusive; they must be considered under the totality of circumstances, including whether 'less intrusive alternatives' were available to law enforcement and whether the suspect was

given 'proper warnings' before force was used." *Sabbe v. Wash. Cnty. Bd. of Comm'rs*, 84 F.4th 807, 822 (9th Cir. 2023) (quoting *Seidner v. de Vries*, 39 F.4th 591, 599 (9th Cir. 2022)).  Where a police officer has used deadly force, it is "especially important" that the Court view the evidence in the light most favorable to the nonmoving party.  *Calonge v. City of San Jose*, 104 F.4th 39, 44 (9th Cir. 2024).

### (1)    Severity of Crime

Defendants were attempting to arrest Lewis for committing assault with a deadly weapon more than six weeks before the events of January 20, 2021.  Assault with a deadly weapon is a serious crime, but the crime was not in progress and had not occurred immediately before officers arrived.  *See Sabbe*, 84 F.4th at 824 (noting that uncontested facts did not support a finding that, as of the time Defendants executed PIT maneuvers to stop the suspect's pickup truck, the suspect had committed a serious crime).  This factor does not weigh strongly in favor of Plaintiffs or Defendants.

### (2)    Immediate Threat

As noted, the "most important" factor is whether the suspect posed an immediate threat.  *Rice*, 989 F.3d at 1121; *see Gonzalez v. City of Anaheim*, 747 F.3d 789, 794 (9th Cir. 2014) ("The key issue . . . is whether a reasonable jury would necessarily find that [the officer] perceived an immediate threat of death or serious physical injury at the time he shot [the suspect]," which requires the Court to "consider exactly what was happening when the shot was fired").  In considering "whether there was an immediate threat, a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern."  *Mattos v. Agarano*, 661 F.3d 433, 441–42 (9th Cir. 2011) (en banc) (internal quotation marks and citation omitted).  The Ninth Circuit has emphasized that "'summary judgment is not appropriate in § 1983 deadly force cases that turn on [an] officer's credibility that is genuinely in doubt.'"  *S.R. Nehad v. Browder*, 929 F.3d 1125, 1133 (9th Cir. 2019) (quoting *Newmaker v. City of Fortuna*, 842 F.3d 1108, 1116 (9th Cir. 2016)).  In determining whether Lewis posed an immediate threat to officers or others, the Court must consider the perspective of an officer on the

scene.  *Hart*, 99 F.4th at 549.

In their Motion, Defendants argue that Lewis posed an immediate threat because he "previously threatened others with a gun."  (Doc. 64 at 12.)  But the incident in which Lewis allegedly "threatened others with a gun" occurred on December 4, 2020.

Defendants further contend that Lewis fled in his truck, stopped, exited, and advanced toward Deputy Caudillo "in a threatening manner holding a black object that [Defendant] Caudillo perceived to be a gun."  (*Id.*)  In response, Plaintiffs argue that although Lewis "appeared to be of no threat considering he was unarmed, exited the vehicle with his hands visible, and was getting on the ground, [Defendant] Caudillo immediately jumped out of his vehicle" and fired three shots at Lewis.  (Doc. 75 at 2.)  Plaintiffs contend that neither Defendant Moseley nor Defendant Caudillo "described aggressive or threatening behavior exhibited by [Lewis]," and it is reasonable to conclude that "any threat was extinguished the second [] Lewis vacated his vehicle."  (*Id.* at 3.)  In their Statement of Facts, Plaintiffs assert that the physical evidence does not support Defendants' "chest-forward theory" or that Lewis was running toward Defendant Caudillo when Caudillo shot Lewis.  (PSOF ¶ 99.)  Plaintiffs contend that if Defendant Caudillo was aiming at Lewis's center of mass, as he was trained to do, "Lewis had to have been falling, ducking, surrendering, or collapsing" when Caudillo shot him.  (*Id.* ¶ 136.)  Thus, Plaintiffs contend, because Lewis was falling, diving, or collapsing when Defendant Caudillo shot him, Lewis did not pose an immediate threat.  Plaintiffs also submit surveillance footage from a neighboring house and assert that in the footage, neighbor Traci Caruthers can be heard stating: "They shot the kid as he was getting on the ground."  (Doc. 75 at 7.)[4]  Plaintiffs assert this statement "reflect[s] a suspect abiding by law enforcement and not behaving in a threatening manner towards law enforcement or the public."  (*Id.*)

In their Reply, Defendants argue that "[n]o one denies that Lewis was advancing towards [Defendant] Caudillo," that Lewis was holding a black object in his right hand,

---

[4] Plaintiffs cite their Exhibit 23, which is a copy of the "zoomed surveillance footage."  (Doc. 74 at 4.)

and that there was a probable cause alert for Lewis for previously threatening two individuals with a black handgun.  (Doc. 81 at 6.)  Defendants contend that Lewis was "constantly moving towards" Defendant Caudillo "holding what Caudillo reasonably believed to be a gun," and "[t]hat deadly threat is not extinguished by speculation that Lewis was falling or diving to ground."  (*Id.* at 9.)  Defendants dispute that Ms. Caruthers said, "They shot the kid as he was getting on the ground."  (*Id.* at 8.)  Defendants submit a Declaration of Ms. Caruthers and a transcript of an interview taken shortly after the shooting; in the Declaration and interview transcript, Ms. Caruthers states that she and her husband were awoken by gunshots, went to their front door, and saw "the kid" laying on the ground as people were trying to resuscitate him.  (Decl. of Traci Caruthers, Doc. 81-6 at 2 ¶¶ 6-8; Interview of Traci Caruthers, Doc. 86-1 at 6-7.)  The Caruthers' surveillance camera was motion activated and did not begin recording until Ms. Caruthers and her husband went to the front door.  (*Id.* at 3 ¶ 11.)  Ms. Caruthers avers that she has no recollection of saying "They shot the kid as he was getting on the ground," and that some of what she said in the surveillance video is "simply unintelligible."  (*Id.* at 3 ¶ 12.)

