*AUDILETT LAW PC*
335 NORTH WILMOT RD SUITE 500
TUCSON, ARIZONA 85711-2636
(520) 748-2440
Email: daa@audilettlaw.com

Daryl A. Audilett, Esq.
State Bar No. 009007; PCC No. 2036
Attorney for Defendants Nanos, Caudillo, Moseley and Pima County

*HUMPHREY & PETERSEN, PC*
6063 E. GRANT ROAD
TUCSON, ARIZONA 85712
(520)-795-1900

Andrew J. Petersen, State Bar No. 016699
Email: APetersen@humphreyandpetersen.com
Attorney for Defendants Nanos, Caudillo, Moseley and Pima County

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Anna Christine Lewis, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>Chris Nanos, et al.,<br><br>Defendants. | NO. CV 21-00557-TUC-RM<br><br>MOTION FOR RECONSIDERATION<br><br>(Oral Argument Requested)<br><br>(The Honorable Rosemary Márquez) |

Under LRCiv 7.2(g)(1), reconsideration is appropriate upon “a showing of manifest error or a showing of new facts or legal authority that could not have been brought to its attention earlier with reasonable diligence,” including “matters that the movant believes were overlooked or misapprehended by the Court.”

**Relief requested:** Defendants respectfully request that the Court reconsider its

September 27, 2024 Order (Doc. 85) ruling on Defendants' Motion for Summary Judgment. Defendants specifically request that this Court dismiss this lawsuit in its entirety based on Defendants' Motion for Summary Judgment and on Defendants' Motion for Reconsideration.

**Specifically on the Fourth Amendment:**

1. Page 18, Severity of Crime:

In its ruling, the Court states that the Defendants were attempting to arrest Plaintiffs' decedent Lewis for committing assault with a deadly weapon more than six weeks earlier. The Court agrees assault with a deadly weapon is a serious crime, but the "crime was not in progress" and had not occurred immediately before officers arrived. This characterization does not capture the gravity of the reasonably perceived threat presented by Lewis to the deputies on the scene on January 20, 2021. Given knowledge of Lewis's prior history, Sgt. Moseley was sufficiently concerned to request that ballistic shields be brought to the scene to protect from gunfire from Lewis. (Doc. 65, DSOF 168.)

Moreover, there is no question there was a "crime in progress" when the shooting occurred. Not only was Lewis being stopped because of the prior assault with a deadly weapon, on a residential street Lewis committed felony flight, resisting arrest, recklessly drove through desert brush, popping a tire, and then just seconds before the shooting, Lewis committed aggravated assault and endangerment on an officer when he intentionally backed into Sgt. Moseley's vehicle. A.R.S. § 28-622.01 (felony flight); A.R.S. § 13-2508 (resisting arrest); A.R.S. § 13-1204A.8(a) (aggravated assault on law enforcement officer); A.R.S. § 13-1201A (endangerment). Sgt. Moseley was afraid that Lewis was going to get out and start

shooting at him. (DSOF 183.)

Both Deputy Caudillo and Sgt. Moseley knew that Lewis had brandished a black handgun at two men on December 4, 2020, and had threatened to shoot them, and had bragged about shooting 10 other people. (DSOF 145, 219-222.) From that moment forward, Lewis was a clear and present danger to the public, warranting immediate arrest.

Detectives Valdez and Houston went to the house of Lewis's grandparents, the Stricklens, Lewis's reported address, to look for Lewis on December 16, 2020. (DSOF 66, 67.) On December 18, 2020, Detective Valdez issued a probable cause alert for Lewis's arrest. (DSOF 77.) Sgt. Moseley was also at the Stricklen home on December 16, 2020; this is when Lewis first came to Moseley's attention. (DSOF 141.) Sgt. Moseley started investigating Lewis's history and learned of various criminal activities and arrests involving Lewis and guns and drugs. (DSOF 143 - 148.)

