JL

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Anna Christine Lewis,

Plaintiff,

v.

Chris Nanos, et al.,

Defendants.

No. CV-21-00557-TUC-RM

**ORDER**

Pending before the Court is Defendants Pima County, Nanos, Caudillo, and Moseley's Motion for Reconsideration (Doc. 87) of the Court's September 27, 2024 Order granting in part and denying in part Defendants' Motion for Summary Judgment (Doc. 85). On December 17, 2024, Defendants filed a Notice of Supplemental Legal Authority (Doc. 88) in support of their Motion, in which they address the Ninth Circuit Court of Appeals' December 10, 2024 opinion in *Napouk v. Las Vegas Metropolitan Police Department*, 123 F.4th 906 (9th Cir. 2024).

## I. Background

Plaintiffs Anna Christine Lewis and Bradley Lewis, on their own behalf and as personal representatives of the estate of Bradley Alexander Lewis ("Lewis"),[1] brought this civil rights action, through counsel, pursuant to 42 U.S.C. § 1983. (Doc. 14.) Plaintiffs

[1] Anna Christine Lewis and Bradley Lewis are Bradley Alexander Lewis's mother and father. (Doc. 85 at 1.) The Second Amended Complaint also identifies as Plaintiffs Helen Stricklen, Ralph Rust Stricklen, Jerlene Jones, and George Preston Lewis, who are Bradley Alexander Lewis's grandparents. (*Id.*)

sought relief with respect to the January 20, 2021 shooting death of Lewis. (*Id.*) Defendants Pima County, Sheriff Chris Nanos, and Deputies Gilbert Caudillo and Michael Moseley moved for summary judgment on the merits of Plaintiff's § 1983 excessive force and due process claims and state-law wrongful death, loss of consortium, and property damage claims. (Doc. 64.)

In the September 27, 2024 Order, the Court granted the Motion for Summary Judgment as to the official-capacity claims against Defendants Nanos, Moseley, and Caudillo; the Fourth Amendment excessive force claim in Count One against Pima County, Nanos, and Moseley; the substantive due process claim in Count Two; the wrongful death claim in Count Three against Defendants Nanos and Moseley; the loss of consortium claim in Count Four; and the property damage claim in Count Five as to Defendants Nanos and Moseley. (Doc. 85.) The Court denied the Motion as to the Fourth Amendment excessive force claim in Count One against Defendant Caudillo, the wrongful death claim in Count Three against Defendants Pima County and Caudillo, and the property damage claim in Count Five against Defendants Pima County and Caudillo. (*Id.*)

**II. Governing Standard**

The Court has discretion to reconsider and vacate a prior order. *Barber v. Hawaii*, 42 F.3d 1185, 1198 (9th Cir. 1994); *United States v. Nutri-cology, Inc.*, 982 F.2d 394, 396 (9th Cir. 1992). "The Court will ordinarily deny a motion for reconsideration of an Order absent a showing of manifest error or a showing of new facts or legal authority that could not have been brought to its attention earlier with reasonable diligence." LRCiv 7.2(g)(1). Any motion for reconsideration must specifically identify the matters that were overlooked or misapprehended by the Court. *Id.* If any new matters are being brought to the Court's attention for the first time, the movant must identify the reasons they were not presented earlier, and any specific modifications being sought in the Court's Order. *Id.* No motion for reconsideration of an Order may repeat any oral or written argument made in support of or in opposition to the motion that resulted in the Order. *Id.*

. . . .

## III. Summary Judgment

In the September 27, 2024 Order, the Court found the following relevant facts: On December 18, 2020, the Pima County Sheriff's Department ("PCSD") initiated a Probable Cause Alert on Lewis for allegedly committing assault with a deadly weapon on December 4, 2020. (Doc. 85 at 6-7.) During the December 4, 2020 incident, Lewis allegedly pointed a handgun at two men and stated, "I've dropped ten bodies before and you're just a number to me. I'll do it again." (*Id.* at 6.)

On January 20, 2021, PCSD Deputies located Lewis's blue Toyota Tacoma pick-up truck. (*Id.* at 8-9.) Deputies "engaged in a high risk stop procedure" and commanded Lewis to get out of the truck with his hands up. (*Id.* at 9.) Defendant Caudillo saw Lewis inside the truck, and Lewis put the truck in reverse "and floored it." (*Id.* at 10.) Lewis tried to evade the Deputies and in doing so, he hit Defendant Moseley's patrol vehicle. (*Id.* at 11.) Lewis opened the driver's side truck door, "took off running rearward," and ran toward where Defendant Caudillo was seated in his patrol vehicle. (*Id.* at 11-12.) Lewis had a black "mass" or "object" in his right hand. (*Id.* at 12-13, 22.) Defendant Caudillo "took one step out of his patrol vehicle with his left foot, immediately drew his department-issued Glock 17 9mm handgun, pointed his gun at Lewis, and fired." (*Id.* at 12.) Lewis later died from his injuries. (*Id.* at 14.) The black object in Lewis's right hand turned out to be a small black key fob for the Toyota Tacoma and a black lanyard. (*Id.* at 13.) After the shooting, Defendant Caudillo stated that he believed the black object in Lewis's right hand was a handgun, specifically, a Glock. (*Id.* at 22.)