The Ninth Circuit has recognized that if "[a] person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat."  *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013).  Here, it is undisputed that Lewis was unarmed on January 20, 2021.  Furthermore, there is no evidence that Lewis made a serious verbal threat or any "harrowing" gestures, and there is a factual dispute concerning whether he was charging Caudillo in a threatening manner.  Plaintiffs' expert Lucien Haag opines that the fatal penetrating gunshot wound was fired when Lewis was facing his truck and bent or leaning over.  (Doc. 75-11 at 6.)  Viewing the evidence in the light most favorable to Lewis, a reasonable juror could find that Lewis was diving or attempting to get on the ground when Caudillo shot him, and that he was not advancing toward Caudillo "in a threatening manner."  *See J.G. v. City of Colton*, No. 5:18-cv-02386-RGK-SP, 2020 WL 2124597, at *8 (C.D. Cal. Jan. 24, 2020) (noting that a reasonable jury could conclude that decedent who had a knife but did not raise it did not

pose a danger to anyone when officer shot him even where the decedent "arguably act[ed] aggressively" and moved forward toward the officer just before the first shot was fired).

There is also a genuine dispute whether Defendant Caudillo reasonably believed Lewis was armed. *See Nehad*, 929 F.3d at 1133 (quoting *Torres v. City of Madera*, 648 F.3d 1119, 1124, 1127 (9th Cir. 2011)) ("Where, as here, an officer's particular use of force is based on a mistake of fact, we ask whether a reasonable officer would have or should have accurately perceived that fact. [W]hether the mistake was an *honest* one is not the concern, only whether it was a *reasonable* one.") (internal quotation marks omitted); *see also Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1168 (9th Cir. 2013) (a "reasonable officer sometimes makes mistakes—reasonable mistakes—of fact or law, and thereby commits an unconstitutional act. Though we may excuse the reasonable officer for such a mistake, it sometimes proves necessary for a jury to determine first whether the mistake was, in fact, reasonable") (internal citation omitted).

The Ninth Circuit has observed that in the deadly force context, the Court cannot "'simply accept what may be a self-serving account by the police officer.'" *Cruz v. City of Anaheim*, 765 F.3d 1076, 1078 (9th Cir. 2014) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). "Because the person most likely to rebut the officers' version of events—the one killed—can't testify," the Court "'must carefully examine all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts.'" *Id.* (quoting *Scott*, 39 F.3d at 915). This includes "'circumstantial evidence that, if believed, would tend to discredit the police officer's story.'" *Id.* (quoting *Scott*, 39 F.3d at 915).

The evidence demonstrates that Defendant Moseley saw the object in Lewis's hand but did not describe it as appearing to be a handgun. Defendant Moseley testified that when Lewis sprinted away from him, he saw a "black object" in Lewis's right hand. (Depo. of Michael Moseley, Doc. 75-27 at 67:20-25.) Defendant Moseley testified that his "memory of that object is like a snapshot, not of a motion. And with that amount of speed, I mean, it's just a black object." (*Id.* at 85:8-10.) Defendant Moseley also testified that "at

no time did [Moseley] observe [Lewis] pose a lethal threat to [Moseley] or anybody else." (*Id.* at 133:18-20.)  Defendant Moseley's testimony is evidence that, if believed, would tend to discredit Defendant Caudillo's story.

In an interview shortly after the shooting, Defendant Caudillo stated that Lewis was "directly in front of [Caudillo's] vehicle coming at [him]," and Caudillo could see Lewis had "a black thing" in his right hand.  (Doc. 65-8 at 55.)  Caudillo stated that once he saw Lewis "running at [him] and the "black mass" in Lewis's hand, he knew he did not "have time" and "just point shot."  (*Id.* at 56.)  Caudillo did not describe the black object as resembling a Glock, handgun, or any other type of weapon.

Defendant Caudillo testified at his deposition, "I was hyper-focused on [Lewis's] hands, I see a gun.  A black mass.  A black square that looks just like a Glock. . . .  (H)is hand is in a position, as, like, if you were to hold a coffee cup.  And above his index finger, on top of his -- there is a black mass that -- it looks square.  I think it's a Glock.  I think it's a gun."  (Depo. of Gilbert Caudillo, Doc. 65-9 at 5:8-16.)  Given Caudillo's extensive training and experience with firearms, including that Caudillo shot Lewis with a type of Glock handgun, even in the tense, rapidly evolving circumstances, there is a question of fact whether it was reasonable for Caudillo to believe that the object he saw in Lewis's right hand—which turned out to be a small key fob for the Tacoma and a lanyard—was a Glock or some other type of handgun.  *See Longoria v. Pinal Cnty.*, 873 F.3d 699, 706-07 (9th Cir. 2017) (where officer shot unarmed suspect who was "flailing his arms and moving erratically before turning around and raising his empty hands above his head" several seconds before the officer shot him, the "most important question" was "whether [the officer] reasonably perceived that [the decedent] assumed a threatening or 'shooter's stance.' 'If [he] did, [he] w[as] entitled to shoot; if [he] didn't, [he] [was]nt.")" (quoting *Cruz*, 765 F.3d at 1079); *Estate of Lopez v. Gelhaus*, 871 F.3d 998, 1010 (9th Cir. 2017) (determining that a reasonable jury could conclude that decedent did not pose an immediate threat where, among other things, he was holding a toy gun, which the officer believed was an AK-47, down by his side, with the muzzle pointed towards the ground); *see also Nehad*,

929 F.3d at 1133 (noting that possible inconsistencies in officer's description of shooting, along with video, eyewitness, and expert evidence that belied officer's claim that the decedent was "aggressing" were "sufficient to give rise to genuine doubts about [the officer's] credibility").