Sgt. Moseley was attempting to locate Lewis for three to five weeks before the shooting. (DSOF 142.) Sgt. Moseley drove by the Stricklens' home on a very regular basis. (DSOF 147.) Sgt. Moseley and detectives had a conversation, which Deputy Caudillo overheard, wondering if Lewis was involved in the shooting incident on January 3/4, 2021, at the Stricklens' next-door neighbors' home. (DSOF 145(e); Doc. 65-5, ep. 21:30-37; DSOF 223, 224.)

In the dark early morning hours of January 20, 2021, Lewis was seen, videoed, and identified attempting car busts (burglaries) in another neighborhood. (DSOF 105-119.) That alerted deputies to begin searching for Lewis. (DSOF 120, 121.) In the early morning

darkness, Sgt. Moseley spotted Lewis's blue truck parked approximately 100 yards down the street from his grandparents Stricklens' residence. (DSOF 156- 158, 326.)

When the deputies attempted a high-risk stop with weapons drawn, loudly commanding Lewis by name to exit his truck, Lewis sped away. (DSOF 165, 166, 175-176.) The Lewis truck went forward, wheels spinning, dust flying, through desert vegetation, bouncing up and down violently. (DSOF 256.) Lewis drove into the Stricklens' driveway with Sgt. Moseley in pursuit. Sgt. Moseley initially drove his vehicle into the back of Lewis's vehicle to try and pin him in the driveway, and after this Lewis backed aggressively into Sgt. Moseley's vehicle. Sgt. Moseley was in fear for his life, thinking Lewis may jump out and shoot at him. (DSOF 177, 178, 182, 183.)

In determining severity of the crime, this Court must consider Lewis's clear and present danger to the public after threatening to shoot two men on December 4, 2020 with a black handgun and bragging about shooting 10 others. And, the Court should not ignore what happened in the early morning darkness on January 20, 2021 with the felony flight, resisting arrest, endangerment and aggravated assault just prior to the shooting. The Court must consider the violent desperation exhibited by Lewis's reckless and violent vehicular flight. The Court must consider Deputy Caudillo's reasonable perception that Lewis's vehicular flight looked to Deputy Caudillo like a desperate attempt to get away by someone who is out of control. (DSOF 267-268.)

2. Immediate Threat:

Next, the Court held there is a genuine dispute whether Deputy Caudillo reasonably

believed Lewis was armed. The Court refers to Deputy Caudillo's interview shortly after the shooting and states: "Caudillo did not describe the black object as resembling a Glock, handgun or any other type of weapon." The Court appears to suggest that Deputy Caudillo did not specifically say that he saw a gun when he was interviewed shortly after the shooting and did not refer to seeing a gun until his deposition. (Doc. 85, p. 22 lines 4-14; citing Defendants SSOF Doc. 65-8, ep. 55, 56; and citing Doc. 65-9, Depo of Gilbert Caudillo, Doc. 65-9 ep 5:8-16.) This characterization by the Court is incorrect. Contained in Defendants' SSOF Doc. 65-8, ep. 71 (p. 40 of Caudillo's interview January 25, 2021, four days after the shooting), Caudillo said:

12 Q2. **And you described, I believe, and correct me if I'm wrong, a, a black mass.**

13 A. **Well, it's a, a black thing and, and I could see it in between, um, on the inside of his**

14 **index finger**.

15 Q2. Okay.

16 A. I, I could see, that's what I saw. I saw something here.

17 Q2. Okay. And, and just for, for the recording you're kind of using your, your right hand and

18 opening up as if maybe you were about to grab a cup.

19 A. Right.

20 Q2. Okay.

21 A. I could make out his …

22 A2. Yeah, I think you answered his question.

23 A. …okay.

24 Q2. Okay. Um, what was your mindset that moment? Tell me what you …

25 A**.** **He's got a weapon in his hand, a gun in his hand, and he's coming to kill me.**

26 Q2. … okay.

27 A. **I'm going to be in a face to face fire fight …**

28 Q2. Okay.

29 A. …right now.

30 Q2. Yeah.

31 A. I thought it was going to be a **chest to chest fire fight and I knew if I don't stop the threat**

32 **I was going to get killed, shot …**

(Doc. 65-8 ep 71, transcript p 40, emphasis added.)