In the September 27, 2024 Order, the Court determined there were genuine disputes of material fact regarding whether Defendant Caudillo used excessive force against Lewis when Caudillo shot and killed Lewis. Applying the Fourth Amendment objective reasonableness standard, the Court determined that Caudillo used deadly force when he shot Lewis, which implicated "the highest level of Fourth Amendment interests." (*Id.* at

17.) Next, the Court considered the *Graham*[2] factors, reasoning that Defendants were attempting to arrest Lewis for committing assault with a deadly weapon more than six weeks before the events of January 20, 2021, and although assault with a deadly weapon is a serious crime, the crime was not in progress and had not occurred immediately before officers arrived at the scene. (*Id.*)

In considering the "most important" *Graham* factor—whether Lewis posed an *immediate* threat to officers or others—the Court determined that viewing the evidence in the light most favorable to Lewis, a reasonable juror could find that Lewis was diving or attempting to get on the ground when Caudillo shot him, and that he was not advancing toward Caudillo "in a threatening manner." (*Id.* at 18-21.) The Court further determined that, viewing the evidence in the light most favorable to Lewis, "[g]iven Caudillo's extensive training and experience with firearms, including that Caudillo shot Lewis with a type of Glock handgun, even in the tense, rapidly evolving circumstances, there is a question of fact whether it was reasonable for Caudillo to believe that the object he saw in Lewis's right hand—which turned out to be a small key fob for the Tacoma and a lanyard—was a Glock or some other type of handgun." (*Id.* at 22.)

With respect to whether Lewis was actively resisting or attempting to escape, the Court determined that the evidence demonstrated that Lewis had been actively attempting to escape before Defendant Caudillo shot him, but there were factual disputes as to whether Lewis was continuing to attempt to escape once he exited his vehicle. (*Id.* at 23.) Specifically, the Court noted that Plaintiffs' expert opined that the fatal penetrating gunshot wound was fired when Lewis was facing his truck and bent or leaning over. (*Id.* at 20.) The Court reasoned that, viewing the evidence in the light most favorable to Lewis, a reasonable juror could find that Lewis was diving or attempting to get on the ground when Caudillo shot him. (*Id.*)

. . . .

---

[2] *Graham v. Connor*, 490 U.S. 386 (1989).

The Court also considered other factors, including whether less intrusive alternatives were available to law enforcement and whether the suspect was given proper warnings before force was used. (*Id.*) The Court noted that Plaintiffs' expert opined that if Defendant Caudillo had ordered Lewis to stop running and Lewis had ignored Caudillo's commands, Caudillo could have "used his hands to physically subdue Lewis" or deployed his Taser or O.C. pepper spray. (*Id.*) The Court also observed that it was undisputed that Defendant Caudillo did not warn Lewis that he would use deadly force, and although only 55 seconds elapsed between the time Defendant Caudillo found Lewis in the Toyota Tacoma and the time Caudillo shot Lewis, Defendant Moseley had time to repeatedly "beg[]" Lewis to "stop" while Lewis was backing his truck into Mosely's police vehicle. (*Id.*) The Court determined there was evidence that "Mosely, Caudillo, and other officers on the scene had time to warn Lewis that deadly force would be used if he did not comply with their commands." (*Id.*)

Mindful of the Ninth Circuit's admonition in *Santos v. Gates*, 287 F.3d 846 (9th Cir. 2002), that "summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly" because the balancing required by *Graham* "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," the Court determined that a reasonable jury could find that the force Defendant Caudillo used was "greater than is reasonable under the circumstances." (*Id.* at 24 (citing *Santos*, 287 F.3d at 854)).

With respect to whether Defendant Caudillo was entitled to qualified immunity, the Court determined that at the time of the shooting, it was clearly established that law enforcement officers may not kill even armed suspects "who do not pose an immediate threat to their safety or the safety of others," including in some circumstances in which the suspect has "committed a violent crime in the immediate past." (*Id.* at 26.) The Court further determined that it was clearly established that "an unreasonable mistake in the use of deadly force against an unarmed, nondangerous suspect violates the Fourth Amendment." (*Id.*) The Court cited *Cruz v. City of Anaheim*, 765 F.3d 1076 (9th Cir.

2014), as putting Defendant Caudillo on notice that the use of deadly force in the circumstances of this case—*as taken in the light most favorable to Plaintiffs*—would be unconstitutional. (*Id.*) The Court reasoned that the jury must determine the facts relevant to qualified immunity: whether Defendant Caudillo could have reasonably believed that Lewis was holding a handgun and whether Caudillo could have reasonably perceived that Lewis was moving toward him in an aggressive or threatening manner, and because Defendant Caudillo's entitlement to qualified immunity depended on the resolution of disputed issues of fact in his favor, summary judgment was not appropriate. (*Id.* at 27.)