Construing the evidence in favor of Lewis, there is a question of fact whether Lewis posed an immediate threat immediately before Defendant Caudillo shot Lewis. *See Estate of Aguirre v. County of Riverside*, 29 F.4th 624, 626 (9th Cir. 2022) (where officer shot decedent without warning, the dispute was "the level of threat [the decedent] posed immediately before he died"). This factor weighs in favor of Plaintiffs.

### (3)    Actively Resisting or Attempting Escape

Defendants argue that Lewis ignored many commands and opportunities to surrender, then fled, driving recklessly. (Doc. 64 at 11.) Plaintiffs do not address Defendants' assertions in their Response. The evidence in the record demonstrates that Lewis had been actively attempting to escape before Defendant Caudillo shot him, although there are factual disputes as to whether Lewis was continuing to attempt to escape once he exited his vehicle. This factor weighs at least somewhat in favor of Defendants.

### (4)    Other Factors

As noted, the Ninth Circuit has identified other factors that courts should consider in determining whether the force used was reasonable, including whether less intrusive alternatives were available to law enforcement and whether the suspect was given proper warnings before force was used. *Sabbe*, 84 F.4th at 822. Plaintiffs' expert, William Harmening, opines that if Defendant Caudillo had ordered Lewis to stop running and Lewis had ignored Caudillo's commands, Caudillo could have "used his hands to physically subdue Lewis" or deployed his Taser or O.C. pepper spray. (Doc. 75-5 at 17.)

It is undisputed that Defendant Caudillo did not warn Lewis that he would use deadly force. According to Defendants' Statement of Facts, 55 seconds elapsed from the time Defendant Caudillo said, "He's inside. He's in the car" to the time Deputy Gilbert reported shots fired. (DSOF ¶ 205.) Although not a significant amount of time, in those

55 seconds, Defendant Moseley had time to repeatedly "beg[]" Lewis to "stop" while Lewis was backing his truck into Mosely's police vehicle. (DSOF ¶¶ 184.)  Accordingly, there is evidence that Mosely, Caudillo, and other officers on the scene had time to warn Lewis that deadly force would be used if he did not comply with their commands.  Although a Fourth Amendment violation "cannot be established based merely on bad tactics that result in a deadly confrontation that could have been avoided, the events leading up to the shooting, including the officers['] tactics, are encompassed in the facts and circumstances for the reasonableness analysis." *Vos*, 892 F.3d at 1034 (internal quotation marks and citations omitted).  This factor weighs somewhat in favor of Plaintiffs.

### c.    Gravity of Intrusion Versus Need for Intrusion

Finally, the Court must balance the force used against the need for such force to determine whether the force used was "greater than is reasonable under the circumstances." *Espinosa v. City and Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (quoting *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009)).  The Ninth Circuit has repeatedly held that because the balancing required by *Graham* "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," "summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Santos*, 287 F.3d at 853.

Balancing all these considerations, a reasonable jury could find that the force Defendant Caudillo used was "greater than is reasonable under the circumstances."  The Court will therefore consider whether Defendant Caudillo is entitled to qualified immunity.

### d.    Qualified Immunity

Under the doctrine of qualified immunity, police officers are not liable under § 1983 "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *Dist. of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 2012)).  Qualified immunity "attaches when an official's conduct does not violate clearly established statutory

or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *White v. Pauly*, 580 U.S. 73, 78-79 (2017) (per curiam)) (alterations and internal quotation marks omitted). At summary judgment, an officer may be denied qualified immunity "only if (1) the facts alleged, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right, and (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood [his] conduct to be unlawful in that situation." *Torres*, 648 F.3d at 1123.

"'[C]learly established law must be 'particularized' to the facts of the case." *White*, 580 U.S. at 79 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "'[G]eneral statements of the law are not inherently incapable of giving fair and clear warning' to officers, but 'in the light of pre-existing law the unlawfulness must be apparent.'" *Id.* (internal quotation marks and citations omitted).[5] "An officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Kisela*, 584 U.S. at 105 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778–779 (2014)). The Supreme Court has recognized that "specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam). "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue."

---

[5] The Supreme Court has "not yet decided what precedents—other than [its] own—qualify as controlling authority for purposes of qualified immunity." *Wesby*, 583 U.S. at 66 n.8. But the Supreme Court has assumed without deciding that controlling circuit precedent can constitute clearly established law. *See City and County of San Francisco v. Sheehan*, 575 U.S. 600, 614 (2015); *Carroll v. Carman*, 574 U.S. 13 (2014) (per curiam); *Reichle v. Howards*, 566 U.S. 658, 665–666 (2012) (concluding that even if controlling circuit authority could be a dispositive source of clearly established law, the Tenth Circuit's cases did not satisfy the "clearly established" standard).

*Kisela*, 584 U.S. at 104 (quoting *Mullenix*, 577 U.S. at 12), and "moves the officer's actions outside the 'hazy border between excessive and acceptable force,'" *Hopson v. Alexander*, 71 F.4th 692, 698 (quoting *Brosseau*, 543 U.S. at 201).

At the time of the shooting, it was clearly established that law enforcement officers may not kill even armed suspects "who do not pose an immediate threat to their safety or the safety of others," including in some circumstances in which the suspect has "committed a violent crime in the immediate past." *Harris v. Roderick*, 126 F.3d 1189, 1203-04 (9th Cir. 1997). And it was clearly established that "an unreasonable mistake in the use of deadly force against an unarmed, nondangerous suspect violates the Fourth Amendment." *Torres*, 648 F.3d at 1129.