Not only did Deputy Caudillo describe what he saw looked like a gun, Deputy Caudillo believed he was going to be in a face-to-face fire fight. If Lewis was not stopped, Caudillo believed he, Caudillo, was going to get killed, shot. This Court says otherwise without citation: "Caudillo did not describe the black object as resembling a Glock, handgun, or any other type of weapon." (Doc. 85, p. 22:8-9.) This is an inaccurate and misleading depiction of Deputy Caudillo's statement. (DSOF 275-287.) The Court surmising that Deputy Caudillo could have realized this was not a gun is unsupported by any evidence. The undisputed evidence, as depicted in expert Steve Ijames photographs at Doc. 65-8 ep 82 and 83, taken during daylight, does not reasonably rule out a gun. Defense expert Steve Ijames held the exact same key fob, and when shown the photographs, Deputy Caudillo stated: "That's what

I saw." (DSOF 295.) Yet, this Court finds that in the darkness and with illumination from the patrol vehicle lights including flashing emergency lights, Officer Caudillo could have determined this was not a gun.

This Court refers to Judge Kozinski's "self-serving account" bromide in *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). But where is the evidence this was a "self-serving account"? One can always speculate, but where is the actual contrary evidence? Sgt. Moseley's observation of Lewis was an instant, a flash, as Lewis exited his driver's door. (DSOF 189.) Sgt. Moseley had taken cover on the driver's side of the Stricklen truck, which was to the left of the Lewis truck. (*See* aerial photo, Doc. 66-3, ep 13.) Lewis immediately ran out of Moseley's sight to Moseley's right, and Sgt. Moseley did not see what Deputy Caudillo saw advancing toward him. Sgt. Moseley did not see the shooting, he only heard the shots. (DSOF 185-198.) That Sgt. Moseley observed a black object in Lewis' right hand as Lewis sprinted toward Deputy Caudillo is *not* contrary evidence; it is corroborating evidence.

As to whether Sgt. Moseley observed a lethal threat, the question being asked was at the moment he saw Lewis jump out of his vehicle running from him. (Doc. 75-27 ep 133, lines 14-17; DSOF 189-194.) Sgt. Moseley explained: "The reason I said in one part of my statement that Lewis never posed a deadly threat to me personally when he came out of his truck so quick is I don't think he saw me at that time in the few seconds he was visible to me. I maintained cover, but what I was thinking was he's going to come out and he is going to start shooting." (Doc. 65-5 ep 14 ¶ 70). One has to look at the context of the statement and the totality of the circumstances. Sgt. Moseley articulated his concerns that Lewis was going

to get out of his vehicle and start shooting into his vehicle and that is why he got out and took cover behind a truck. (DSOF 182-186.) Deputy Caudillo also heard Sgt. Moseley shout, "watch out, watch out." (DSOF 276.) Deputy Caudillo believed Sgt. Moseley was seeing and warning him of some kind of threat that he was not seeing. (*Id.*)

Moreover, a ballistic expert opining that Lewis's bullet wound is consistent with Lewis falling or diving toward the ground does not negate the immediacy of the perceived threat. First, Lewis's act of falling or diving, even if true, that motion occurs towards Deputy Caudillo. Second, a person armed with a handgun can fire that gun even when falling to the ground, diving to the ground, or landing on the ground. In other words, even if Lewis was falling or diving down, Deputy Caudillo was easily within striking distance from a bullet or weapon. It is critical to take into account, in the totality of the circumstances, that in Deputy Caudillo's 20 years as a patrol officer and in SWAT, involved in many activities chasing suspects on foot and in vehicle pursuits, Deputy Caudillo had never had a suspect flee from him in such a dangerous and desperate manner, stop the vehicle, jump out and race back at Deputy Caudillo with a black object in his hand. That is what Lewis did. Deputy Caudillo reasonably believed that he was under attack. (DSOF 214-217.) Lewis did not continue to flee, into the desert. The uniqueness of the totality of this event weighs heavily in favor of Deputy Caudillo.