The Court denied Defendants' Motion for Summary Judgment with respect to Plaintiffs' wrongful death claim because a jury could conclude that Defendant Caudillo's decision to shoot Lewis was objectively unreasonable, and Pima County is vicariously liable for Caudillo's wrongful conduct. (*Id.* at 38.) The Court also denied the Motion with respect to Helen and Ralph Rust Stricklen's property damage claim because the Court concluded there are genuine disputes of material fact regarding whether Defendant Caudillo's conduct was objectively reasonable.

## IV. Defendants' Motion

Defendants argue that the Court erred in determining there are genuine disputes of material fact regarding whether Defendant Caudillo used excessive force against Lewis when Caudillo shot and killed Lewis. (Doc. 87.) First, Defendants contend that the Court's characterization of the crime Lewis had committed six weeks before the shooting "does not capture the gravity of the reasonably perceived threat presented by Lewis to the deputies on the scene on January 20, 2021." (*Id.* at 2.) Defendants also assert that there is "no question there was a 'crime in progress' when the shooting occurred" because Lewis "committed felony flight, resisting arrest[;] recklessly drove through desert brush, popping a tire[;] and then just seconds before the shooting, . . . committed aggravated assault and endangerment on an officer when he intentionally backed into [Defendant] Moseley's vehicle." (*Id.*)

. . . .

Next, Defendants argue that "[i]n determining severity of the crime, this Court must consider Lewis's clear and present danger to the public after threatening to shoot two men on December 4, 2020 with a black handgun and bragging about shooting 10 others," "what happened in the early morning darkness on January 20, 2021 with the felony flight, resisting arrest, endangerment and aggravated assault just prior to the shooting," "the violent desperation exhibited by Lewis's reckless and violent vehicular flight," and Defendant Caudillo's "reasonable perception that Lewis's vehicular flight looked to [Defendant] Caudillo like a desperate attempt to get away by someone who is out of control." (*Id.* at 3-4.)

Defendants further contend the Court erred in determining there was a genuine dispute regarding whether Defendant Caudillo reasonably believed Lewis was armed. (*Id.* at 5.) Defendants assert that the Court incorrectly suggested that in his interview shortly after the shooting, Defendant Caudillo did not specifically say that he saw Lewis holding a gun. (*Id.*) Defendants cite a portion of Defendant Caudillo's interview with detectives on January 25, 2020—five days after the shooting—in which the interviewer asked, "Um, what was your mindset that moment? Tell me what you . . ." (*Id.* at 6.) Defendant Caudillo responded, "He's got a weapon in his hand, a gun in his hand, and he's coming to kill me. . . . I'm going to be in a face to face fire fight . . . I thought it was going to be a chest to chest fire fight and I knew if I don't stop the threat I was going to get killed, shot." (*Id.*) Defendants assert that "[t]he Court surmising that Deputy Caudillo could have realized this was not a gun is unsupported by any evidence." (*Id.*) They contend that "[t]he undisputed evidence," as depicted by their expert's photographs, "does not reasonably rule out a gun." (*Id.* at 6-7.)

Defendants also contend the Court erred in concluding there are factual disputes as to whether Lewis was continuing to attempt to escape once he exited his vehicle. (*Id.* at 10.) They assert that Lewis did not open the truck door and step out with his hands up, or "get down on the ground in surrender mode." (*Id.*) Defendants argue there is "absolutely

no evidence that Lewis was compliant or surrendering," and, "if he was falling or diving to the ground, the threat remained" because "Lewis could still shoot Caudillo." (*Id.*)

Defendants further contend the Court's "analysis of failure to warn is grounded in facts that were overlooked and/or misapprehended. A failure to warn is at issue only if there is a timeframe within which there is time to warn." (*Id.*) Defendants assert that Plaintiffs' expert estimated the time for Lewis to leave his truck and advance to where he was shot as 2.7 - 4 seconds. (*Id.*)

With respect to qualified immunity, Defendants argue that the Court's decision "waters down qualified immunity" and that the decisions the Court cited in its qualified immunity analysis do not "squarely govern" this case. (*Id.* at 12-13.) Defendants assert that the Court

> never identifies any case that would put a reasonable objective officer on notice that it was unconstitutional to shoot a suspect with a known history of aggravated assault with a black handgun, who failed to surrender and stop when he was located weeks later, who then drove away (felony flight) from the officers in a reckless and dangerous fashion, who backed into a law enforcement officer, and then after being cornered, . . . jumped out while advancing within a few feet from an officer pointing an object perceived to be a gun.

(*Id.* at 15.) Defendants also argue that the Court's decision is "irreconcilable" with Supreme Court precedent admonishing federal courts "not to define clearly established law at too high a level of generality" and Ninth Circuit qualified immunity cases.[3] (*Id.*)

Finally, with respect to the wrongful death and property damage claims, Defendants argue that Pima County is not the proper Defendant for the state-law claims and that the

---

[3] Defendants cite *City of Tahlequah v. Bond*, 595 U.S. 9 (2021); *City of Escondido v. Emmons*, 587 U.S. 38 (2019); *Kisela v. Hughes*, 584 U.S. 100 (2018); *County of Los Angeles v. Mendez*, 581 U.S. 420 (2017); *Plumhoff v. Ricard*, 572 U.S. 765 (2014); *Williams v. City of Sparks*, 112 F.4th 635 (9th Cir. 2024); *Hart v. City of Redwood City*, 99 F.4th 543 (9th Cir. 2024); *Waid v. County of Lyon*, 87 F.4th 383 (9th Cir. 2023); *Sabbe v. Wash. County Bd. Of Comm'rs*, 84 F.4th 807 (9th Cir. 2023); *Monzon v. City of Murrieta*, 978 F.3d 1150 (9th Cir. 2020); *S.B. v. County of San Diego*, 864 F.3d 1010 (9th Cir. 2017); and *Wilkinson v. Torres*, 610 F.3d 546 (9th Cir. 2010).