*Cruz* also put Defendant Caudillo on notice that the use of deadly force in the circumstances of this case—as taken in the light most favorable to Plaintiffs—would be unconstitutional. There, a confidential informant told the police that Cruz was a gang member who sold methamphetamine and carried a gun, and officers determined Cruz was a parolee who had a past felony conviction involving a firearm. 765 F.3d at 1077–78. Sometime later, the informant told police where Cruz was, what his vehicle looked like, and that he was armed with a nine-millimeter. *Id.* at 1078. Multiple police officers pulled Cruz over for a broken taillight. *Id.* The officers surrounded him, and Cruz tried to escape by backing his SUV into a marked patrol car. *Id.* The officers exited their vehicles with their weapons drawn and shouted at Cruz to get on the ground as he was emerging from the vehicle. *Id.* According to the officers, Cruz ignored their commands and reached for the waistband of his pants, prompting all five officers to open fire, killing Cruz. *Id.* The officers found no weapon on Cruz's body, but a loaded nine-millimeter was later recovered from the passenger seat. *Id.* The Ninth Circuit reversed the grant of summary judgment to the officers because of multiple disputed facts, including whether Cruz had reached for his waistband. The Ninth Circuit reasoned, "[I]f the suspect doesn't reach for his waistband or make some similar threatening gesture, it would clearly be unreasonable for the officers to shoot him after he stopped his vehicle and opened the door. At that point, the suspect

1  no longer poses an immediate threat to the police or the public, so deadly force is not

2  justified." *Id.* at 1078-79.

3      Here, a jury must determine the facts relevant to qualified immunity: whether

4  Defendant Caudillo could have reasonably believed that Lewis was holding a handgun and

5  whether Caudillo could have reasonably perceived that Lewis was moving toward him in

6  an aggressive or threatening manner.  *See Lopez*, 871 F.3d at 1021-22 (finding that a jury

7  must determine the facts relevant to qualified immunity: whether the officer could have

8  reasonably perceived the decedent turning while holding a toy AK-47 as a "harrowing

9  gesture").  Because Defendant Caudillo's entitlement to qualified immunity depends on

10  the resolution of disputed issues of fact in his favor, summary judgment is not appropriate.

11  *See Nehad*, 929 F.3d at 1140 (9th Cir. 2019) (quoting *Morales v. Fry*, 873 F.3d 817, 824

12  (9th Cir. 2017)) ("[W]hen there are disputed factual issues that are necessary to a qualified

13  immunity decision, these issues must first be determined by the jury before the court can

14  rule on qualified immunity."); *Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir.

15  2003) ("[w]here officers' entitlement to qualified immunity depends on the resolution of

16  disputed issues of fact in their favor, and against the non-moving party, summary judgment

17  is not appropriate").  The Court will therefore deny Defendants' Motion for Summary

18  Judgment as to Plaintiffs' excessive force claim against Defendant Caudillo.

19      **C.**  **Substantive Due Process**

20          **1.**  **Legal Standard**

21      "'[A] parent has a constitutionally protected liberty interest under the Fourteenth

22  Amendment in the companionship and society of his or her child and . . . a 'child's interest

23  in her relationship with a parent is sufficiently weighty by itself to constitute a cognizable

24  liberty interest.'"  *Ochoa v. City of Mesa*, 26 F.4th 1050, 1055 (9th Cir. 2022) (quoting

25  *Curnow ex rel. Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991)).  Parents

26  asserting a claim that police officers violated their Fourteenth Amendment rights during a

27  police shooting must show that the officer's conduct "shocks the conscience."  *Porter v.

28  Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).  "There are two tests used to decide whether

officers' conduct 'shocks the conscience.'  Which test applies turns on whether the officers had time to deliberate their conduct."  *Ochoa*, 26 F.4th at 1056.

The deliberate-indifference test applies if the situation at issue "evolve[d] in a time frame that permits the officer to deliberate before acting."  *Id.* (quoting *Porter*, 546 F.3d at 1137).  "Deliberation is not possible if the officers 'encounter[ed] fast paced circumstances presenting competing public safety obligations.'"  *Id.* (quoting *Porter*, 546 F.3d at 1139).  Deliberation in this context "should not be interpreted in the narrow, technical sense."  *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010).

"The purpose-to-harm test applies if the situation at issue 'escalate[d] so quickly that the officer [had to] make a snap judgment.'"  *Ochoa*, 26 F.4th at 1056 (quoting *Porter*, 546 F.3d at 1137).  The purpose-to-harm test requires "a more demanding showing that [the officers] acted with a purpose to harm [the decedent] for reasons unrelated to legitimate law enforcement objectives."  *Id.*  Legitimate objectives can include "arrest, self-protection, and protection of the public."  *Foster v. City of Indio*, 908 F.3d 1204, 1211 (9th Cir. 2018).  Illegitimate objectives include "when the officer had any ulterior motives for using force against the suspect, such as to bully a suspect or 'get even,' or when an officer uses force against a clearly harmless or subdued suspect."  *Id.* (internal quotation marks omitted) (quoting *Gonzalez*, 747 F.3d at 798; *Wilkinson*, 610 F.3d at 554).

The Fourteenth Amendment "shocks the conscience" standard is not the same as the "objectively unreasonable" standard in the Fourth Amendment excessive force context.  *Ochoa*, 26 F.4th at 1056.  The Fourteenth Amendment standard "demands more" of a plaintiff.  *Id.* (*citing Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 n.4 (9th Cir. 1998)).  "Indeed, 'it may be possible for an officer's conduct to be objectively unreasonable [under the Fourth Amendment] yet still not infringe the more demanding standard that governs substantive due process claims [under the Fourteenth Amendment].'"  *Id.* (quoting *Moreland*, 159 F.3d at 371 n.4).