In the totality of the circumstances, Lewis running toward Deputy Caudillo holding and pointing what Deputy Caudillo perceived to be a gun, is part of a continuing "harrowing gesture." The circumstances *were* harrowing to both Sgt. Moseley and Deputy Caudillo.

Moreover, the Supreme Court has never used language requiring a "furtive movement, harrowing gesture, or serious verbal threat" in deadly force cases. The Ninth Circuit is the only circuit to use this language. The Ninth Circuit first used this phrase in *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013), and the Ninth Circuit used this phrase in *Kisela* that was reversed by the Supreme Court. *Hughes v. Kisela*, 841 F.3d 1081, 1085, *overruled*, 584 U.S. 100 (2018); *cf., Estate of Valverde v. Dodge*, 967 F.3d 1049, 1063-66 (10th Cir. 2020). The Supreme Court has not adopted this language, and while such ambiguous language may be helpful in thinking about an immediate threat, the standard is the totality of the circumstances under *Graham*.

Deputy Caudillo reasonably believed Lewis was armed and coming directly at him. Deputy Caudillo's reasonable perception is his reality. All of Lewis's actions that morning posed a threat -- from the moment he refused the orders to get out of his vehicle until the shooting. Deputy Caudillo has been consistent all along as to what he saw. There is no material factual dispute, and second-guessing officers under similar circumstances such as here puts them at substantial risk and contravenes the very tenets of *Graham v. Connor*, 490 U.S. 386, 396 (1989).

Deputy Caudillo was faced with the very same tense, uncertain, and rapidly evolving circumstances discussed in *Graham*. Deputy Caudillo was forced to make the very same split-second decisions that *Graham* counsels against second-guessing.

3. Actively Resisting or Attempting Escape:

This Court held this "factor weighs at least somewhat in favor of Defendants" but

surmises that there are "factual disputes as to whether Lewis was continuing to attempt to escape once he exited his vehicle." No such factual disputes exist. Lewis did not open his truck door and step out with his hands up. Lewis did not step out of his truck and get down on the ground in surrender mode. Lewis had been arrested before this. Lewis knew the drill. Lewis's active resistance was first manifested in dangerous vehicular flight, through desert brush, then when he committed aggravated assault and endangerment with his truck, and then when aggressively charging toward Deputy Caudillo with a black object in his hand.

Importantly, a neighbor and both of the Stricklens heard deputies give commands before the shooting. (DSOF 375, 378, 379, 383, 384.) There is no evidence of anyone hearing Lewis say anything at all before being shot, and certainly not anything that could remotely be interpreted as surrender. There is absolutely no evidence that Lewis was compliant or surrendering. And, if he was falling or diving to the ground, the threat remained. Lewis could still shoot Caudillo.

4. Other Factors

The Court's analysis of failure to warn is grounded in facts that were overlooked and/or misapprehended. A failure to warn is at issue only if there is a timeframe within which there is time to warn. The timeframe the Court uses begins at 55 seconds before the shooting. (Doc. 85, p. 23:25-28.) That 55-second timeframe is from when Deputy Caudillo, while in his patrol car stopped nose-to-nose with Lewis's parked truck, shouts: "He's inside. He's in the car." Lewis immediately sped away in a reckless and dangerous manner (DSOF 256) and ultimately into the Stricklens' driveway, with Sgt. Moseley in pursuit.

Deputy Caudillo had to get his patrol unit turned around to engage in the pursuit. (DSOF 259.) When Deputy Caudillo arrived in the driveway, the vehicle collisions between Sgt. Moseley and Lewis had already occurred. Moseley had already left his car and had run up the far side, the driver's side of the Stricklen truck. (DSOF 185, 186.)

Deputy Caudillo arrived just in time to see Lewis, instead of running away, running at him with what he perceived to be a black handgun in Lewis's right hand. From a sitting position in his car, Deputy Caudillo only had time to open his door, step his left foot out of his car, stand, draw his gun and fire three shots. (DSOF 277, 284.)