Stricklens' property damage claim fails because Defendant Caudillo's actions were objectively reasonable as a matter of law, and "[f]iring his gun was privileged." (*Id.* at 17-18.)

In their Notice of Supplemental Legal Authority, Defendants contend that the *Napouk* majority's analyses of the facts and law support a finding that Defendant Caudillo's conduct was objectively reasonable and that Caudillo is entitled to qualified immunity. (Doc. 88 at 3.)

## V. Analysis

### A. Excessive Force Claim

Defendants have not shown the Court made a "manifest error" in denying their Motion for Summary Judgment as to the Fourth Amendment excessive force claim against Defendant Caudillo.

#### 1. Severity of the Crime

Defendants argue that there were crimes in progress when the shooting occurred, including felony flight, aggravated assault, and endangerment of an officer. Defendants, could have, but did not, make this argument in their Motion for Summary Judgment, and the Court need not consider it now.

#### 2. Immediate Threat

The Court did not mischaracterize Defendant Caudillo's statement to detectives about the object he saw in Lewis's right hand. The Court noted that in an interview five days after the shooting, Defendant Caudillo stated that Lewis was "directly in front of [Caudillo's] vehicle coming at [him]," and Caudillo could see Lewis had "a black thing" in his right hand. (Doc. 85 at 22.) The Court observed that Caudillo stated that once he saw Lewis "running at [him]" and the "black mass" in Lewis's hand, he knew he did not "have time" and "just point shot." (*Id.*) The Court stated that Defendant Caudillo "did not describe the black object as resembling a Glock, handgun, or any other type of weapon." (*Id.*)

After Defendant Caudillo described the entire incident to detectives for nearly an hour and a half, there was a short break, and afterward, the detectives started "kind of dissecting what [Caudillo]" had told them. (Doc. 65-8 at 32-58.) Defendant Caudillo stated that after he was "outside of [his patrol vehicle] door," he was "doing everything to look into [Lewis's] hand," and "that's when [Caudillo saw] a black object." (*Id.* at 71.) The detective stated, "And you described, I believe, and correct me if I'm wrong, a, a black mass." (*Id.*) Defendant Caudillo responded, "Well, it's a, a black thing and, and I could see it in between, um, on the inside of his index finger. . . . I, I could see, that's what I saw. I saw something here." (*Id.*) The detective stated, "Okay. And, and just for, for the recording you're kind of using your, your right hand and opening up as if maybe you were about to grab a cup." (*Id.*) Defendant Caudillo responded, "Right," and stated, "I could make out his . . ." (*Id.*) An attorney who was present for the interview stated, "Yeah, I think you answered his question." (*Id.*) The detective asked, "Okay. Um, what was your mindset that moment? Tell me what you . . ." (*Id.*) Defendant Caudillo responded, "He's got a weapon in his hand, a gun in his hand, and he's coming to kill me. . . . I'm going to be in a face to face fire fight . . . right now. . . . I thought it was going to be a chest to chest fire fight and I knew if I don't stop the threat I was going to get killed, shot …" (*Id.*) Until that moment in the interview, Defendant Caudillo had not said the black "mass" or "object" Lewis had in his hand looked like a gun.

Defendants argue that the "undisputed evidence," as depicted in their expert's photographs, "does not reasonably rule out a gun," yet the Court found "that in the darkness and with illumination from the patrol vehicle lights including flashing emergency lights, Officer Caudillo could have determined this was not a gun." (Doc. 87 at 7.) First, Defendants' assertion that the "undisputed evidence" does not reasonably rule out a gun is inaccurate. Defendants refer to three photographs their expert, Steve Ijames, took while preparing his report. The photos show Ijames holding the key fob and lanyard in his right hand in various positions. (Doc. 66-10 at 23-24.) Ijames wrote in his report that "Sergeant Caudillo said that he believed the black object Mr. Lewis was holding in his hand was a

gun. While examining the key fob at the Pima County evidence facility I held the key fob in my right hand, bladed my body, and raised my arm towards Mr. Daryl Audilett. I then moved around to alter the light and asked Mr. Audilett to take photographs of the key fob." (*Id.*) Ijames opined, based on his photographs, "[t]here are many ways that Mr. Lewis could have been holding the key fob in his right hand while advancing towards Sergeant Caudillo and raising his arm-and none of them would have looked exactly like the isolated and static condition" of the key fob at the scene. (*Id.* at 22.)