### 2.    Parties' Arguments

Defendants argue the "purpose to harm" test applies, and that when Lewis, who had

been "known to threaten others with a black handgun, advanced threateningly at [Defendant] Caudillo, while holding a black object that [Defendant] Caudillo perceived to be a gun, [Defendant] Caudillo made a split-second judgment" and shot Lewis. (Doc. 64 at 14.)

In their Response, Plaintiffs contend that "when shooting [Lewis] while he was unarmed and not posing any risk to any of the officers, Defendants acted in an objectively unreasonable manner and/or deliberate indifference to a significant risk of harm to [Lewis]." (Doc. 75 at 7.) Plaintiffs point to Ms. Caruther's statement in the surveillance footage and also argue that their experts opined that Lewis was "falling, collapsing, or diving" when he was shot and that Defendants' "rapid approach/chest forward theory could not occur, nor could the event occur in fractions of a second as Defendants claim." (*Id.* at 7-8.)

### 3.    Analysis

The Court agrees with Defendants that the "purpose to harm" test applies. It is undisputed that Lewis moved toward Defendant Caudillo, holding a black object in his hand. Defendant Caudillo made a split-second judgment that the object in Lewis's hand was a handgun and shot Lewis to protect himself. Self-protection is a legitimate law enforcement objective. As discussed above, there are genuine disputes concerning the reasonableness of Caudillo's conclusion that Lewis posed an immediate threat of harm. However, Plaintiffs point to no competent evidence in the record that Defendant Caudillo had any ulterior motive for shooting Lewis. Plaintiffs rely on Ms. Caruthers' supposed statement from the surveillance footage, but that statement is partly unintelligible and there is no evidence that Ms. Caruthers witnessed Lewis's shooting. On this record, Plaintiffs have not shown that Defendant Caudillo's conduct "shocks the conscience." The Court will therefore grant Defendants' Motion for Summary Judgment as to Plaintiffs' substantive due process claim.

### D.    Defendant Nanos

Plaintiffs concede Defendant Nanos was not personally involved in the January 20,

2021 shooting, but they contend that § 1983 liability may be imposed on a governmental authority when the final decision-making authority is directly responsible for the deprivation.  (Doc. 75 at 14.)

There is no respondeat superior liability under § 1983, and therefore a defendant's position as the supervisor of persons who allegedly violated a plaintiff's constitutional rights does not impose liability.  *Monell*, 436 U.S. at 694; *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011).  However, a plaintiff may assert a claim against a supervisor "for deliberate indifference based upon the supervisor's knowledge of and acquiescence in unconstitutional conduct by his or her subordinates."  *Starr*, 652 F.3d at 1207-08.  A supervisor may be liable "if he or she was personally involved in the constitutional deprivation or a sufficient causal connection exists between the supervisor's unlawful conduct and the constitutional violation."  *Lemire v. California Dep't of Corrs. and Rehab.*, 726 F.3d 1062, 1074–75 (9th Cir. 2013) (quoting *Lolli v. Cnty. of Orange*, 351 F.3d 410, 418 (9th Cir. 2003)).

Supervisory liability is direct liability, which requires the plaintiff to allege that a supervisor breached a duty to the plaintiff and was the proximate cause of the injury.  *Starr*, 652 F.3d at 1207.  A causal connection can be "an affirmative link" between a constitutional deprivation and "the adoption of any plan or policy by [a supervisor,] express or otherwise showing [his or her] authorization or approval of such misconduct."  *Rizzo v. Goode*, 423 U.S. 362, 371 (1976).  In other words, a supervisor can be liable for creating policies and procedures that violated a plaintiff's constitutional rights.  *See Hydrick v. Hunter*, 669 F.3d 937, 942 (9th Cir. 2012).

Plaintiffs have not shown the requisite causal connection between any conduct by Defendant Nanos *before* January 20, 2021, and Defendant Caudillo shooting Lewis.  Rather, Plaintiffs focus on Defendant Nanos's purported failure to properly investigate the shooting and failure to discipline Defendant Caudillo after the shooting.  On this record, no reasonable jury could conclude that Defendant Nanos was directly responsible for Lewis's shooting.  The Court will therefore grant summary judgment in favor of Defendant

1  Nanos as to Plaintiffs' § 1983 claims.

2  **E.    Municipal Liability**

3  In the Second Amended Complaint, Plaintiffs assert three bases for liability against

4  Pima County and Nanos on the § 1983 claims: that Pima County and Nanos had a policy

5  or custom that amounted to deliberate indifference, that they ratified Defendants Caudillo

6  and Moseley's wrongful conduct, and that they failed to adequately train or supervise

7  Defendants Caudillo and Moseley.[6]

8  **1.    Policy or Custom**

9  A government entity may not be held liable under § 1983 unless a policy, practice,

10  or custom of the entity can be shown to be the cause of or directly related to a violation of

11  constitutional rights. *Monell*, 436 U.S. at 694. To prevail on a claim based on a policy,

12  practice, or custom, Plaintiffs must show (1) that Lewis's constitutional rights were

13  violated by an employee or employees of Pima County; (2) that Pima County has customs

14  or policies that amount to deliberate indifference; and (3) that the policies or customs were

15  the moving force behind the violation of Lewis's constitutional rights in the sense that Pima

16  County could have prevented the violation with an appropriate policy. *See Gibson v. Cnty.*

17  *of Washoe*, 290 F.3d 1175, 1193–94 (9th Cir. 2002). Further, if the policy or custom in

18  question is an unwritten one, Plaintiffs must show that it is so "persistent and widespread"

19  that it constitutes a "permanent and well settled" practice. *Monell*, 436 U.S. at 691 (quoting

20  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)). "Liability for improper custom

21  may not be predicated on isolated or sporadic incidents; it must be founded upon practices

22  of sufficient duration, frequency and consistency that the conduct has become a traditional

23  method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996); *see*

24  *also Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("Official municipal policy includes the

25  decisions of a government's lawmakers, the acts of its policymaking officials, and practices

26  so persistent and widespread as to practically have the force of law.")