Plaintiff's own expert Peles estimated the time for Lewis to leave his truck and advance to where he was shot at 2.7 - 4 seconds. (DSOF 390.) Importantly, because of the angle of Deputy Caudillo's car stopped behind Lewis's truck, Deputy Caudillo did not have the advantage of seeing Lewis's driver's side door open or of seeing Lewis come out of his truck. (DSOF 274-276; *see* aerial photo, Doc. 66-3, ep 13**.)** Deputy Caudillo picked up sight of Lewis advancing when Lewis was already several feet behind his open truck door. Hence, for Deputy Caudillo, his available reaction time must fall somewhere short of Peles's 2.7 - 4 seconds. Plaintiffs' expert Peles further agrees that when Lewis was shot, he fell 2 feet rearward and rightward of the Lewis truck's left rear corner. That is towards Deputy Caudillo. This brought Lewis's landing location a mere 6.5 feet from Deputy Caudillo. (Defendants' Reply, Doc. 81, pp. 5:21 to 6:6.)

The Court states that "there is evidence that Moseley, Caudillo, and other officers on the scene had time to warn Lewis that deadly force would be used if he did not comply with

their commands." (Doc. 85, p. 24:3-4.) This analysis is disconcerting. The Court does not say at what specific juncture officers should have threatened to shoot Lewis. Was it at the felony stop up the street where Lewis had not displayed a weapon and from which he fled? Was it during the dynamic, frenetic high speed vehicle pursuit? Was it during the frantic Strickens' driveway collisions between Lewis and Sgt. Moseley when Sgt. Moseley was just trying to maintain control of the vehicle? Neither of the police experts opine that such a warning should have been given at any point during this fast moving, rapidly evolving event.

Another reason the Court's failure to warn analysis is disconcerting is that Deputy Caudillo is the only remaining defendant for the shooting. Yet, the Court's failure to warn analysis appears to assign fault to Deputy Caudillo for the actions of other deputies not threatening Lewis with deadly force.

Both Sgt. Moseley and Deputy Berry gave loud commands to Lewis by name at the high risk felony stop area approximately 100 yards from the Stricklens' driveway, to get out of his truck with his hands up. (DSSOF 165, 166, 315.) Although Deputy Caudillo does not recall giving commands the instant before he shot, a neighbor and the Stricklens stated they heard commands prior to the shots. (DSSOF 374-379, 383-84.) Police procedures expert Steve Ijames opines the deputies' overall use of warnings was appropriate (DSOF 189; see also Doc. 66-10 ep 26). Moreover, Plaintiff's police procedures expert Harmening did not give any opinion that there was a failure to warn.

**On the denial of qualified immunity:**

This Court's decision waters down qualified immunity. Even if a court determines

there is an issue of fact on excessive force, police officers are still entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue. *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018). On the "immediate threat," it is undisputed after all the interactions with the deputies, Lewis was advancing towards Deputy Caudillo holding a black object in his right hand.

This Court denies qualified immunity citing *Harris v. Roderick*, 126 F.3d 1189, 1203 (9th Cir. 1997). That case, the Ruby Ridge case, is a far cry from the facts here. *Harris* involved the sniper element of an FBI Hostage Rescue Team ("HRT") being given a "shoot on sight" order for any armed adult male seen in the vicinity of a cabin where participants in a shootout with other FBI agents had fled the day before. *Id.* at 1192-94. The sniper team engaged people at the cabin, resulting in the death of Vickie Weaver and wounding Randall Weaver and Kevin Harris. *Id.* There was no evidence anyone at the cabin was armed or posed a threat to anyone at the time they were shot.

The Supreme Court rejected such a connection in a more analogous case, *Kisela v. Hughes*, 584 U.S. 100, 108 (2018) ("Suffice it to say, a reasonable officer could miss the connection between the situation confronting the sniper at Ruby Ridge and the situation confronting Kisela in Hughes' front yard."). On remand, the Ninth Circuit affirmed Judge Zapata's ruling that the force used was objectively reasonable, and he did not need to rule on qualified immunity.