In their Response to Defendants' Motion for Summary Judgment, Plaintiffs raised several disputes about Ijames's photographs, including that Defendant Caudillo "never once stated or described" Lewis holding the key fob in this manner in any of his post-shooting interviews; the photos were not an accurate simulation of the event because they were taken in broad daylight, there were no "taken down lights" or spotlights shining at him, the vehicle positions were incorrect, and Ijames was standing face-forward when the evidence showed Lewis was in a "bladed position"; and the intent of the photos was to contradict Plaintiffs' expert's statement that the size, dimensions, and shape of the key fob do not share similar characteristics to a gun. (Doc. 75-1 at 10-11.) Plaintiffs also pointed out that during his deposition, Ijames acknowledged that Defendant Caudillo never described Lewis as holding the key fob and lanyard in the manner Ijames did in the photographs.[4] (*Id.* at 10-11.) The photographs—taken years after the incident in a different location in dissimilar circumstances—are not "undisputed evidence" of anything.

---

[4] Ijames was asked, "Can you point to a document that you reviewed prior to that day that shows how Alex Lewis was holding the FOB? Document, including written statements, emails, photographs?" (Doc. 75-6 at 24.) Ijames responded,

> I don't believe that I ever had one. I don't believe, that I'm aware of, that Deputy Caudillo had a clear indication of exactly what positioning any item was, to give an exact answer to your question. The description that I had from statements and reports was this black object in the hand that had square features. There was no definitive answer to your question. What you're asking me about in this picture in this position here in my report was in response to, I believe, one reference that your expert said, there is no way

Second, Defendants mischaracterize the Court's conclusion regarding whether Lewis posed an immediate threat to Caudillo or others. The Court did not determine that Defendant Caudillo could not have believed the black object Lewis held was a gun. It is possible Defendant Caudillo believed the black object was a gun. Rather, the Court determined, *viewing the evidence in the light most favorable to Lewis*, that there was a question of fact whether it was *reasonable* for Caudillo to believe that the object he saw in Lewis's right hand was a Glock or some other type of handgun.

The Ninth Circuit's opinion in *Napouk* does not compel a different conclusion. The facts in *Napouk* were as follows:

> At around midnight on October 27, 2018, a bystander called the LVMPD nonemergency line to report that a white adult male was walking down Floating Flower Avenue with a "slim jim" or a "long stick," peering into cars, talking to himself, and raising his fist at the cars. Three minutes later, another bystander called 911 to report that an African American adult male with a "machete," "big tool," or "piece of metal" was going door-to-door looking into houses, talking to himself, and pointing the object at the houses. A few minutes later, the first bystander called again to report that the man had moved to Tender Tulip Avenue and was going into people's backyards and looking into windows. The bystander told the operator that he was armed and would shoot the man if he came into his yard.
>
> A few minutes after the first call, Seargent [sic] Kenton and Officer Gunn, riding in separate patrol cars, assigned themselves to the call. According to the information they received from dispatch, a male wearing a baseball cap and

---

> that a FOB could be held to look like a gun. And I'm simply giving the example of ways that that particular FOB could be held to give an appearance of a firearm, not the way, because I don't think anyone knows definitively how Alex was, in fact, holding that object that night. No one knows for certain, and I don't think I've read anything where Deputy Caudillo has said for certain . . . the exact positioning in the split seconds that they saw that object in his hand, how it was being held.

(*Id.* at 24-25.)

camo backpack was walking around with a "slim jim," a "long stick," or "possibly a ... machete," going door to door and peering into windows. A police helicopter was also dispatched.

When the officers arrived in the neighborhood, Gunn briefly spoke with the second bystander, who told him that Napouk was one street over and wearing sunglasses. The officers did not preplan or communicate before they interacted with Napouk. Both officers drove over to the next street, where Napouk came out from between two houses. Both officers thought Napouk was holding a machete. Gunn activated his patrol car lights and parked his car right in front of Napouk, and Kenton parked behind Gunn. Gunn exited his car with his gun drawn and stood near the driver side door, immediately telling Napouk to "put it on the ground," and drop it. He asked Napouk what was in his hand and repeated his command to drop it.

Kenton also exited his car, moved towards Napouk with his gun drawn, repeatedly asked Napouk what was in his hand, and told him to put it on the ground. Kenton also repeatedly commanded Napouk to remove the headphones from his ears while pointing to his own ears. Napouk stood still for several seconds to the right of Gunn's patrol car, holding the long, black object at his side. Gunn reported that Napouk was not following commands and "saying we're gonna have to shoot him."