27  _____

28  [6] As discussed above, Plaintiffs' official-capacity claims against Defendants Nanos are duplicative of their claims against Pima County.

Plaintiffs have not presented any evidence of a Pima County policy or custom that amounted to deliberate indifference or that any such policy or custom was the moving force behind any violation of Lewis's constitutional rights.  Plaintiffs' use of force expert, William M. Harmening, opined that Defendant Caudillo *violated* PCSD's deadly force policy.  (Doc. 75-5 at 17.)  An employee's violation of an otherwise valid policy does not support a *Monell* claim, and Plaintiffs do not assert that PCSD's deadly force policy amounts to deliberate indifference.  Plaintiffs argue at length that Defendants Pima County and Nanos "must be held accountable" in *this case* "for their conduct and systematic abuse within the legal system." (Doc. 75 at 14-17.)  But Defendant Nanos's general performance as sheriff, or his purported non-compliance with unrelated state and federal laws, is not at issue here.

On the record before the Court, there are no genuine disputes of material fact regarding whether Pima County had a policy or custom that caused a violation of Lewis's rights.

### 2.     Ratification

Plaintiffs contend that Pima County and Defendant Nanos condoned and "turned a blind eye" to Defendant Caudillo's unconstitutional use of excessive force, and that Pima County's and Nanos's "systematic and gross deficiencies are evidenced by their inaction to properly supervise [their] officials and employees in proxy of their failure to reprimand." (Doc. 75 at 14.)

A municipality can be liable "for an isolated constitutional violation if the final policymaker 'ratified' a subordinate's actions." *Christie v. Iopa*, 176 F.3d 1231, 1238 (9th Cir. 1999).  To show ratification, a plaintiff must prove that authorized policymakers knew of a subordinate's actions "before the alleged constitutional violations ceased," and that they "made a deliberate choice to endorse" the subordinate's actions "and the basis" for them.  *Id.* at 1239 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).  "A mere failure to overrule a subordinate's actions, without more, is insufficient to support a § 1983 claim." *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004).  "In other words, in order

for there to be ratification, there must be 'something more' than a single failure to discipline or the fact that a policymaker concluded that the defendant officer's actions were in keeping with the applicable policies and procedures." *Garcia v. City of Imperial*, No. 08cv2357 BTM(PCL), 2010 WL 3911457 at \*10 (S.D. Cal 2010); *see also Kanae v. Hodson*, 294 F. Supp. 2d 1179, 1191 (D. Haw. 2003) (finding a plaintiff must "present 'something more' than a failure to discipline" to survive summary judgment).

Plaintiffs point to no *evidence* in the record regarding PCSD's investigation into Lewis's shooting.[7]  Furthermore, Defendant Nanos did not know of Defendant Caudillo's actions before the alleged constitutional violation ceased.  *See Christie*, 176 F.3d at 1239. And there is no evidence of any other instances of Defendant Caudillo committing misconduct for which he was not reprimanded, or evidence of Pima County or Nanos failing to appropriately discipline officers for using excessive force.  *See Gillette v. Delmore*, 979 F.3d 1342, 1348 (9th Cir. 1992) ("To hold cities liable under section 1983 whenever policymakers fail to overrule the unconstitutional discretionary acts of subordinates would simply smuggle respondeat superior liability into section 1983 law [creating an] end run around *Monell*").[8]

Defendants' police practices expert, Steve Ijames, found that between 2018 and

---

[7] In their Statement of Facts, Plaintiffs assert, "Sheriff Nanos, Pima County Sheriff's Department, and Pima County did not properly investigate Caudillo's or Moseley's involvement of Mr. Lewis['s] in-custody death, which did unconstitutionally deprive Mr. Lewis of the right to be free from the use of excessive force." (PSSOF ¶ 310.)  Plaintiffs also assert, "Sheriff Nanos, Pima County Sheriff's Department, and Pima County failed to appropriately reprimand Caudillo's and Moseley's excessive use of force and ratified such conduct by not appropriately corroborating the deputies['] statements with physical evidence that discredits the claims made by Caudillo and Moseley." (*Id.* ¶ 311.)  But Plaintiffs fail to cite any evidence in support of these factual assertions.

[8] Plaintiffs contend that Defendant Nanos has "established a pattern of behavior within PCSD where deputies receive no serious repercussions for their actions." (Doc. 75 at 15.)  But the two instances of improper investigation and discipline that Plaintiffs cite are not factually analogous to the case at hand and do not show deliberate indifference to officers' use of excessive force. (*See* Doc. 75 at 14-15.)  In the first instance, Plaintiffs contend that Defendant Nanos failed to terminate a PCSD employee accused of shoplifting. (*Id.* at 14-15.)  In the second instance, Plaintiffs assert that a PCSD deputy was sexually assaulted by another deputy and Defendant Nanos delayed an internal investigation of how the victim's chain of command handled the case (*Id.*)  These factually distinguishable prior instances are insufficient to support liability under a ratification theory.