This Court cites *Longoria v. Pinal Cnty.,* 873 F.3d 699, 706-07 (9th Cir. 2017). That case involves an individual with empty hands and does not "squarely govern" this case. The

Court further asserts *Cruz v. City of Anaheim*, is clearly established law. 765 F.3d 1076 (9th Cir. 2014). The facts in *Cruz* are also significantly different from this case. For the cases to be similar, one would have to assume before the officers fired in *Cruz*, that Cruz was being sought for aggravated assault with a deadly weapon and, instead of being shot as he emerged from the vehicle, he emerged from the vehicle holding a black object in his hand while he ran towards the officers. *Cruz* does not squarely govern the facts here.

Nor is the law clearly established under *Estate of Lopez v. Gelhaus*, 871 F.3d 998, 1021-22 (9th Cir. 2017). Lewis was not an unknown 13-year-old boy (Andy) holding a toy gun who was simply walking down the road and was approached from behind by law enforcement officers who saw the gun pointed toward the ground. *Id.* at 1002. From the time the officer shouted at Andy, and he turned to face the officers and was shot, three seconds elapsed. *Id.* at 1007. There was disagreement from the two officers involved. *Id.* One officer said the boy glanced backwards after the patrol car's "chirp," the other officer testified he did not. *Id.* Second, following the backwards glance dispute, there was another dispute as to whether there was more than one warning. *Id.* Third, the officers disputed whether the boy had the gun in his right or left hand. "The 'swinging around' of the gun would look vastly different if Andy turned clockwise with the weapon in his right hand, as opposed to his left." *Id.* Fourth, there was a factual dispute regarding whether the boy was actually raising the weapon at all. *Id.* For the case to squarely govern, Andy would have been sought by law enforcement officers for aggravated assault with a deadly weapon, the boy would have to have fled and committed aggravated assault on an officer, and the boy would have run

towards the officers while pointing the toy gun at them. *Id. Lopez* does not "squarely govern" the facts here.

Here, it was learned after the fact that Lewis was unarmed, but this does not change what Deputy Caudillo saw. Lewis was holding a black object in his right hand as he ran towards Deputy Caudillo after a high-risk stop which Lewis fled from, and only moments before had backed into Sgt. Moseley while attempting to flee. The question is not whether Lewis was armed or unarmed but whether Lewis could have had a gun in his hand. That is why some courts preclude evidence learned after the shooting that the suspect was unarmed. "The reception of evidence or any information beyond what [the officer] had and reasonably believed at the time he fired his revolver is improper." *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988).

The Court never identifies any case that would put a reasonable objective officer on notice that it was unconstitutional to shoot a suspect with a *known* history of aggravated assault with a black handgun, who failed to surrender and stop when he was located weeks later, who then drove away (felony flight) from the officers in a reckless and dangerous fashion, who backed into a law enforcement officer, and then after being cornered, he jumped out while advancing within a few feet from an officer pointing an object perceived to be a gun.

This Court's decision is irreconcilable with Supreme Court precedent including: *City of Tahlequah v. Bond*, 1442 S. Ct. 9 (2021) (officers entitled to qualified immunity after shooting and killing plaintiff's decedent who was intoxicated and advancing on officers with

a hammer; "We have repeatedly told courts not to define clearly established law at too high a level of generality."); *City of Escondido v. Emmons*, 139 S. Ct. 500 (2019) (Ninth Circuit erred by defining the clearly established right at a high level of generality); *Kisela v. Hughes*, 138 S. Ct. 114 (2018) (affirming trial court's decision on qualified immunity and reversing Ninth Circuit; plaintiff was not advancing on officers but was holding a knife walking toward her housemate); *Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017) (rejecting Ninth Circuit's provocation rule, which held that an officer's otherwise reasonable and lawful defensive use of force was unreasonable as a matter of law if the officer intentionally or recklessly provoked a violent response and the provocation was an independent constitutional violation conflated excessive force claims with other Fourth Amendment claims and permitted excessive force claims that could not otherwise succeed); *Plumhoff v. Ricard*, 134 S.Ct. 2012 (2014) (police entitled to qualified immunity for shooting plaintiff's decedent who was fleeing from officers after pursuit).