Napouk then walked slowly in front of and around to the driver side of Gunn's patrol car, where Gunn was standing, failing to follow the officers' commands to put the object down. Gunn retreated to stand behind the back of his patrol car, and both officers continued to repeat commands to "drop the knife." Napouk stood next to the driver side door of Gunn's patrol car and smoked a cigarette for over a minute, with Gunn positioned at the driver side bumper and Kenton on the passenger side at the hood of the car. The officers repeatedly told Napouk that "it's not worth it," that "it's all good, man. We can talk," and that "you're not in any trouble," and Kenton also tried asking his name. Kenton radioed during this time to request a beanbag shotgun and a canine unit and asked that medical be standing by. Napouk stayed in the same place and

> moved the long object in different positions, pointing it outward, up in the air, and straight out next to him.
>
> After around two minutes standing in one place and failing to abide by the officers' commands, Napouk moved more quickly along the side of the car toward Gunn, telling the officers twice to "get out of here." Gunn retreated around the other side of the car, repeating his command to drop the weapon. Kenton followed Napouk around the car repeating commands to drop it. Napouk then turned and walked at Kenton, who retreated back to stand with Gunn at the passenger side near the hood of the car. Both officers said "I'm gonna shoot you," and Napouk responded "you have to." Gunn told Napouk if he took one more step towards them, "I will shoot you," and Napouk said, "I know." Kenton told him again to drop it and "it's not worth it man," and again tried to ask his name and talk to him.
>
> Napouk stopped at the front driver side of Gunn's patrol car for another minute, moving his hat around on his head and telling the officers to "get out of here," while the officers stood on the passenger side, continuing to repeat commands to drop it and attempting to ask his name. Eventually, he began slowly moving again, across the front of the car toward them. They again retreated, Gunn behind a parked car on the side of the road next to his patrol car, and Kenton to the back of Gunn's patrol car. Kenton again radioed to request that someone with a beanbag shotgun come in behind him.
>
> Napouk continued to move slowly in their direction, changing his grip on the object a few times. The officers continued instructing him to put it down, and Kenton told him "I don't want to shoot you today." Napouk continued to move along the passenger side of Gunn's patrol car towards Kenton, positioning himself between the two officers. Gunn told Kenton to "watch your crossfire." Kenton told Napouk "one more step and you're dead," to which Napouk responded, "I know" and continued advancing. When Napouk was about nine feet away, the officers both shot him multiple times.

123 F.4th at 912-14. After the shooting, it was discovered that the object was a plastic toy fashioned to appear as a blade. *Id.* at 914. The Ninth Circuit determined that Napouk

posed an immediate threat to the safety of the officers, although the officers mistakenly believed he had a machete. *Id.* at 915. The Ninth Circuit noted that witnesses gave several different descriptions of the object Napouk held, "which highlight[ed] that others were at least confused as to what the object was," and that the officers were told that Napouk had either a slim jim, long stick, or machete. *Id.* at 916. The Ninth Circuit also observed that when they arrived on the scene, both officers asked Napouk what was in his hand, and he failed to respond. *Id.* Kenton told him at various points to drop "the knife" and "the weapon." *Id.* "Pictures and reports of the object confirm[ed] that at twenty-two inches long, made of layers of dark gray plastic adhered together and square at the end, and with a handle made of wire and yellow rope covered in black tape, the object was a 'homemade plastic sword.'" *Id.* The Ninth Circuit further noted that "[e]ven Plaintiffs describe[d] the object in their complaint as a 'toy sword wrapped in duct tape' and a 'machete shaped instrument.' Put simply, the item objectively looked like a machete, and no rational jury could find Kenton or Gunn's mistake unreasonable." *Id.* The Ninth Circuit distinguished several cases in which "certain circumstances, such as special training or warnings from others on the scene, put the officer 'on notice' that their belief might be mistaken, such that they 'should have known,'" concluding that in *Napouk*, "no such facts alleged by Plaintiffs suggest circumstances by which the officers should have known the object, which was obviously made to look like a knife, was not actually a knife." *Id.*

Here, Defendants cannot—and do not—argue that *no* rational jury could find Defendant Caudillo's mistake unreasonable. There were no witness statements at the time of the shooting that Lewis had a handgun, and unlike the machete-shaped toy sword in *Napouk*, here the key fob and lanyard were not designed to look like a weapon. Whether it was *reasonable* in the circumstances for Caudillo to perceive the key fob as a handgun is a question for the jury, one that could eventually be decided in Caudillo's favor. But again, Defendants would have this Court construe the evidence in *their* favor on summary judgment, which the Court may not do.

Defendants also take issue with the Court's observation that in the deadly force context, the Court cannot simply accept what may be a self-serving account by the police officer, arguing, "One can always speculate, but where is the actual contrary evidence?" (Doc. 87 at 7.) In its immediate threat analysis, the Court observed that it cannot simply accept what may be a self-serving account by the police officer because "'the person most likely to rebut the officers' version of events—the one killed—can't testify.'" (Doc. 85 at 21) (quoting *Cruz*, 765 F.3d at 1078). Rather, the Court "'must carefully examine all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts.'" (*Id.*) (quoting *Cruz*, 765 F.3d at 1078). The Court noted that Defendant Moseley also saw a black object in Lewis's right hand but did not describe it as a gun. (*Id.*) Although Defendants attempt to portray Moseley's observation of a black "object" in Lewis' right hand as "corroborating evidence" of Defendant Caudillo's version of events, (Doc. 87 at 7), Moseley's description of Lewis holding a black object that Moseley did *not* perceive to be a gun could be viewed as undermining Caudillo's statement that he believed the black object was a gun.