2020, PCSD made 54,704 arrests.  (Doc. 66-10 at 32.)  Some type of "force" was used during 439 of those arrests, most commonly, a "take down," or wrestling a suspect to the ground.  (*Id.*)  Between 2018 and 2020, there were 403 complaints about PCSD employees, and of those complaints, 87 were sustained in part or in their entirety, including complaints that alleged excessive force.  (*Id.* at 33.)  There were seven suspensions and one termination for excessive force.  (*Id.*)  Ijames opined that "the low force to arrest ratio and high sustained complaint ratio—with a documented record of significant related discipline being administered—strongly suggests that Sheriff Nanos/PCSD and Pima County takes employee accountability very seriously—including in the area of use of force."  (*Id.*)  In his rebuttal, Plaintiff's expert, William Harmening, did not address Ijames's data and opinion regarding PCSD's handling of complaints about employees.  (*See* Doc. 75-8.)

On this record, there are no genuine disputes of material fact regarding whether Pima County improperly ratified Defendant Caudillo's wrongful conduct.

### 3.    Failure to Train or Supervise

Plaintiffs contend that Defendants Pima County and Nanos failed to "properly train, manage, control and equip" Defendants Moseley and Caudillo.  (Doc. 75 at 14.)

"Policies of omission regarding the supervision of employees . . . can be policies or customs that create . . . liability . . . , but only if the omission reflects a deliberate or conscious choice to countenance the possibility of a constitutional violation."  *Gibson*, 290 F.3d at 1194 (quotations omitted).  A "decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983."  *Connick*, 563 U.S. at 60.  To prevail on a *Monell* claim for failure to train under § 1983, a plaintiff must allege facts demonstrating that the local government's failure to train amounts to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact."  *Id.* at 61 (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

Deliberate indifference may be shown if there are facts to support that "in light of the duties assigned to specific officers or employees, the need for more or different training

is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policy-makers . . . can reasonably be said to have been deliberately indifferent to the need." *Clement v. Gomez*, 298 F.3d 898, 905 (9th Cir. 2002) (citing *Canton*, 489 U.S. at 390). Although "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train," *Connick*, 563 U.S. at 62, a plaintiff may still prove a failure-to-train claim without showing a pattern of constitutional violations where a violation "may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations," *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1186 (9th Cir. 2006) (internal citation omitted). In such instances, "failing to train could be so patently obvious that [an entity] could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick*, 563 U.S. at 64.

Plaintiffs have not pointed to any evidence in the record to support their assertion that Pima County failed to adequately train or supervise Defendants Caudillo and Moseley. There is no evidence that Pima County made a decision not to train Caudillo and Moseley regarding use of excessive force. Plaintiffs have not presented any evidence that the training Caudillo and Moseley received was so inadequate that it was obvious that constitutional violations were likely. Plaintiffs fail to point to any evidence in the record showing a pattern of similar constitutional violations or any evidence that Pima County failed to equip Caudillo and Moseley such that a violation was a "highly predictable consequence."

Defendants' expert, Steve Ijames, opined that PCSD adequately trained Defendant Caudillo regarding the appropriate use of force. (Doc. 66-10 at 26.) Ijames reviewed Defendant Caudillo's training file and "noted numerous blocks of instruction that address advanced officer training—which includes the use of force and firearms." (*Id.*) Ijames stated these blocks of instruction also would include the Pima County use of force and deadly force policies, as well as Arizona Post standards information on Use of Force, 8.5.3 and 8.5.4, and would provide information concerning the basis for and justification to use

deadly force. (*Id.*) Ijames opined that "the hindsight determination that Mr. Lewis was not armed is not reflective of improper training. The standard for assessment is not what is learned in hindsight, but what a prudent, experienced, and professionally trained law enforcement officer would have perceived and reasonably done in these or similar circumstances." (*Id.*) Plaintiffs' expert, William Harmening, did not address Ijames's opinion in his rebuttal report. (*See* Doc. 75-8.)

On this record, there is no genuine dispute of material fact regarding whether Pima County failed to properly train and supervise Defendant Caudillo. The Court will grant Defendants' Motion for Summary Judgment as to Plaintiffs' *Monell* claims.

## VI.    Loss of Consortium

Defendants argue that Plaintiffs Anna and Bradley Lewis's loss of consortium claims fail because Defendant Caudillo's use of deadly force was objectively reasonable. (Doc. 64 at 15.) In their Response, Plaintiffs contend that "Defendants have liability through one or more of the legal theories set forth in Plaintiffs' Complaint for the death of Decedent Lewis and that said liability entitles them to damages for the loss of companionship/association of Decedent Lewis." (Doc. 75 at 11.)

In Arizona, a parent can recover for loss of consortium of an adult child. *See Frank v. Superior Court of State of Ariz., in and for Maricopa County*, 722 P.2d 955, 956 (Ariz. 1986). However, when a child dies, a loss of consortium claim is subsumed by a wrongful death claim. *See* Ariz. Rev. Stat. § 12-613; *Frank*, 722 P.2d at 956 (noting that Arizona's wrongful death statute allows for consortium damages). Plaintiffs cannot maintain a separate loss of consortium claim. The Court will therefore grant Defendants' Motion for Summary Judgment as to Plaintiffs' loss of consortium claim.

## VII.    Wrongful Death

Under Arizona law:

> When death of a person is caused by wrongful act, neglect or default, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action to recover damages in respect thereof, then, and in every such case, the person who or the corporation which would have been liable if death had not ensued shall be liable to an action for damages, notwithstanding the death of the person injured.

Ariz. Rev. Stat. § 12-611.

Defendants' entire argument in their Motion for Summary Judgment regarding Plaintiffs' wrongful death claim is that the claim fails because Defendant Caudillo's use of deadly force was objectively reasonable.  (Doc. 64 at 13.)