This Court's order is also irreconcilable with Ninth Circuit cases including: *Williams v. City of Sparks*, 112 F.4th 635 (9th Cir. 2024) (holding qualified immunity protected officers who fired upon a driver who had fled and struck police vehicles); *Hart v. City of Redwood City*, 99 F.4th 543 (9th Cir. 2024) (district court erred in not finding qualified immunity for officer who fired on suspect who had failed to comply with commands and moved toward the officer while holding a knife); *Waid v. Cnty, of Lyon*, 87 F.4th 383 (9th Cir. 2023) (affirming qualified immunity, even assuming plaintiffs' decedent was unarmed and not reaching for a weapon, he used aggressive language, ignored an order, and rushed towards

the officers); *Sabbe v. Wash. Cnty. Bd. Of Comm'rs*, 84 F.4th 807 (9th Cir. 2023) (affirming qualified immunity after offers entered property, rammed Sabbe's pickup that he was driving recklessly on his property, and then shooting him when he emerged from his vehicle); *Monzon v. City of Murrieta*, 978 F.3d 1150 (9th Cir. 2020) (affirming qualified immunity; deadly force objectively reasonable when officers fired into vehicle after suspect accelerated toward the officers); *S.B. v. Cnty. of San Diego*, 864 F.3d 1010 (9th Cir. 2017) (not clearly established that using deadly force on emotionally disturbed individual who grabbed knife from his pocket); and *Wilkinson v. Torres*, 610 F.3d 546 (9th Cir. 2010) (affirming qualified immunity and holding court must view facts from officer's perspective at the time he decided to fire and the "critical inquiry is what [the officer] perceived," rejecting plaintiff's "sanitized" version of facts that was not supported by the record as a whole and failed to account for "the urgency of the situation").

**Pima County is not a proper defendant on the state law claims:**

Pima County is not the proper defendant on the state law claims. *E.g.*, *Fridena v. Maricopa County*, 18 Ariz. App. 527, 530 (1972).

**Plaintiff's state law claims also fail:**

Arizona law provides a defense when an officer's use of force is reasonable. A.R.S. §§ 13-409 and 13-410 (C). These statutes justify the use of deadly force when reasonably necessary to effect an arrest or detention when the peace officer "reasonably believes that it is necessary. . .to defend himself or a third person from what the peace officer reasonably believes to be the use or imminent use of deadly physical force." Additionally, under § 13-411 (A), Deputy Caudillo was justified in using deadly physical force against Lewis if he

reasonably believed it was immediately necessary to prevent his commission of aggravated assault under § 13-1204(A)(1) and (2). The statute also provides:

> (B) There is no duty to retreat before threatening or using deadly physical force justified by subsection A of this section.
> (C) A person is presumed to be acting reasonably for the purposes of this section if he is acting to prevent the commission of any of the offenses listed in subsection A of this section. [including aggravated assault with a "deadly weapon or dangerous instrument."]

The state law wrongful death claim fails for the same reasons as the Fourth Amendment excessive force claim, the use of deadly force was objectively reasonable. Arizona also recognizes qualified immunity, both statutory and common law. *Spooner v. City of Phoenix*, 246 Ariz. 119 (2018) (officers are entitled to statutory immunity under A.R.S. § 12-820.05(A) and common law).

The Stricklens' property damage claim fails for all the same reasons including necessity. Deputy Caudillo's actions were objectively reasonable as a matter of law. Firing his gun was privileged.

For these reasons, the Defendants request reconsideration.

DATED this 11th of October, 2024.

*AUDILETT LAW PC*

/s/ Daryl Audilett

______________________________

Daryl A. Audilett
Attorney for Defendant Nanos, Caudillo, Moseley and Pima County

HUMPHREY & PETERSEN, P.C.

/s/ Andrew Petersen

______________________________
Andrew J. Petersen
Attorney for Defendants Nanos, Caudillo, Moseley and Pima County

CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Eduardo H. Coronado, Esq.
CORONADO LAW FIRM, P.L.L.C.
4700 W. White Mountain Boulevard, Suite A
Lakeside, AZ 85929
**Attorney for Plaintiffs**

By /s/ Karen Audilett