Defendants argue that even if Lewis was falling or diving when Defendant Caudillo shot him, he was moving toward Caudillo, and a person armed with a handgun can fire that gun even when falling, diving, or landing on the ground. (*Id.* at 8.) Defendants contend that "even if Lewis was falling or diving down, [Defendant] Caudillo was easily within striking distance from a bullet or weapon." (*Id.*) But this argument assumes that Defendant Caudillo reasonably believed that Lewis had a handgun and fails to account for the impact that Plaintiff's movements could have on the level of threat he could reasonably be perceived to present. If a jury could reasonably view his movements as indicative of surrender, as opposed to flight or attack, this finding might undermine the reasonableness of Caudillo's belief that Lewis posed an immediate threat. As the Court stated with respect to whether Lewis posed a threat, the question is whether Lewis "posed an *immediate* threat *immediately* before Defendant Caudillo shot Lewis." (Doc. 85 at 23.) Defendants fail to mention *Estate of Aguirre v. County of Riverside*, 29 F.4th 624, 626 (9th Cir. 2022), in

which the Ninth Circuit characterized the issue where an officer fatally shot an individual as "the level of threat [the decedent] posed immediately before he died." The Court correctly determined that, *construing the evidence in favor of Lewis*, there is a question of fact whether Lewis posed an immediate threat immediately before Caudillo shot him. (*Id.*)

The Court did not err in concluding there are genuine disputes of material fact regarding whether Lewis posed an immediate threat to Defendant Caudillo immediately before Caudillo shot Lewis.

**3. Active Resistance or Attempting Escape**

Defendants contend the Court placed insufficient weight on Lewis's "attempts to escape or actively resist." (Doc. 87 at 10.) The Court considered Lewis's attempts to escape in his truck. (Doc. 85 at 23.) But with respect to whether Lewis was still attempting to escape *immediately* before Defendant Caudillo shot him, Defendants' assertions require the Court to construe all the evidence in *their* favor. Viewing the evidence in *Lewis's* favor—as the Court must—there is a factual dispute regarding whether Lewis was diving or attempting to get on the ground when Caudillo shot him. It is up to the jury, not this Court on summary judgment, to determine those facts.

**4. Other Factors**

With respect to whether Defendant Caudillo should have warned Lewis that deadly force would be used, the Ninth Circuit has emphasized that "police officers normally provide such warnings where feasible, even when the force is less than deadly, and that the failure to give such a warning is a factor to consider" in determining whether the use of force was objectively reasonable. *Bryan v. McPherson*, 630 F.3d 805, 831 (9th Cir. 2010). Defendants point that only a few seconds elapsed between the time Lewis exited his truck and the time Defendant Caudillo shot him, and Caudillo therefore did not have time to warn Lewis that deadly force would be used, is well-taken. But even if there was not time to warn Lewis that deadly force would be used if he did not comply with commands, that does not change the conclusion that there are genuine disputes of material fact with respect

to most of the objective reasonableness test. The Court did not err in denying summary judgment as to the Fourth Amendment violation.

**5. Qualified Immunity**

With respect to qualified immunity, Defendants also fail to show the Court made a "manifest error." First, Defendants would require this Court to identify a case with nearly identical facts as "clearly established" law, but the Supreme Court has emphasized that factually identical precedents, or even cases involving "fundamentally similar" facts, are not required for law to be clearly established for qualified immunity purposes. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Rather, the "clearly established" standard requires that the "*legal principle* clearly prohibit the officer's conduct in the particular circumstances before him," which "requires a high 'degree of specificity.'" *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 13 (2015) (per curiam)) (internal quotation marks omitted) (emphasis added). The Supreme Court in *Wesby* instructed courts to "identify a case where an officer acting under *similar* circumstances … was held to have violated the Fourth Amendment." *Id.* (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam)) (emphasis added). Indeed, if a case with identical facts were required to show clearly established law, as Defendants suggest, officers would always have qualified immunity.

Defendants object to the Court's citation of *Harris v. Roderick*, 126 F.3d 1189 (9th Cir. 1997), contending the facts in that case are "a far cry from the facts here." (Doc. 87 at 13.) But the Court cited *Harris* as setting forth a *legal principle* that applies to this case—that law enforcement officers may not kill even armed suspects "who do not pose an immediate threat to their safety or the safety of others," including in some circumstances in which the suspect has "committed a violent crime in the immediate past." (Doc. 85 at 26) (quoting *Harris*, 126 F.3d at 1203-04). The Ninth Circuit in *Estate of Lopez v. Gelhaus*, 871 F.3d 998 (9th Cir. 2017), *cert. denied*, *Gelhaus v. Estate of Lopez ex rel. Lopez*, 585 U.S. 1024 (2018), similarly relied on *Harris* as giving a police officer "warning that his use of deadly force was not objectively reasonable" and setting forth the clearly established

law that "'[l]aw enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed.'" *Id.* at 1019 (quoting *Harris*, 126 F.3d at 1204).