In their Response, Plaintiffs argue Defendant Caudillo's shooting of Lewis was "negligent and/or grossly negligent and/or intentionally wrongful and/or objectively unreasonable."  (Doc. 75 at 9.)  Plaintiffs also contend that Defendant Moseley and Caudillo "failed to procure adequate medical attention [for Lewis] within a reasonable time" and instead continued to hold Lewis down to handcuff him and "searched the scene looking for a nonexistent firearm before providing first aid when it was clear [Lewis] was in distress."  (*Id.*)  Plaintiffs assert that Defendant Moseley and Caudillo's actions were "[s]o egregious" that even paramedics dispatched to the scene "commented on the attending officers' complete disinterest in providing needed details for trauma physicians who might need the information to possibly help save [Lewis's] life."  (*Id.*)

In their Reply, Defendants argue that Plaintiffs have no medical expert to opine on whether delayed medical attention caused Lewis's death, and their Motion for Summary Judgment "clearly laid out the promptness with which medical attention was summoned and CPR given by deputies and soon thereafter, the arrival of paramedics."  (Doc. 81 at 12.)  Defendants contend that a police officer who promptly summons medical care has acted reasonably for purposes of the Fourth Amendment.  (*Id.*)

The state law wrongful death claim is governed by the same reasonableness standard as the Fourth Amendment excessive force claim.  *See Longoria*, 873 F.3d at 711 ("Because we find a material dispute of facts as to whether or not [the officer's] use of deadly force was reasonable, we reverse the district court's grant of summary judgment in the state cause of action [under Ariz. Rev. Stat. § 12-611] as well.")).

With respect to Defendant Moseley, Plaintiffs assert in their Statement of Facts that "[b]efore providing medical aid, Mr. Lewis was handcuffed and the scene was searched for a non-existent handgun, which greatly hindered life-saving measures."  (PSSOF ¶ 309.)

But Plaintiffs cite no evidence in the record to support this assertion. The available evidence demonstrates that Defendant Moseley immediately radioed for "meds" and directed Communications to tell "meds" that they needed to come directly to the scene. According to the timeline set forth in Defendants' Statement of Facts, which Plaintiffs do not dispute, approximately 16 seconds after Deputy Gilbert announced "shots fired," Defendant Moseley stated "998," signifying officer-involved shooting; 4 seconds later, Moseley said "start meds 10-18" meaning as soon as possible; 23 seconds after that, Moseley said, "We need an IFAK --- somebody bring an IFAK 10-18"; just under a minute later, the dispatcher said "meds" had been started; and about a minute after that, Moseley said, "meds need to move in as soon as they get here. Do not hold off." (DSOF ¶ 205.) Deputy Joseph arrived and performed CPR for three or four minutes before paramedics arrived.

On this record, no reasonable jury could conclude that Defendant Moseley's conduct in calling for medical attention for Lewis was objectively unreasonable. The Court will grant summary judgment in favor of Defendant Moseley as to Plaintiffs' wrongful death claim.

For the reasons explained above, a jury could conclude that Defendant Caudillo's decision to shoot Lewis was objectively unreasonable. Pima County is vicariously liable for Defendant Caudillo's wrongful conduct. The Court will deny Defendants' Motion for Summary Judgment as to Plaintiffs' wrongful death claim against Defendants Pima County and Caudillo.

**VIII.  Property Damage**

In Count Five of the Second Amended Complaint, Ralph Rust Stricklen and Helen Stricklen seek compensatory relief for damage caused to their 2019 Ford F-150 pick-up truck by the bullets Defendant Caudillo fired. Plaintiffs include Defendants Nanos and Moseley in their claim, but the claim is based solely on bullets hitting their truck, and the only bullets fired were from Defendant Caudillo's service weapon. The Court will

therefore grant summary judgment in favor of Defendants Nanos and Moseley as to the property damage claim.

In their Motion for Summary Judgment, Defendants argue that the Stricklens never disclosed any economic loss, cost of repair, or loss of use associated with the bullet damage to their truck, and Defendant Caudillo firing the three bullets was objectively reasonable, justified, and necessary. (Doc. 64 at 15.) In their Response, Plaintiffs state that the Stricklens sustained $4,538.18 in damages and argue that Count Five must proceed to trial because there is a genuine issue of material fact as to whether Defendant Caudillo "firing the bullets" was objectively reasonable, justified, or necessary. (Doc. 75 at 11.) Defendants do not address Plaintiffs' argument in their Reply.

Because the Court has concluded that there are genuine disputes of material fact regarding whether Defendant Caudillo's conduct was objectively reasonable, the Court will deny Defendants' Motion for Summary Judgment as to the property damage claim against Defendants Pima County and Caudillo.

**IT IS ORDERED:**

(1)    Defendants' Motion for Summary Judgment (Doc. 64) is **granted** in part and **denied** in part, as follows:

        (a)    The Motion is **granted** as to the official-capacity claims against Defendants Nanos, Moseley, and Caudillo; the Fourth Amendment excessive force claim in Count One against Pima County, Nanos, and Moseley; the substantive due process claim in Count Two; the wrongful death claim in Count Three against Defendants Nanos and Moseley; the loss of consortium claim in Count Four; and the property damage claim in Count Five as to Defendants Nanos and Moseley.

        (b)    The Motion is **denied** as to the Fourth Amendment excessive force claim in Count One against Defendant Caudillo, the wrongful death claim in Count Three against Defendants Pima County and Caudillo, and the property damage claim in Count Five against Defendants

Pima County and Caudillo.

(2)   Defendants Nanos and Moseley are **dismissed with prejudice**.

(3)   Counts Two and Four are **dismissed with prejudice**.

(4)   The remaining claims are the Fourth Amendment excessive force claim in Count One against Defendant Caudillo, the wrongful death claim in Count Three against Defendants Pima County and Caudillo, and the property damage claim in Count Five against Defendants Pima County and Caudillo.

Dated this 27th day of September, 2024.

Honorable Rosemary Márquez
United States District Judge