Next, Defendants unsuccessfully try to distinguish the cases the Court identified as "clearly established" law. Defendants argue that *Longoria v. Pinal County*, 873 F.3d 699 (9th Cir. 2017), does not "squarely govern" this case because *Longoria* involved "an individual with empty hands." (Doc. 87 at 14.) But the Court did not cite *Longoria* as "clearly established law" for qualified immunity purposes; rather, it cited *Longoria* in its discussion of whether Caudillo reasonably believed that Lewis posed an immediate threat immediately before Caudillo shot Lewis. (Doc. 85 at 22.)

Defendants also contend that the facts in *Cruz* are "significantly different from this case," and that for the cases to be similar, "one would have to assume before the officers fired in Cruz, that Cruz was being sought for aggravated assault with a deadly weapon and, instead of being shot as he emerged from the vehicle, he emerged from the vehicle holding a black object in his hand while he ran towards the officers." (Doc. 87 at 14.) Defendants' argument that *Cruz* does not "squarely govern" this case because Cruz was a gang member who sold methamphetamine and carried a gun and who was a parolee who had a past felony conviction involving a firearm, while Lewis had allegedly committed aggravated assault with a handgun six weeks before the shooting, is specious. Cruz had been convicted of a felony involving a firearm and was known to carry a gun. That Cruz was not *suspected* of committing aggravated assault, as Lewis was, does not make *Cruz* inapposite. Likewise, the fact that Cruz did not run at officers while holding a black object in his hand does not distinguish *Cruz* from this case. The Ninth Circuit reversed the grant of summary judgment in favor of the officers because it was disputed whether Cruz had reached for his waistband before officers shot him. Thus, there were disputes of fact regarding whether Cruz posed an immediate threat to the officers. Likewise, here, there are disputes of fact regarding whether Lewis posed an immediate threat to Caudillo immediately before Caudillo shot Lewis.

Defendants argue the law is not clearly established under *Lopez* because Lewis was not an "unknown 13-year-old boy" who was holding a toy gun and "simply walking down the road" when he was approached from behind by law enforcement officers who saw the gun pointed toward the ground. (*Id.* at 14.) Defendants contend that for *Lopez* to "squarely govern," the boy "would have been sought by law enforcement officers for aggravated assault with a deadly weapon, the boy would have to have fled and committed aggravated assault on an officer, and the boy would have run towards the officers while pointing the toy gun at them." (*Id.* at 15.) But the legal principle derived from *Lopez* is that an unreasonable mistake of fact will not support qualified immunity. *Id.* at 1020. In *Lopez*, as in this case, there were disputed facts regarding whether the person against whom force was used posed an immediate threat to law enforcement officers. *Id.* at 1020-21.

Defendants also cite various cases that they contend demonstrate Defendant Caudillo is entitled to qualified immunity. Defendants failed to cite all but two of those cases in their summary judgment briefing. Defendants offer no explanation for their failure to cite this available legal authority, and the Court need not consider it. *See* LRCiv 7.2(g)(1). As to the cases that were cited previously—*Waid v. County of Lyon*, 87 F.4th 383 (9th Cir. 2023), and *Hart v. City of Redwood City*, 99 F.4th 543 (9th Cir. 2024)—those cases do not squarely govern this case when they did not involve an individual who was suspected of committing aggravated assault with a handgun six weeks earlier, committed aggravated assault against an officer by hitting a patrol vehicle with his vehicle, ran at an officer while holding a black object that was not a weapon and was not characterized as such until five days after the incident, and was shot and killed. *See Waid*, 87 F.4th at 389 (officers entitled to qualified immunity for the shooting death of a decedent who was unarmed where officers responded to active domestic violence situation, decedent used aggressive language with the officers, decedent ignored an order from the officers and rushed towards them in a small and confined space); *Hart*, 99 F.4th at 545 (no Fourth Amendment violation where decedent had a knife, ignored clear commands to drop the

knife, advanced towards officers while brandishing the knife, and an attempt to use less than deadly force to subdue decedent was ineffective).

In short, Defendants have not shown the Court erred in denying qualified immunity to Defendant Caudillo.

**B. State-Law Claims**

Defendants argue that Pima County is not the proper Defendant for Plaintiffs' state-law claims. (Doc. 87 at 18.) First, Defendants could have, but did not, make this argument in their summary judgment briefing. Second, Defendants cite *Fridena v. Maricopa County*, 504 P.2d 58 (Ariz. Ct. App. 1972), with no explanation of how *Fridena* applies to this case. It is not the Court's responsibility to divine the basis for Defendants' Motion. Thus, Defendants have not shown the Court erred in this regard.

Finally, Defendants contend that the Stricklens' property damage claim fails because Defendant Caudillo's actions were objectively reasonable as a matter of law, and "[f]iring his gun was privileged." (Doc. 87 at 18.) As the Court noted in the September 27, 2024 Order, there are genuine disputes of material fact regarding whether Defendant Caudillo's conduct was objectively reasonable. (Doc. 85 at 39.) Accordingly, Defendants have not shown the Court erred in denying summary judgment as to the property damage claim.

For the foregoing reasons, Defendants' Motion for Reconsideration will be denied.

**IT IS ORDERED** that Defendants' Motion for Reconsideration (Doc. 87) is **denied**.

Dated this 3rd day of February, 2025.

Honorable Rosemary Márquez
United States District Judge